MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

ANDREW P. CAPUTO (CABN 203655)
NATALIE LEE (CABN 277362)
Assistant United States Attorneys

    450 Golden Gate Ave., Box 36055
    San Francisco, California 94102
    Telephone:  (415) 436-7200
    Fax: (415) 436-7234
    E-Mail: andrew.caputo@usdoj.gov
    E-Mail: natalie.lee2@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, </br> </br>     Plaintiff, </br> </br>   v. </br> </br> DEBORAH JEAN MADDEN, </br> </br>     Defendant. | No. CR 11-0879 SI </br> </br> UNITED STATES'S TRIAL MEMORANDUM </br> </br> Date: January 10, 2013 </br> Time: 11:00 a.m. |

The United States respectfully files its trial memorandum in this matter.

I.   <u>The Charged Crime.</u>

Defendant Deborah Jean Madden is charged with a single count of acquiring or obtaining possession of cocaine by misrepresentation, fraud, forgery, deception, or subterfuge, in violation of 21 U.S.C. § 843(a)(3).  There are three elements to this crime.  First, the defendant must have acquired or obtained possession of cocaine.  Second, the defendant must have done so by misrepresentation, fraud, forgery, deception, or subterfuge.  Third, the defendant must have done so knowingly or intentionally.

II. <u>Evidence in Support of the Charge.</u>

Defendant worked as a criminalist in the narcotics unit of the San Francisco Police Department's ("SFPD's") Criminalistics Laboratory ("crime lab"). Her duties focused on identifying and weighing suspected controlled substances.

In November 2009 there were three criminalists working in the crime lab's narcotics unit: defendant, Tasha Smith, and Lois Woodworth, the unit's supervisor. Each criminalist had an individual evidence storage locker, which she used to store narcotics evidence that had not yet completed the testing and review process. Keys for the lockers were kept in a keybox to which each of the criminalists had access. On the morning of November 24, 2009, Ms. Smith arrived at work, opened her evidence locker, and discovered that the evidence envelopes in the locker had been disturbed. She reported the disturbance to Ms. Woodworth, who said she had not been in Ms. Smith's locker. Ms. Woodworth directed Ms. Smith to ask defendant whether she had entered Ms. Smith's locker. When Ms. Smith left the crime lab at the end of the previous workday, defendant was the only person physically present in the narcotics unit. At around this time, defendant had begun working late on many days without putting in for overtime.

When approached by Ms. Smith, defendant denied entering Ms. Smith's locker. Ms. Smith reported defendant's denial to Ms. Woodworth, who began preparing an investigation into the matter. At this point defendant reversed her original denial and admitted entering Ms. Smith's locker, claiming implausibly that she had done so in order to retrieve a lab report contained in one of the evidence envelopes in the locker. Ms. Woodworth pointed out to defendant the illogic of this explanation, since copies of lab reports were readily available elsewhere in the crime lab. Defendant claimed she had been unable to find the copy of the report at the other location. She said she had really needed the report and thus had entered Ms. Smith's evidence locker to find it. Ms. Woodworth told defendant that she would write up defendant for this violation of laboratory procedures.

On December 16, 2009, about three weeks after the incident with Ms. Smith's evidence locker, Ms. Woodworth received a phone call from defendant's sister, Veronica Grossi. Ms. Grossi told Ms. Woodworth that she had discovered in defendant's bedroom a vial containing

white powder.[1] This development in combination with defendant's suspicious entry into Ms. Smith's evidence locker caused Ms. Woodworth to suspect that defendant might be taking cocaine from the lab. Ms. Woodworth responded by reviewing evidence envelopes containing cocaine that had been in the narcotics unit in recent months and reweighing drug evidence from envelopes that seemed suspicious – for example, because the evidence envelopes bore evidence of having been stapled shut multiple times or had been held in the narcotics unit for an unusual length of time. These reweighs revealed that the amount of powder cocaine contained in several of the evidence envelopes was meaningfully less than the amount specified in the lab report prepared by the relevant criminalist. At the request of SFPD investigators, laboratories of the California Department of Justice ("Cal DOJ") subsequently reweighed the contents of the same evidence envelopes that Ms. Woodworth had reweighed, as well as dozens of additional evidence envelopes that had been in the SFPD crime lab at around this same time. The Cal DOJ reweighs confirmed the results of Ms. Woodworth's reweighs and identified additional evidence envelopes that contained significantly less cocaine than specified in the original SFPD lab reports.

    SFPD Internal Affairs investigators then interviewed defendant in February 2010. She confessed to taking cocaine from the crime lab. In an apparent effort to explain or excuse her culpability, defendant claimed that she took only small amounts of cocaine from the crime lab on only a few occasions and that she only took cocaine that had spilled during the narcotics testing process. Investigators subsequently obtained and executed a state warrant to search defendant's home in San Mateo. The searching officers found 0.09 grams of cocaine in Madden's bedroom, wrapped in a waxy paper consistent with the type of weighing paper used in the crime lab. The waxy paper bore Madden's fingerprints.

---

[1] The government does not intend to call Ms. Grossi at trial. During Ms. Woodworth's direct examination, it intends to have her testify about Ms. Grossi's report of finding the vial of white powder in defendant's bedroom. Because the government will offer Ms. Grossi's report of the vial solely to explain what Ms. Woodworth did next (retest cocaine evidence at the lab to see if anything was missing) and not for the truth of the matter asserted, Ms. Grossi's statement will not be hearsay. The government consents to a limiting instruction about the admission of Ms. Grossi's report of the vial, if defendant wishes one.

U.S.'S TRIAL MEMO.
CR 11-0879 SI     3

III.   Evidentiary, Procedural, and Other Anticipated Legal Issues.

   A.   Disclosure and Discovery.

The United States has provided defendant with extensive discovery, including expert disclosures for the expert witnesses it intends to call. If any new reports or other relevant information are received, the government will provide them in timely fashion to the defense.

In response to our requests for reciprocal discovery, defendant's counsel has represented that the defense intends to call no witnesses at trial and therefore will provide no reciprocal discovery. The United States is relying on this representation.

The United States has disclosed to the defense the transcripts of witness testimony that occurred before the grand jury.

   B.   Stipulations

The parties have reached conceptual agreement on the following four stipulations, which will avoid the need to call four witnesses who testified at the original trial:

   1.   Authentication of Crime Lab payroll records and identification of the pay codes (overtime pay, holiday pay, etc.) contained in them. This stipulation will avoid the need to call Belinda Chin as a witness.

   2.   Authentication of the Crime Lab keycard and alarm data; explanation of how the data is captured, how the user codes work, and how the clocks work in the two data systems. This stipulation will avoid the need to call Pascal Szu as a witness.

   3.   That the white substance found in the glassine paper in Ms. Madden's bedroom during the search of her home on March 3, 2010, was 0.09 grams of cocaine. This stipulation will avoid the need to call Scott Reinhardt as a witness.

   4.   That the glassine paper containing the cocaine found in Ms. Madden's bedroom bore six latent fingerprints of Ms. Madden. This stipulation will avoid the need to call Samantha Dal Porto as a witness.

The parties will reduce these conceptual agreements to formal, written stipulations prior to trial.

### C. Evidence and Arguments Concerning Defendant's Alleged Alcoholism and Personal Problems

At the original trial, the jury heard evidence about defendant's alleged alcoholism and personal problems. That evidence came in through portions of the defendant's recorded February 2010 interview with law enforcement officers and through defense questions on cross examination of Lois Woodworth. Defendant's counsel made repeated references to this evidence about alcohol and personal problems during his closing arguments and argued that it explained defendant's conduct in a way that rendered her not guilty. See U.S.'s First Mot. in Limine (Doc. 75) at 3-5.

At the retrial the government will make no reference in its case in chief to defendant's alleged alcoholism or personal problems. The portions of defendant's recorded interview that we intend to introduce and play for the jury contain no reference to these issues. Neither will the government elicit information about these issues during direct examination of its witnesses. Since defendant's recorded interview is inadmissible hearsay if offered by her, defendant cannot offer the portions of her recorded interview that are not offered by the government. See id. 5-7. Defendant cannot cross-examine government witnesses about her alleged alcoholism or personal problems, since such questions necessarily would call for hearsay. See id. at 7. Accordingly, unless defendant testifies, the government opens the door, or the defense successfully articulates in advance of trial a way of offering evidence of alcoholism or personal problems that complies both with hearsay rules and Rule 403, we respectfully ask the Court to advise both parties that references to such matters would be improper in opening statements or closing arguments.

### D. Admitting Laboratory Reports Into Evidence

As it did at the original trial, the government intends to offer in evidence laboratory reports concerning the testing of narcotics evidence by various criminalists. For the lab reports prepared by criminalists other than defendant, the government will call the relevant criminalist as a witness and offer the report during the testimony of its author. For the lab reports prepared by defendant, the government will have Ms. Smith or Ms. Woodworth authenticate the report as one prepared by defendant and then offer the report in evidence. As explained in more detail in the

government's opposition to defendant's motion to exclude her lab reports, defendant's reports are properly admissible as statements of an opposing party under Federal Rule of Evidence 801(d)(2)(A) and do not implicate the Sixth Amendment's confrontation clause.

E.  Summary Evidence

Pursuant to Federal Rule of Evidence 1006, the government intends to offer in evidence summaries of payroll, alarm, keycard, evidence tracking ("Evidence on Q"), and lab-report data. We will provide copies of the summaries to defendant's counsel in advance of offering them in evidence.

F.  Jury Instructions

Defendant is charged with acquiring or obtaining possession of cocaine by misrepresentation, fraud, forgery, deception, or subterfuge. At the original trial, the jury sought definition of the terms misrepresentation, fraud, forgery, deception, and subterfuge. The law on defining terms for a jury is as follows:

> In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. United States v. Dixon, 201 F.3d 1223, 1230 (9th Cir.2000). Accordingly, the district court need not define common terms that are readily understandable to the jury. United States v. Hicks, 217 F.3d 1038, 1045 (9th Cir.2000) (holding that "false" and "statement" were common terms that the district court need not define).

United States v. Shryock, 342 F.3d 948 (9th Cir. 2003). The United States believes it would be best if the Court defined all five of these terms for the jury, to give jurors the guidance that the original jury sought and needed. In any event, it seems essential to define at least the terms fraud, forgery, and subterfuge, since they surely are not common terms that are readily understandable to a jury. Accordingly, we propose the following alternative definitions from Black's Law Dictionary, from merriam-webster.com and, in the case of the word subterfuge, from two additional online dictionaries.

From Black's Law Dictionary (9th ed. 2009):

> misrepresentation - The act of making a false or misleading assertion about something, usually with the intent to deceive. The word denotes not just written or spoken words but also any other conduct that amounts to a false assertion.

> fraud - A knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment.
>
> forgery - The act of fraudulently making a false document or altering a real one to be used as if genuine.
>
> deception - The act of intentionally giving a false impression.[2]
>
> subterfuge - A clever plan or idea used to escape, avoid, or conceal something.

From merriam-webster.com:

> misrepresentation – the act of making a false or misleading representation of something, usually with an intent to deceive or be unfair.[3]
>
> fraud – deceit or trickery, specifically the intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right; or the act of deceiving or misrepresenting.
>
> forgery – an act of making or imitating falsely, especially with intent to defraud.[4]
>
> deception – the act of giving a false impression.[5]
>
> subterfuge – deception by artifice or stratagem in order to conceal, escape, or evade; or a deceptive device or stratagem.

Of these alternative definitions, the only one that the government finds unhelpful is the merriam-webster.com definition of subterfuge, because it uses the uncommon and not-easily-understood terms "artifice" and "stratagem."  Since the following definitions of subterfuge are clearer than the merriam-webster.com definition, the government prefers them (or the Black's definition):

> subterfuge – deceit used in order to achieve one's goals (from Oxford Dictionaries, at oxforddictionaries.com).
>
> subterfuge – an action taken to hide something from someone (from Cambridge Dictionaries Online, at dictionary.cambridge.org)

---

[2]   This is the Black's definition of the noun "deceit."

[3]   Adapted from the merriam-webster.com definition of the verb "misrepresent."

[4]   Adapted from the merriam-webster.com definition of the verb "forge."

[5]   Adapted from the merriam-webster.com definition of the verb "deceive."

G.     Verdict Form

The United States proposes that the Court use the same verdict form that it used at the original trial.

H.     Jury Selection Procedures

Prior to the original trial, and in the wake of United States v. Yepiz, 685 F.3d 840 (9th Cir. 2012), cert. denied, 2012 WL 5380634 (U.S. Dec. 3, 2012), the government filed a memorandum (Doc. 43) asking the Court to adopt procedures that would prevent defendant from hoarding peremptory challenges by declining to exercise her peremptories until the end of the jury selection process and then exercising them against jurors who had been in the jury box at the time she earlier declined to exercise the challenges. We asked the Court either (a) to allow the parties to exercise a "passed" challenge only against jurors who were not in the jury box at the time the challenge was passed or (b) to use the blind strike method of exercising peremptories. The Court declined to do so. We respectfully renew our request now, for the reasons specified in our earlier memorandum (Doc. 43). We do so only in case the Court's thinking has evolved on this matter since the original trial, noting that the original trial occurred only shortly after Yepiz was decided.

DATED: January 7, 2013                        Respectfully submitted,

                                                      MELINDA HAAG
                                                      United States Attorney

                                                      _____/s/_____
                                                      ANDREW P. CAPUTO
                                                      NATALIE LEE
                                                      Assistant United States Attorneys