MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

ANDREW P. CAPUTO (CABN 203655)
NATALIE LEE (CABN 277362)
Assistant United States Attorneys

    450 Golden Gate Ave., Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7200
    Fax: (415) 436-7234
    E-Mail: andrew.caputo@usdoj.gov
    E-Mail: natalie.lee2@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 11-0879 SI |
| Plaintiff, | UNITED STATES'S SENTENCING MEMORANDUM |
| v. | |
| DEBORAH JEAN MADDEN, | Date: July 19, 2013<br>Time: 11:00 a.m. |
| Defendant. | |

Defendant Deborah Jean Madden stole cocaine from the San Francisco Police Department's crime laboratory. She did so by tampering with packages of evidence in criminal cases against criminal defendants – evidence she was supposed to analyze and safeguard in her capacity as a criminalist. Her breach of public trust resulted in the dismissal of hundreds of criminal cases. It also corroded public confidence in the integrity of the criminal justice process. She now appears for sentencing, having pleaded guilty to a charge of possessing a controlled substance in connection with her diversion of cocaine from the crime lab. The probation office recommends a sentence of a year in prison, the maximum available under the statute. The

United States joins this recommendation in full. We respectfully ask the Court to sentence defendant to 12 months in prison, one year of supervised release, a $5,000 fine, and a $25 special assessment.

**FACTS**

Defendant worked as a criminalist in the narcotics unit of the San Francisco Police Department's ("SFPD's") Criminalistics Laboratory ("crime lab"). Her duties focused on identifying and weighing suspected controlled substances. Presentence Report ("PSR") ¶ 7.

In November 2009 there were three criminalists working in the crime lab's narcotics unit: defendant, Tasha Smith, and Lois Woodworth, the unit supervisor. Each criminalist had an individual evidence storage locker, which she used to store narcotics evidence that had not yet completed the testing and review process. Keys for the lockers were kept in a keybox to which each of the criminalists had access. On the morning of November 24, 2009, Ms. Smith arrived at work, opened her evidence locker, and discovered that the evidence envelopes in the locker had been disturbed. She reported the disturbance to Ms. Woodworth, who said she had not been in Ms. Smith's locker. Ms. Woodworth directed Ms. Smith to ask defendant whether she had entered Ms. Smith's locker. When Ms. Smith left the crime lab at the end of the previous workday, defendant was the only person present in the narcotics unit. At around this time, defendant had begun working late on many days without putting in for overtime. Id. ¶¶ 7-8.

When approached by Ms. Smith, defendant denied entering Ms. Smith's locker. Ms. Smith reported defendant's denial to Ms. Woodworth, who began preparing an investigation into the matter. At this point defendant reversed her original denial and admitted entering Ms. Smith's locker, claiming implausibly that she had done so in order to retrieve a lab report contained in one of the evidence envelopes in the locker. Ms. Woodworth pointed out to defendant the illogic of this explanation, since copies of lab reports were readily available elsewhere in the crime lab. Defendant claimed she had been unable to find the copy of the report at the other location. She said she had really needed the report and thus had entered Ms. Smith's evidence locker to find it. Ms. Woodworth told defendant that she would write up defendant for this violation of laboratory procedures. Id. ¶¶ 8-9.

On December 16, 2009, about three weeks after the incident with Ms. Smith's evidence locker, Ms. Woodworth received a phone call from defendant's sister, Veronica Grossi. Ms. Grossi told Ms. Woodworth that she had discovered in defendant's bedroom a vial containing white powder. This development in combination with defendant's suspicious entry into Ms. Smith's evidence locker caused Ms. Woodworth to suspect that defendant might be taking cocaine from the lab. Ms. Woodworth responded by reviewing evidence envelopes containing cocaine that had been in the narcotics unit in recent months and reweighing drug evidence from envelopes that seemed suspicious – for example, because the evidence envelopes bore evidence of having been stapled shut multiple times or had been held in the narcotics unit for an unusual length of time. These reweighs revealed that the amount of powder cocaine contained in several of the evidence envelopes was meaningfully less than the amount specified in the lab report prepared by the relevant criminalist. At the request of SFPD investigators, laboratories of the California Department of Justice ("Cal DOJ") subsequently reweighed the contents of the same evidence envelopes that Ms. Woodworth had reweighed, as well as dozens of additional evidence envelopes that had been in the SFPD crime lab at around this same time. The Cal DOJ reweighs confirmed the results of Ms. Woodworth's reweighs and identified additional evidence envelopes that contained significantly less cocaine than specified in the original SFPD lab reports. Evidence presented by the government at trial documented a total of approximately 15 grams of cocaine missing from nine evidence envelopes. Id. ¶¶ 10, 13.

SFPD Internal Affairs investigators interviewed defendant in late February 2010. She confessed to taking cocaine from the crime lab. In an apparent effort to explain or excuse her culpability, defendant claimed that she took only small amounts of cocaine from the crime lab on only a few occasions and that she only took cocaine that had spilled during the narcotics testing process. Investigators subsequently obtained and executed a state warrant to search defendant's home in San Mateo. The searching officers found 0.09 grams of cocaine in defendant's bedroom, wrapped in a waxy paper consistent with the type of weighing paper used in the crime lab. The waxy paper bore defendant's fingerprints. Id. ¶¶ 11-12.

The discovery of defendant's thefts of cocaine evidence caused SFPD abruptly to shut

down the crime lab's narcotics unit.  <u>SFPD drug-test technician accused of skimming</u>, S.F. Chron., March 10, 2010[1] ("San Francisco officials Tuesday ordered the shutdown of all drug testing at the police crime lab amid allegations that a former technician stole and used some of the cocaine she was supposed to analyze").  Madden's evidence tampering allowed defense lawyers to challenge the validity of drug evidence previously processed by the crime lab.  In addition, the lab closure triggered by her thefts meant that newly acquired drug evidence could not readily be tested.  As a result, beginning on the day after SFPD announced Madden's thefts and the resultant lab closure, state prosecutors began to dismiss criminal cases against drug defendants.  <u>Crime lab fallout: Drug defendants go free</u>, S.F. Chron., March 11, 2010[2] ("With evidence in cases Madden handled called into question and no technicians available in the now-closed crime lab to test drugs in new cases, prosecutors felt they had no choice but to free [25] defendants Wednesday").  Hundreds of charged cases ultimately were dismissed, and hundreds of new cases were not charged at all due to a lack of drug-testing capacity in the wake of the lab's closure.  PSR ¶¶ 14-15; Exhibit 1 (quantification of dismissed and discharged cases by district attorney's office).  After later testing or retesting of drug evidence by outside laboratories, prosecutors were able to re-file up to one-third of the dismissed cases and to charge about half of the new cases that had been initially discharged due to the lab closure.  PSR ¶ 15.  But even accounting for these later re-filings and filings of cases, defendant's conduct caused the dismissal or discharge of more than 700 criminal cases.  <u>Id.</u>

A federal grand jury charged defendant with acquiring cocaine by misrepresentation, in violation of 21 U.S.C. § 843(a)(3).  Two jury trials on that charge ended in mistrial.  The government then charged defendant by information with possession of cocaine, in violation of 21 U.S.C. § 844(a).  Defendant entered a guilty plea to this latter charge in March 2013.

---

[1] http://www.sfgate.com/news/article/SFPD-drug-test-technician-accused-of-skimming-3270657.php

[2] http://www.sfgate.com/default/article/Crime-lab-fallout-Drug-defendants-go-free-3270606.php

**ARGUMENT**

The Ninth Circuit has specified the appropriate sentencing procedure as follows:

> Proper sentencing procedure requires that, before imposing sentence, the district judge: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and (6) not presume that the Guidelines range is reasonable.

United States v. Blinkinsop, 606 F.3d 1110, 1114 (9th Cir. 2010) (footnote omitted). We begin where the Ninth Circuit begins, with the applicable guidelines range.

I. <u>Defendant's Guidelines Sentencing Range is 1-7 Months.</u>

Defendant contests the probation office's application of the sentencing enhancement at U.S. Sentencing Guidelines Manual section 3B1.3, which increases the base offense by two levels where "the defendant abused a position of public or private trust, <u>or</u> used a special skill, in a manner that significantly facilitated the commission or concealment of the offense" (emphasis added). Because defendant both abused a position of public trust and used her special skill as a criminalist to commit and conceal her offense, the Court should apply the enhancement.

    A. <u>Defendant Abused Her Position of Public Trust to Commit and Conceal Her Offense.</u>

Defendant abused her position of public trust as a criminalist at the crime lab in order to commit and conceal her offense. By virtue of her position, she was among a very small number of people at the police department who had unfettered, unsupervised access to opened packages of drug evidence. She used that access to take the cocaine she has admitted to possessing, when no one else was around to see her take it. The trust and discretion she enjoyed allowed her to come and go from the lab as she pleased. It let her to stay late into the night at the lab, when no one else was there or knew she was there, without having to seek permission to do so.[3]

To qualify as a position of public trust, a job must be "characterized by professional or managerial discretion (<u>i.e.</u>, substantial discretionary judgement that is ordinarily given

---

[3] The factual statements in this and the next paragraph derive from the trial testimony of Tasha Smith and Lois Woodworth, the other criminalists at the SFPD narcotics lab.

considerable deference)." U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.1. Defendant's position as a criminalist meets this test easily. She was able to decide when to come to work in the morning. Once in the lab she could assign evidence envelopes to herself without permission from anyone else. She had the discretion to open evidence envelopes whenever she chose, including when there was no one else in the room or even in the building. She alone chose the types of scientific tests to perform on each evidence sample she analyzed. While her lab reports were subject to review, they generally were reviewed by Ms. Smith, a fellow criminalist with the same level of authority as she; Madden, in turn, generally reviewed Ms. Smith's reports. While the review process consisted of Ms. Smith looking over defendant's reports, no one monitored defendant's manipulation of the drug evidence or her performance of the scientific tests on the evidence. She alone chose how long to keep her evidence envelopes at the lab and when to seal them shut. She testified in court, as an expert, about the results of her analyses. She alone chose how late to stay at the lab at night. When she left the lab at the end of the day, no one inspected what she carried with her. She had full discretion simply to walk out of the building with whatever was in her pocket or hands, get into her car, and drive into the night.

Defendant claims that her job was like a bank teller or a hotel clerk, two positions that the guidelines say lack the professional discretion necessary for positions of trust. Addendum to PSR at 2 (Objection No. 5). But these jobs have little in common with a criminalist's. They do not require scientific training or the exercise of professional judgment in selecting, for example, which test to perform on an evidence sample. They are subject to invasive, often real-time supervision and oversight, by surveillance cameras and regular audits. Bank tellers and hotel clerks do not handle illegal substances on their own as a matter of course; do not testify regularly in court as experts about their work; do not generally decide when to come to work and when to leave; and are not often left alone in their workplace for hours at a time with no customers or co-workers located anywhere in the building.

The caselaw supports application of the abuse-of-trust enhancement here. In United States v. Stella, 591 F.3d 23 (1st Cir. 2009), the defendant was a registered nurse at a hospital, who took for her own use drugs meant for patients. A hospital nurse is subject to far broader

supervision (by doctors and head nurses) than Madden experienced. In Stella, the First Circuit upheld application of the abuse-of-trust enhancement because Stella "worked independently of regular supervision" when caring for patients, "had unsupervised access to drugs" in locked cabinets, and exercised discretion in things such as deciding when to provide patients with prescribed medications. Id. at 28. The analogies with Madden's situation are clear. United States v. Lofink, 564 F.3d 232 (3d Cir. 2009), involved a defendant who was a claims processor for a state agency. The Third Circuit affirmed application of the abuse-of-trust enhancement because the agency trusted Lofink to handle claims and his supervisors delegated much of their approval responsibility to him and "were not likely to closely scrutinize" his work, id. at 242 n.20 – circumstances comparable to Madden's. Other jobs with comparable levels of discretion to Madden's have also resulted in application of the enhancement. See, e.g., United States v. Britt, 388 F.3d 1369, 1372 (11th Cir. 2004) (part-time clerk at Social Security Administration, who processed applications for social security cards, qualified for abuse-of-trust enhancement where she "was not a closely supervised employee"), vacated on other grounds, 546 U.S. 930 (2005), reinstated in relevant part, 437 F.3d 1103 (11th Cir. 2004); United States v. Hale, 685 F.3d 522, 546 (5th Cir. 2012) ("[p]olice officers hold positions of public trust" for purpose of abuse-of-trust enhancement), cert. denied, 133 S. Ct. 559 (2012).

   B.   <u>Defendant Used Her Special Skill as a Criminalist In Her Crime.</u>

The Court can and should apply the section 3B1.3 enhancement on the alternative theory that defendant "used a special skill" to significantly facilitate her crime. U.S. Sentencing Guidelines Manual § 3B1.3. A special skill is "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include ... chemists ... ." Id. § 3B1.3 cmt. n.4. Madden's skills as a criminalist required substantial education and training. She used her chemistry education and training in her day-to-day work. Her skills as a criminalist were essential to her crime; without them she would not have had access to the cocaine she stole. The caselaw supports a special-skills enhancement here. United States v. Fairchild, 940 F.2d 261, 266 (7th Cir.1991) (enhancement proper in drug-manufacturing case where defendant was biologist and formerly worked as chief lab tech in

hospital); <u>United States v. Spencer</u>, 4 F.3d 115, 120 (2d Cir. 1993) (enhancement proper in drug-manufacturing case where defendant was self-taught, amateur, sophisticated chemist)

Applying the section 3B1.3 enhancement, under an abuse-of-trust and/or a special-skills rationale, results in an adjusted offense level of 8. Subtracting two points for acceptance of responsibility yields a total offense level of 6. Defendant's criminal history category is II, so her guidelines range is 1-7 months. PSR ¶¶ 21-29, 34-36, 77.

II. <u>Under the Guidelines, Defendant Warrants an Upward Departure for Significant Disruption of a Governmental Function.</u>

The sentencing guidelines provide for an upward departure where "the defendant's conduct resulted in a significant disruption of a governmental function." U.S. Sentencing Guidelines Manual § 5K2.7. The abrupt closure of the crime lab and the dismissal of hundreds of criminal cases triggered by defendant's cocaine thefts constitute significant disruptions of the government's law enforcement function. They warrant an upward departure under the guidelines.

Also relevant is the damage defendant caused to public confidence in the integrity of the criminal justice system. Defendant worked in law enforcement for the police department. The results of her evidence testing were used to send countless defendants to prison. But while she was helping to convict and punish other people for breaking the drug laws, she was breaking the same laws herself, and tampering with evidence in the process. There cannot be one set of rules and expectations for the people who operate the criminal justice system and another for everyone else. To suggest that there is, as defendants cocaine thefts did, sends a corrosive message that makes people doubt the ability of their government to effect even-handed justice.

Courts have taken these issues of public confidence and integrity into account in deciding whether to impose an upward departure for significant disruption of a governmental function. As one court held in deciding to depart upwardly in a case where a sheriff committed a crime: "Confidence in our legal system is undermined when those who are charged with enforcing the law choose to break the law instead." <u>United States v. Walker</u>, 21 F. Supp. 3d 1288, 1293 (N.D. Okla. 1997), <u>aff'd</u>, 153 F.3d 729 (10th Cir. 1998). <u>See also</u> <u>United States v. Khan</u>, 53 F.3d 507,

518 (2d Cir.1995) (affirming § 5K2.7 departure where fraud disrupted efficient administration of Medicaid and "undermined the public's confidence in government"); United States v. Gunby, 112 F.3d 1493, 1502-03 (11th Cir.1997) (rejecting defendant's argument that "disruption" cannot mean diminished respect for the legal system). This Court should do the same here.

In light of the criminal case dismissals, the lab closure, and the effect on public confidence of defendant's actions, a three-level upward departure seems like a moderate response. Adding three levels, for a final total offense level of nine, means that defendant's guidelines sentencing range would be 6-12 months.

III. Under 18 U.S.C. § 3553(a), a One-Year Sentence is Reasonable and Necessary to Reflect the Seriousness of the Offense and to Afford Adequate Deterrence.

The guidelines are the starting rather than the end point of the sentencing process. The Court's ultimate charge is to fashion a sentence that is substantively reasonable based on the totality of the circumstances, in light of the sentencing factors established by 18 U.S.C. § 3553(a). United States v. Carty, 520 U.S. 984, 991-993 (9th Cir. 2008) (en banc). That sentence may be within, higher than, or lower than the guidelines range, so long as it is reasonable in light of the sentencing factors. Id. The totality of the circumstances and the statutory sentencing factors counsel in favor of a year-long sentence here.

The statutory factors include the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). These considerations strongly support a sentence at the one-year statutory maximum. Defendant was a public official charged with testing and preserving evidence in criminal cases. Instead of meeting these duties, she tampered with evidence packages and stole cocaine for her own use. She subverted the ability of criminal defendants to have their cases adjudicated without evidence being tampered with. She breached her duty to the citizens of San Francisco to perform her job with integrity. She undercut interests of public safety and law enforcement by causing hundreds of criminal cases to be dismissed. And she eroded the confidence of criminal defendants, juries, and the public at large in the integrity of the criminal justice system. These considerations all render defendant's offense at the top end of the

scale of seriousness in cocaine-possession cases and call for the highest sentence available. Especially in light of the harm defendant caused to public confidence in the criminal justice system, it would promote respect for law to show that the justice system can and will respond forcefully to her conduct.

Equally important as the seriousness of defendant's offense is the need to afford adequate deterrence to criminal conduct by others. See id. § 3553(a)(2)(B). There is no need to deter defendant from committing the same crime again, because she never again will be in a position to steal drugs on the job. But a year-long sentence would send a powerful message to others in law enforcement, especially those with access to drugs in their professional capacity, that they must abide by the same rules as anyone else or face significant consequences. Imposing a substantial, year-long sentence would greatly advance interests of general deterrence and is an important additional reason for the Court to adopt the probation office's recommendation.

## CONCLUSION

A guidelines sentencing range of 1-7 months fails to account adequately for the seriousness and corrosiveness of defendant's crime. To properly address the unusually pervasive damage she caused and to take full account of the sentencing factors specified in 18 U.S.C. § 3553(a), including the need to deter others in the future from doing what defendant did here, we respectfully ask the Court to adopt the probation office's recommendation and sentence defendant to 12 months in prison, one year of supervised release, a $5,000 fine, and a $25 special assessment.

DATED: July 12, 2013                        Respectfully submitted,

MELINDA HAAG
United States Attorney

_____/s/_____
ANDREW P. CAPUTO
NATALIE LEE
Assistant United States Attorneys