PAUL F. DeMEESTER (CABN 148578)
ALBERT J. BORO, JR. (CA SBN 126657)
Attorneys at Law
1766A – 18th Street
San Francisco, California 94107
415.305.7280; 415.861.2695 (fax)
e-mail: paulfdemeester@msn.com

Attorneys for Defendant DEBORAH JEAN MADDEN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO VENUE

UNITED STATES OF AMERICA,

      Plaintiff,

         vs.

DEBORAH JEAN MADDEN,

      Defendant.

_____/

No. CR 11-0879-SI

**Sentencing Memorandum & Objections**

Sentencing Hearing: July 19, 2013
@ 11 a.m. before the Honorable
Susan Illston, Judge Presiding

## DEFENDANT'S REQUEST FOR SENTENCE

### *Introduction*

    This sentencing hearing marks the end of a legal odyssey for Debbie Madden that began as she ended her long career as a San Francisco Police Department criminalist. Ms. Madden started work at the San Francisco Crime Lab on January 1, 1980 and retired on March 1, 2010. Three days prior to the end of her lab tenure, police inspectors

interviewed her regarding allegations that she had taken some cocaine salt from the lab for personal use. She admitted having done that. Police executed a search warrant at her San Mateo home and found 0.09 grams of a substance that later tested positive for the presence of cocaine salt. Ms. Madden was arrested on March 3, 2010 and released the next morning. See *Inmate Record* for San Mateo CJIS, attached as page 32. The district attorney for San Mateo County charged her with simple possession of cocaine, a felony, in violation of California Health and Safety Code section 11350(a). Ms. Madden resolved her case with a guilty plea under the Deferred Entry of Judgment program, whereby the charge was dismissed after she had completed a drug counseling program and tested negative for alcohol and drugs during the program term. Cal. Pen.Code, §§ 1000-1000.6; see *Proof of Completion* form dated August 31, 2011, and *Dismissal Notice* dated April 26, 2012, attached respectively as pp. 33 and 34.

The San Mateo County district attorney was asked to prosecute any charges relating to any misconduct by Ms. Madden at the San Francisco Crime Lab but declined. In April 2010, the San Francisco district attorney recused her office from the Madden case because of a potential conflict of interest. The California Attorney General stepped in but on December 2, 2010, decided not to charge Ms. Madden with any crime. A year later, the United States Government (Government) obtained the grand jury indictment against Ms. Madden on which she was tried twice. After two hung juries, both parties reached an agreement to resolve the case on the basis of a misdemeanor simple possession of cocaine salt, while leaving the appropriate sentence up to the Court.

The Government and the United States Probation Office both recommend a one-year sentence based primarily on the closure of the lab's narcotics unit and the dismissal of cases. But neither the Government nor the Probation Office have conducted a critical examination to determine whether those events are attributable to Ms. Madden. Such examination – conducted herein - reveals that Ms. Madden is not to blame for either.

Ms. Madden stands before the Court as a fallible human being, who has battled alcoholism all of her adult life but who may proudly state that she has been sober since December 16, 2009. She has turned her long struggle with the bottle into doing good for others, within her Alcoholics Anonymous (AA) community and by studying to become a substance abuse counselor.

The last years of Ms. Madden's career at the Crime Lab were marked by negative events in her life: a nine-month bout with breast cancer starting in June of 2003; the illness of her mother in 2004, an illness that had started just two weeks after Ms. Madden's cancer treatment (chemotherapy and radiation) had ended in March of 2004, and to which illness her mother succumbed on October 24, 2004; the 2007 tumultuous end to a 17-year domestic relationship (culminating in an alcohol-fueled incident that led to misdemeanor domestic violence and vandalism convictions); and a sad reunion with the bottle that spiraled out of control during the Fall of 2009.

Successful in her fourth year of recovery from alcoholism, but worried still about any recurrence of cancer, Ms. Madden is not a candidate for prison. Instead, she is an ideal candidate for probation, with a modest amount of home detention as a condition of probation. This memorandum outlines why.

Defendant Madden's Sentencing Memo

## I.  DEBBIE MADDEN – THE SUCCESSFUL TURN-AROUND

### A.  Sober and Counting

The trial evidence demonstrated that by December 15, 2009, Ms. Madden was at a low point in her life.  The alcohol had gotten the better of her.  She had resorted to cocaine salt in an unsuccessful attempt to reduce her alcohol consumption.  Her employment had ended on a sad note.  Less than two weeks earlier she had attempted suicide.

Alcohol problems had marked her marriage (1978-1982) and landed her in hospital for detox and/or treatment (1987, 1996) or at Camp Recovery Center in Santa Cruz County for 30-day residential stints in both 2007 and 2009-2010.  PSR, ¶¶ 44, 62, 63.

Alcoholism is a disease that is not easily overcome.  But all indications are that Ms. Madden has turned the corner and has been an unmitigated success in her recovery.  Upon successful completion of her 30-day detox and treatment program after her December 15, 2009 admission at the Camp Recovery Center, counselors recommended that she attend daily AA sessions for 90 days.  Ms. Madden did that and then some.

After the 90 days, Ms. Madden continued and still continues to attend AA meetings at least five to six times per week, sometimes three meetings a day.  The AA program has been central to her life since her retirement, as evidenced by the many letters from her colleagues in AA.  Andrea Fadelli tells us how Ms. Madden has become not just an attendee at AA meetings but how she volunteers whenever work is to be done at the meetings.  Fadelli Letter, attached at p. 35.  Elizabeth Crosman admires how she

volunteers to speak at the meetings. Crosman Letter, attached at p. 36. Valerie Blatteis writes that Ms. Madden is "always ready to help and pitch in where needed." Ms. Blatteis speaks highly of Ms. Madden's efforts to help a 90-year old member who moved across the Bay make the meetings in Foster City by driving her back and forth from her new home. Blatteis Letter, attached at p. 37. Kimberly Stevens "can't say enough about ... Debbie's service in and out of the program of Alcoholics Anonymous." Stevens Letter, attached at p. 38. Nancy Griffin gained a friend in Ms. Madden, pointing to Ms. Madden's love for dogs and her enthusiasm for helping others with alcohol and drug problems. Ms. Griffin "noticed right away that Debbie was so glad to be sober and she always said so many good things about staying sober when she shared with the group." Griffin Letter, attached at pp. 39-41.

What struck John Syracuse when he first met Ms. Madden in 2010 was her "sincere humility" and how she has become an inspiration to himself and other recovering alcoholics and addicts by her positive attitude and outlook. He describes how Ms. Madden is an active member in AA, how she regularly attends book study, accompanies other members on a weekend retreat, and participates in the homeless outreach dinner. Syracuse Letter, attached at p. 42. Virginia Fortmiller describes how Ms. Madden has taken on a leadership role by serving as secretary of her AA group. Fortmiller Letter, attached at p. 43. Jeffrey Phillips writes of how Ms. Madden has become involved with the "Hospital and Institutions" arm of AA, "regularly bringing AA meetings into hospitals and rehab centers where people cannot yet attend outside meetings." He states that "Debbie's whole life has become about service to others."

Phillips Letter, attached at p. 44. Susan Roney Anderson, Ms. Madden's partner in the Hospital and Institutions Program – which includes the Maple Street Homeless Shelter in Redwood City and Our Common Ground in East Palo Alto – describes Ms. Madden as "a model for me to follow when I start letting my small problems interfere with my sobriety." Anderson Letter, attached at p. 45.

Barbara Black tells us that Ms. Madden "is a good example of how she has applied the program of Alcoholics Anonymous to her life on a daily basis." Black Letter, attached at p. 46. Fellow College of San Mateo student Robert Evans adds that Ms. Madden not only helps others with recovery but also with schoolwork. "She is always in the library, and I see her at lots of meetings." Evans Letter, attached at p. 47. John Walsh, a 45-year member of AA, informs us that Ms. Madden "is responsive to advice." Walsh Letter, attached at p. 48. Recovery colleague Joan La Macchia writes that "Deborah has become a woman of service to others with unselfish kindness." La Machhia Letter, attached at p. 49.

Neighbor Diane Scheller – who testified at trial about her sad discoveries of finding Ms. Madden holed up in her home drunk on two occasions during the Fall of 2009 – has witnessed the Debbie Madden before and after her climb to recovery, in part through her participation in AA. Gone is the feeling of being lost and depressed. The sober Debbie "loves to laugh and is very outgoing." Ms. Scheller also testified and now writes about Ms. Madden's love for children. Ms. Scheller knows as Ms. Madden has become close to the seven Scheller grandchildren. "Most mornings, you'll find Deb and Aliyah (my 3 year old granddaughter) sitting on her couch watching Dora The Explorer

_____

and eating cereal." Ms. Scheller concludes by saying that "Deb will be part of my family forever." Diane Scheller Letter, attached at p. 50. Scheller's daughter Kathleen Warner and son Jeff Scheller confirm Ms. Madden's closeness and daily contact with the seven grandkids, whom they affectionately call "Auntie Deb." Warner and Jeff Scheller Letters, attached at pp. 51-53.

Ms. Madden's sister, Veronica Grossi, has seen the "many positive changes in my sister, Debbie Madden's life, since December 2009." Ms. Grossi is the one who took her sister to the Camp Recovery Center on that dark day in Ms. Madden's life, December 15, 2009. Ms. Grossi is proud of what her sister has achieved since, expressing that she wishes that she could be as positive about life as her sister Debbie is. Grossi Letter, attached at p. 54.

Ms. Grossi's sentiments are echoed by her daughter. Kristina Joseph is proud of the example her aunt "is setting in turning such a negative into something so positive." Ms. Grossi's granddaughter Jenevieve Joseph looks up to her great aunt, who came to tell her third grade class of how a criminalist assesses a crime scene. Kristina Joseph Letter, attached at p. 55-56.

### B. Back to School

Ms. Madden has returned to school in order to become an alcohol and drug abuse counselor by obtaining her AOD [Alcohol or Other Drugs] Certificate. She wants to help others who face the same problems that she has. As a student at the College of San Mateo since the Fall Semester of 2010, she has taken the following classes: *Introduction to Alcohol/Drug Studies*; *Pharmacological & Physical Effects of Alcohol*; *Intervention,*

*Treatment & Recovery*; *Group AOD [Alcohol and Other Drug] Counseling Process*; *Individual AOD Counseling Process*; *General Psychology*; *Introduction to Psychobiology*; *Family Systems in Addiction*; *Co-Occur Disorders I*; *Experimental Psychology*; *Developmental Psychology*; *Abnormal Psychology*; *Co-Occur Disorders II: Management/Treatment*; *Oceanography*; *AOD Treatment for Incarcerated*; *Field Studies and Seminar I*. College of San Mateo Transcript of Academic Record, attached as pp. 57 (Official June 13, 2012 Transcript) and 58 (Unofficial January 4, 2013).

Ms. Madden has made the Dean's List twice and been inducted into the Phi Theta Kapp Honor Society. March 5, 2012 and February 13, 2013 Letters for Jennifer Hughes, Vice President of Student Services at the College of San Mateo, and April 27, 2012 Phi Theta Kappa Certificate, attached at pp. 59-61.

Although the January 2013 re-trial prevented Ms. Madden from completing the *Field Studies/Seminar II* program during the Spring 2013 Semester, she is registered for the *Specific Population Group AOD Study* class starting on August 21, 2013. Class Schedule Summary: Fall 2013, attached at p. 62.

Faculty member Mary Taylor Fullerton had Ms. Madden in her *Disorders II: Management & Treatment* course during the Spring 2012 Semester. She wrote that "Debbie was a model student" who earned an "A" grade and was committed to learning the subject matter:

> I enjoyed having Debbie in my class; I appreciated her rich class participation and dedicated learning efforts. It was clear she not only strived to achieve good grades, but to truly absorb, understand, and assimilate knowledge of the course content.

Fullerton Letter, attached at p. 63.

Likewise, Psychology Professor Dr. James O. Clifford, Jr., describes Ms. Madden as an inquisitive student, eager to continue her quest for knowledge outside the class room and moving on to more challenging courses. Dr. Clifford is convinced that Ms. Madden "can and will make significant contributions to several communities." Clifford Letter, attached at p. 64.

Long-time friend Dale Webdale (since 1992) sees Ms. Madden's passion and dedication to her studies and believes her friend will excel in a career as an alcohol and drug counselor. Webdale Letter, attached at p. 65.

## C.    Continuing Commitment to Serve Despite Legal Difficulties

On April 6, 1984, Ms. Madden responded to a homicide crime scene as part of her criminalist duties. She collected blood stains from the victim's body. The case went unresolved until DNA evidence uncovered a suspect through the Cold Case Program.

The suspect, Dwight Culton, went to trial in early 2011, at a time that Ms. Madden was facing prosecution. Although Ms. Madden's counsel obtained use immunity for her testimony at trial (counsel would have been remiss not to follow that route), Ms. Madden went beyond the call of duty in helping the prosecution with the case, as attested to by Assistant District Attorney Linda Allen, who was responsible for the case until shortly before trial. Without subpoena or promises, Ms. Madden helped the prosecution prepare for trial and was able to direct the prosecution to 1984 notes that helped provide critical crime scene details previously unknown to the prosecution. Ms. Madden testified at a pretrial hearing (March 30, 2011) and before the jury (April 19, 2011). Prosecutor Allen

concludes that "[h]er cooperation and testimony were instrumental in obtaining a First Degree Murder conviction."  Allen Declaration, attached at pp. 66-67.

Retired San Francisco Police Sergeant James Miller saw that professional dedication in Ms. Madden's Crime Lab tenure.  For almost twenty years, Sergeant Miller had daily contact with Ms. Madden on narcotics cases.  "She was professional at all times, and during the long period that I was interacting with her, she was a productive employee who served in an exemplary way."  She displayed empathy regarding officers on the force, asking about their home lives and problems, and supporting them in their work.  Miller Letter, attached at pp. 68-69.  Sergeant Miller's testimonial demonstrates that Ms. Madden's lapse at the end of her tenure was an aberration.

The notion that Ms. Madden's misconduct at the end of her career was out of character is further evinced by Lana Lau, who has known Ms. Madden for over fifty years, even since they met in Latin class at junior high.  Lau describes Ms. Madden as "a very caring person" and recalls how she was devoted to her mom's care, unselfishly "spending many, many hours taking her to doctor's appointments, shopping for groceries, visiting her in the hospital and rehabilitation facilities during her final years."  Lau Letter, attached at p. 70.

**D.  Health Still a Concern**

On May 20, 2003, Ms. Madden was diagnosed with breast cancer.  In short order, she underwent lumpectomy surgery, received four cycles of Adriamycin-Cytoxan chemotherapy, followed by radiation therapy and taking Arimidex medication for five years.

Blood work conducted earlier this year showed abnormal heme results ("3/28/13 SPEP abnormal, with M spike 0.2 ng/dl"). On May 15, 2013, a bone marrow aspiration and biopsy was performed. That "bone marrow specimen does not provide any strong evidence for plasma cell myeloma or B-cell lymphoma, and are consistent with a monoclonal gammopathy of uncertain significance." But new blood work is required every four months to make sure the situation does not worsen. Ms. Madden has a doctor's appointment scheduled for September 30, 2013, prior to which she needs to complete the blood study (mid-September).

Ms. Madden and her medical team have a legitimate, continuing worry about her health.

## II. WHAT HAPPENED AT THE CRIME LAB IS CONSISTENT WITH WHAT MS. MADDEN TOLD POLICE HAD HAPPENED AT THE CRIME LAB

On February 26, 2010, before any defense attorney was involved in the case, Ms. Madden was interviewed by San Francisco police. Docket No. 86-1. She told them that she had taken powder cocaine home from the lab on five occasions when some had spilled during testing. Docket No. 86-1, at pp. 44-45. The evidence at trial was consistent with her statement.

Even though the Government claims 14 discrepancies out of the many re-weighings that were conducted, the majority are suspect as being attributable to Ms. Madden's conduct. PSR, ¶ 13. But three of those discrepancies relating to November 20, 2009 are insignificant: 0.04 grams out of 20.40 grams; 0.05 grams out of 12.94 grams, and 0.01 grams out of 12.05 grams. As to a fourth discrepancy, the Government's own

trial witness, California Department of Justice criminalist Boyd Lasater testified that he could not say there was any significant difference regarding the 174 gram item (November 20, 2009) due to the balance used for such great weights, that do not permit accuracy beyond the decimal point.  A hole in the evidence bag explains a fifth discrepancy of 3.91 grams out of 26.72 grams regarding the October 30, 2009 item, as testified to by state criminalist Jillian Bartgis.  Three other discrepancies related to items analyzed by Ms. Tasha Smith (both November 5, 2009 items) and Ms. Lois Woodworth (6.01 gram November 20, 2009 item).  The evidence at trial showed that Ms. Madden had cocaine salt cases assigned to her just about every day she worked at the lab and had more stored in her locker, completely obviating any need to resort to the same substance in colleagues' lockers.  That leaves six items handled by Ms. Madden that had discrepancies of 2.71 (October 24, 2009), 0.82 (November 4, 2009), 0.71 (November 11, 2009), 2.79 (November 16, 2009), 0.42 (November 16, 2009), and 0.78 (December 2, 2009) grams.

But this does not mean that the alleged discrepancies are correct.  When the undersigned counsel requested balance calibration records from the San Mateo County district attorney's office relating to Ms. Madden's state case for simple possession, that prosecutor's office provided such records.  *Controlled Substances Balance Calibration Checks* for April through May, 2010 (4 pages); *Heusser Neweigh, LLC Mass Certificate of Calibration*, dated January 26, 2010, Heusser Neweigh Test No. 03895-10 (4 pages); *Heusser Neweigh, LLC Mass Certificate of Calibration*, dated January 26, 2010, Heusser

Neweigh Test No. 00487-10 (4 pages); and *Heusser Neweigh Certificate of Calibration*, dated January 2010 (3 pages), attached collectively at pp. 71-85.

The San Mateo County case discovery – involving the 0.09 gram substance found at Ms. Madden's home that tested positive for cocaine salt – shows that the San Mateo County Sheriff's Crime Lab is diligent about having annual balance calibration checks performed while conducting more regular <u>and documented</u> calibration checks in-house.

The San Mateo County lab's practice and procedures are in sharp contrast to the evidence adduced at trial about the San Francisco Crime Lab – where there was no evidence, much less documentation, of any internal or external balance calibration checks. In other words, before any amount may be deemed to be discrepant, it has to be shown that the original weighing in San Francisco, be it by Ms. Madden, Ms. Smith, or Ms. Woodworth, could be backed up by documented balance calibration checks of any of the balances used. This cannot be done with respect to any of the alleged discrepancy figures forwarded by the Government. Hence, there is no basis to know if the alleged discrepancies are due to differences in calibration of the various equipment or differences in the weight of substances.

This point is underscored by a comment made by the Honorable Maxine M. Chesney, United States District Court Judge in our district, who presided over the capital trial in the case of *United States v. Dennis Cyrus, Jr.*, No. CR 05-0324-MMC (*Cyrus*), wherein she commented on the San Francisco Crime Lab weight calibration practice and procedure:

Defendant Madden's Sentencing Memo

Now, the defendant is not giving up their argument that the entirety of the lab process is subject to challenge, not just the weight. But, again, the weight seemed to me to be something of some significance because of the infrequent calibration, although, frankly, it was brought up to the jury that they didn't have perhaps the most pristine practice in the lab; it wasn't made to look like a mode of lab science.

Reporter's Transcript of Proceedings, November 19, 2010, *Cyrus*, at pp. 14-15 (these two pages and the cover sheet for that day's proceedings are attached at pp. 86-88.

Judge Chesney's criticism is equally applicable to the case at bench, in light of the findings by Mr. John S. Yoshida, the Laboratory Director for the California Department of Justice Bureau of Forensic Sciences Central Valley Laboratory, which lab re-analyzed 323 items during the Madden investigation. Mr. Yoshida wrote to lead investigator Inspector Peter Walsh (twice a witness at the Madden trials) as follows:

The evaluation of weight losses was further complicated by the inappropriate use of weighing boats, papers or ziplock bags. The weighing boats and papers are supposed to be tared out (zero out the balance after the weighing boat/paper is placed on the weighing pan). This good laboratory practice appears to be sporadically used. **Lab staff indicates that sometimes they forget to zero the weighing boat/paper which adds weight to the sample or remove the weighing boat/paper after the zero out of the balance which would make the sample weigh less than it really is.**

Yoshida Letter of April 14, 2010, attached at pp. 89-90; emphasis added.

Lab Director Yoshida informed Inspector Walsh that weighing paper weighs 0.96 grams, a small ziplock bag 0.65 grams and a small weighing boat 2.18 grams. Yoshida Letter, attached at p. 89. The information related by Mr. Yoshida explains any discrepancies that were alleged by the Government to have been Ms. Madden's handiwork.

It is regrettable that the Government did not see fit to apprise the Probation Office of Director Yoshida's findings and letter, as the information directly impeaches the validity of any alleged discrepancies.

### III. THE CONTROLLED SUBSTANCES UNIT OF THE CRIME LAB WAS NOT CLOSED DUE ANYTHING MS. MADDEN DID BUT WAS CLOSED BECAUSE OF THE ISSUANCE OF TWO CRITICAL AUDITS AND THE SAN FRANCISCO POLICE DEPARTMENT'S ABYSMAL RESOURCE POLICY OF UNDERSTAFFING THE UNIT

#### A. Audits Critical of Lab Management But Not of Ms. Madden

The Government blames Ms. Madden for the closure of the Controlled Substances Unit. The blame is misplaced. Two audits were published in early 2010 that were highly critical of the Crime Lab's Controlled Substances Unit, and had little to do with any of the cocaine salt takings allegations that were leveled against Ms. Madden. Furthermore, the San Francisco Police Department had starved the Controlled Substances Unit of analysts over the years, resulting in basically one person being left to do the work of five criminalists after Ms. Madden retired. These two reasons constitute the basis for the closure of the Controlled Substances Unit.

We start our discussion with the second of the two audits as it involved Mr. John Yoshida. He and Sacramento County Laboratory of Forensic Services Director Robert A. Jarzen audited the San Francisco Crime Lab Controlled Substances Unit between March 23 and 25, 2010. The purpose of the audit was to assist the San Francisco Police Department (SFPD) in assessing the operation of the Crime Lab. *San Francisco Police Department Criminalistics Laboratory – Audit of the Controlled Substances Unit,*

attached at pp. 91-99. Undoubtedly, the audit was triggered by the negative audit published by the American Society of Crime Laboratory Directors (ASCLD) earlier that year, as reflected in an SFPD chronological note referring to the fact that ASCLD was not recertifying the Crime Lab and had given the Crime Lab six months to fix any deficiencies. The February 10, 2010 police notation states the following: "2/10/10 Recert to SFPD not given/mos to fix." Bates page 3306 in *U.S. v. Madden* discovery provided by the Government, attached as p. 100.

The audit criticized the San Francisco Crime Lab, *inter alia*, for: giving analysts discretion on whether to weigh gross or net weight (p. 92); not having written instructions for the maintenance and repair of balances (p. 92); not having organized maintenance and repair documentation for balances (p. 92); the need to have management set up a quality-directed (not quantity-directed) approach to casework (p. 93); the lack of adequate room or design features to effectively handle the volume of drug evidence submitted for analysis, with a recommendation that the lab accommodate five analyst work stations instead of the three they had (p. 93); having limited staff during the period July-December 2009 which created "an untenable situation and directly affects the quality of the analytical work" (p. 96); having a 48-hour turnaround time for drug cases that "has seriously hampered the growth and quality of work in the Controlled Substances Unit" whereby the "stress and strain of trying to meet the demands of court has resulted in sacrificing quality for quantity ... and possibly provided the opportunity for evidence tampering and abuse of the evidence control system" (p. 96); not having proper sealing of evidence packaging that had they been in place "could have" prevented "evidence

Defendant Madden's Sentencing Memo

tampering" (p. 96); failing to provide "a secure general drug evidence storage locker" (p. 97); having the unit supervisor Lois Woodworth assisting in analyzing drug cases, leaving her "very little time for her supervision of the Controlled Substances Unit" in addition to her forensic alcohol lab and court duties (p. 97); and not having proper direction for supervisor Woodworth (p. 97).

The audit makes abundantly clear that managerial faults and the lack of adequate staffing hampered the Controlled Substances Unit, not the temporary flaws of one of the employees who happens to make up 50% of the Controlled Substances unit where there should be at least five analysts to handle the caseload (the audit recommends having five work stations). The audit actually blames the managerial faults for creating the potential for evidence tampering.

The earlier audit, and one which was referenced in the Yoshida-Jarzen audit (see attached at p. 91) was that by the American Society of Crime Laboratory Directors (ASCLD), based on an audit conducted from November 17 through 20, 2009, before Ms. Madden was even suspected of any wrongdoing. The audit does not fault Ms. Madden for anything. Hence, its criticisms are aimed at the management of the lab, not one individual employee. The lab's practices and procedures are taken to task, not Ms. Madden's work. The ASCLD *San Francisco Police Department Criminalistics Laboratory Inspection Report* is attached at pp. 101-123.

The *Inspection Report* bluntly states that the Crime Lab's budget was not adequate to meet the written objectives of the lab. *Inspection Report*, § 1.1.2.2(I), see attached at p. 103. Clearly written and well understood documentation or procedure did not exist for

personnel evaluations and objectives.  *Inspection Report*, § 1.1.2.10(D), see attached at p. 103.  The Crime Lab did not "have and use a documented training program in each discipline and subdiscipline for employees who are new, untrained or in need of remedial training."  *Inspection Report*, § 1.3.3.1(E), see attached at p. 105.  The Crime Lab did not "have a written or secure electronic chain of custody record with all necessary data which provides for complete tracking of all evidence."  *Inspection Report*, § 1.4.1.1(E), see attached at p. 105.  The Crime Lab did not "create and maintain a uniquely identified case record for all examination and administrative documentation generated and/or received by the laboratory for each case involving the analysis of evidence."  *Inspection Report*, § 1.4.2.14(E), see attached at p. 108.  The Crime Lab scored a negative on whether "conclusions and opinions in reports" are "supported by data available in the case record," and whether "the examination documents" are "sufficiently detailed such that, in the absence of the examiner(s), another competent examiner or supervisor could evaluate what was done and interpret the data."  *Inspection Report*, § 1.4.2.16(E), see attached at p. 108.  The Crime Lab did not "have, use and document a system of technical review of the reports to ensure that the conclusions of its examiners are reasonable and within the constraints of scientific knowledge."  *Inspection Report*, § 1.4.2.22(E), see attached at p. 109.  The Crime Lab did not have a written procedure for when the lab had an indication of a significant technical problem, in order to initiate a review and take any corrective action required.  *Inspection Report*, § 1.4.2.25(E), see attached at p. 109.  The Crime Lab did not "conduct proficiency testing using re-examination or blind techniques."  *Inspection Report*, § 1.4.3.4(I), see attached at p. 110.  The Crime Lab did not have

"sufficient space provided for storage of supplies, equipment and tools." *Inspection Report*, § 3.1.2(D), see attached at p. 117. The Crime Lab did not demonstrate "general cleanliness and apparent good-housekeeping." *Inspection Report*, § 3.4.12(D), see attached at p. 120.

In its Summary section, the *Inspection Report* noted the following concerns:

> The laboratory does not have sufficient personnel resources to meet its present objectives. The laboratory must analyze most controlled substance cases within a forty-eight hour time period to prevent the dismissal of criminal charges. Mandatory overtime is continually used to meet this requirement. Even with the required overtime the laboratory does not always meet this requirement. *Inspection Report*, Summary, § 1.1.2.2(I), see attached at p. 121.

> In the Controlled Substances discipline, chain of custody records are maintained electronically. Evidence transfers which did not occur sometimes show up in the record and transfers which did occur are sometimes omitted from the record.
> In the Controlled Substances discipline, the terminal in which analysts enter electronic chain of custody information is not secured from unauthorized access. The laboratory does not have a written procedure for securing the terminal after an analyst had made an entry and steps away from the terminal. *Inspection Report*, Summary, § 1.4.1.1(E), see attached at p. 121.

> In the Controlled Substances discipline, the Controlled Substances SOP 4.A.5 states that the negative control will be free of controlled substances contaminants. Mass spectral data was not available for review in the case record for extraneous peaks found in the reagent blank/negative control. The laboratory does not have a policy to retain this data.
> In the Controlled Substances discipline, the date the analyst begins the examination is not recorded in the examination documentation. *Inspection Report*, Summary, § 1.4.2.16(E), see attached at p. 122.

> Balance verifications in the controlled substances discipline are performed on a monthly basis. In two instances balances have been taken out of service for errors without initiating a review and following the laboratory corrective action procedure. *Inspection Report*, Summary, § 1.4.2.25(E), see attached at p. 122.

Cleaning supplies, water carboy bottles, and metal storage cabinets are located in the corridors of the laboratory.
*Inspection Report*, Summary, §3.1.2(D), see attached at p. 122.

Common areas in the building which are used by the laboratory are in a poor state of housekeeping and repair.
*Inspection Report*, Summary, § 3.4.12(D), see attached at p. 122.

In his February 5, 2010 response to the ASCLD audit report, then Crime Lab Manager James Mudge admitted that the Crime Lab's budget was inadequate to meet the written objections: "The comments are noted and undisputed."  Mr. Mudge further admitted that "[s]ince there are no logbooks for the balances, there was no mechanism to record when and why the balances were removed from service."  Mr. Mudge admitted that the Crime Lab thereby violated its own Quality Assurance Manual.  Mudge Letter to ASCLD re *Inspection Report*, dated February 5, 2010, attached at pp. 124-129 (quotes are at pp. 124 and 128).

What is totally missing from the ASCLD *Inspection Report*, the Mudge response, and the Yoshida-Jarzen audit report is any blame for Ms. Madden as an individual.

**B.      One Analyst Where At Least Five Were Needed**

Manager Mudge's concession of insufficient budget points to a resource allocation problem.  The Yoshida-Jarzen report is more specific as to the meaning of an ill-advised resource policy and recommended as follows:

Increase the number of Controlled Substances Unit staff to handle the estimated 14,000+ drug cases submitted annually to the Criminalistics Laboratory.
-      In the recently issued report *An Examination of Forensic Science in California November 2009* of the California Crime Laboratory Review Task Force (http://ag.ca.gov/publications/crime_labs_report.pdf) the task force notes that the average number of drug cases completed per analyst per year (2007) was approximately 1,053 cases/analyst (Table 9,

page 64). Furthermore, the report also includes information in "ideal" drug case turnaround times of 1-20 days versus actual drug case turnaround times of 1-63 days (Table 11, page 66). The SFPD Criminalistics Laboratory's Controlled Substances Unit staff average 5,000 to 7,000 drug cases per analyst per year and provide a 2-day turnaround time.

Yoshida-Jarzen Audit Report, see attached at p. 98.

After Ms. Madden retired, the Controlled Substances Unit was down to one analyst (Ms. Smith) to analyze 12,000 (Ms. Woodworth's figure at trial – see the attached p. 130, excerpt from Ms. Woodworth's testimony at the first Madden trial last fall) to 14,000 cases (the Yoshida-Jarzen number) annually. No wonder then that the Controlled Substances Unit had to close. The workload was unbearable for the sole person left to handle the work meant for five persons. These facts show that the resource problem and resulting unit closure is not of Ms. Madden's doing.

E-mails between San Francisco Police Department and the office of the San Francisco District Attorney confirm that both the police brass and the top prosecutors were aware of the staffing problem but did little about it. When Ms. Woodworth started with the Crime Lab in 2001, there were five narcotic analyst positions in the Crime Lab. Woodworth testimony at first Madden trial, see the attached p. 131 ("When I started, there was myself and four other drug chemists.") An internal memorandum shows that in 2007, for an annual work load of 13,166 cases, there were five full-time employee ("5 FTEs") narcotics analyst positions filled. Bates p. 3465 in discovery provided by the Government, attached at p. 132. In 2008, a Crime Lab schematic shows the decline in staffing with only 2.35 positions devoted to narcotics analysis. *San Francisco Police*

Defendant Madden's Sentencing Memo

*Department Criminalistics Laboratory 2008*, attached at p. 133.  On December 15, 2009,

Ms. Woodworth sounded the alarm on the staffing levels in the Controlled Substances

Unit in a memorandum to then Crime Lab Manager Mudge, calling attention "to the

critical nature of staffing in the controlled substances unit" and pointing out that the

eligible list for hiring had been exhausted.  Woodworth Memo of December 15, 2009,

attached at p. 134.

       The alarm should have been sounded earlier as Ms. Woodworth noted in an

August 5, 2009 e-mail that her Controlled Substances Unit was "already sorely

understaffed."  Woodworth E-mail of August 5, 2009, attached at pp. 135-136 (in the

same e-mail Ms. Woodworth puts the annual case load at 14,000, not 12,000, the figure

she provided at trial).  On November 23, 2009, Ms. Woodworth wrote to then-Captain

John Goldberg that "we are indeed extremely short-staffed (down to 3 from 6)," and that

was counting Ms. Woodworth's own partial position.  Woodworth E-mail of November

23, 2009, attached at pp. 137-138.  Then-Chief Assistant District Attorney Russell J.

Giuntini recognized that "there are now only 3 narc analysts at the lab which could

impede our ability to try cases as we can't 115 [hearsay testimony through police officer

at preliminary hearing] a trial."  Giuntini E-mail of November 24, 2009, attached at p.

139.  Then-Captain Goldberg labeled the situation as "going from bad to worse" when he

noted that one of the three afore-mentioned narcotics analysts "is having medical issues."

Goldberg E-mail of December 14, 2009, attached at p. 140.  The analyst with the medical

issues was, of course, Ms. Madden, who would never return to the lab and retired instead.

And then there were two, one really if we consider that Ms. Woodworth was only helping out. No wonder then that court cases ended up being dismissed. The Police Department had starved the Crime Lab of the necessary staff levels to conduct narcotics analysis and provide testimony in court. With just one analyst, it was unrealistic to maintain the unit for 12,000 to 14,000 cases when the prosecution demanded a 48-hour turnaround and occasional testimony. Narcotics analysis had to be contracted out to outside agencies because the Police Department had neglected to fill the lab positions. Ms. Madden was not to blame.

## IV.    CASE DISMISSALS WERE UNNECESSARY

Mr. James L. Norris was the Director of the San Francisco Police Department Forensic Services Division – which included the Crime Lab - from 1995 until his retirement in 2004. Between 1987 and 1995 he had acted as the manager of the Crime Lab. Declaration of James L. Norris, attached at pp. 141-147.

Mr. Norris opines that the Madden issue could have been easily managed had there been at least five analysts performing narcotics analysis. When he managed the Crime Lab, a far worse problem arose when one of the analysts was not conducting confirmatory tests but yet reported them as if she had conducted them. Thousands of cases were affected. The analyst's employment was terminated, her cases were isolated and reanalyzed where appropriate. There were no mass dismissals of criminal cases in the courtrooms. The Controlled Substances Unit was not closed. Norris Declaration, attached at p. 142.

_____

Defendant Madden's Sentencing Memo

Mr. Norris noted that Ms. Madden has never been accused of falsifying a result. Norris Declaration, attached at p. 142. Mr. Norris is of the opinion that the Controlled Substances Unit was closed due to the critical ASCLD audit and the staff shortage. Norris Declaration, attached at p. 143. Mr. Norris noted that the Crime Lab needed two extensions in order to remedy the Crime Lab's flaws and gain recertification from ASCLD. Former Director Norris stated that the closing of the Controlled Substances Unit "was a gross overreaction." Norris Declaration, attached at p. 146.

Mr. Norris also addressed an important point about presumptive field tests. It is apparent that the Government labels the institution of such tests as a consequence of Ms. Madden's conduct. PSR, ¶ 94. But Mr. Norris points out that he tried to institute presumptive field testing during his tenure at Forensic Services to alleviate the 48-hour turnaround problem but that the Police Department refused to adopt his recommendation. Norris Declaration, attached at p. 146. The proposal resurfaced in 2007 after Mr. Norris retired but again fell on deaf ears. *Proposed Field Presumptive Testing Work Flow*, dated March 6, 2007, Bates No. 3486 in discovery provided by the Government, attached at p. 148. The failure to institute presumptive field testing earlier than 2010 was a policy and resource allocation failure by police command staff, not Ms. Madden.

Dismissing the cases was not legally necessary. In *Culton*, the first-degree murder case, Ms. Madden was a necessary witness and was offered immunity. Ms. Madden was very cooperative with the San Francisco district attorney's office in that case in 2011. The same office could have offered Ms. Madden immunity on any drug cases in which her testimony was required. No one will seriously disagree with the notion that drug

cases rank lower in seriousness than a rape-murder case such as *Culton*. Alternatively, the drugs could have been retested by a different analyst who could have testified as to those results, as was done in the 1994 case when a criminalist falsely represented having conducted confirmatory tests.

Thus, there was no legal necessity to dismiss the cases. The prosecution exercised its discretion to not file a number of cases, which was their prerogative (a number of these cases were re-filed later anyway), but the facts set forth in this memorandum demonstrate that the exercise of prosecutorial discretion had everything to do with the Crime Lab not having sufficient narcotics analysts left as well as the criticism leveled at the Crime Lab by respected auditors, and was unrelated to Ms. Madden's conduct.

Also, the San Francisco District Attorney did not have any conflict of interest in the Madden investigation and potential prosecution as the elected district attorney had recused her office from the Madden case early in 2010.

## V.    SENTENCING ISSUES

Both parties agreed to resolve this case for a guilty plea to the sole misdemeanor count charged in the superseding information filed on March 14, 2013, which accused Ms. Madden of having possessed cocaine salt on or about December 3, 2009 within the Northern District of California. In the plea agreement, Ms. Madden agreed that "[o]n or about December 3, 2009, in the city and county of San Francisco, California, I knowingly possessed cocaine outside the scope of my employment." (Plea Agreement, § 2.)

In other words, neither the charge Ms. Madden pled guilty to nor the factual basis to which she stipulated links the offense to her employment. She was never convicted of

theft, fraud or evidence-tampering. Moreover, this offense is a misdemeanor. It remains doubtful whether this case should ever have been brought in federal court.

Ms. Madden agrees that the Base Offense Level is 6. PSR, ¶ 21. The abuse of a position of public trust prong pursuant to U.S.S.G., §3B1.3, is not applicable, however, as asserted by the Probation Office. PSR, ¶ 24.

The Guidelines calculation in the Presentence Report includes a 2-point Offense Level enhancement for Abuse of Position of Trust under Section 3B1.3 of the Guidelines. PSR, ¶ 24. According to the Probation Office, this is justified by the fact that Ms. Madden "was a public employee, who worked with minimal supervision, which allowed her to facilitate the commission of the offense." *Id.* When Ms. Madden objected to this portion of the Report, the Probation Office responded that her position "as a crime lab analyst was characterized by professional discretion and . . . subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature," and pointed to her closing the crime lab at night on multiple occasions. *Id.*, at Addendum ¶ 12. The Court should reject this enhancement as contrary to the trial record and based on reasoning rejected by the Ninth Circuit and other Circuits.

The trial testimony showed that as a crime analyst Ms. Madden performed routine analytical tasks and her position was not "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, application note 1. The crime analyst job consisted of weighing samples, testing substances, and preparing reports. The Presentence Report asserts without explanation that Ms. Madden's closing of the crime lab "would leave her

subject to managerial and professional discretion," PSR Addendum, ¶ 12, but this task

merely consisted of activating the building alarm. The crime analyst job entails no

professional or managerial discretion, and instead just the routine application of tests and

protocols to many samples each day.

Applying an upward enhancement under Section 3B1.3 under the facts presented

here violates the Guidelines and Ninth Circuit precedent, which require "professional or

managerial discretion" for a position of trust. U.S.S.G., § 3B1.3 application note 1;

*United States v. Contreras*, 581 F.3d 1163, 1166, 1168 (9th Cir. 2009), *opinion adopted

by En Banc Court*, 593 F.3d 1135, 1136 (9th Cir. 2010). Holding that she did not have a

position of trust, the Court in *Contreras* reversed an upward enhancement for a prison

cook who by virtue of her position was subject only to cursory searches and had

unmonitored contact with inmates in the prison kitchen and used those freedoms to

smuggle drugs into the prison. 593 F.3d at 1164-65, 1168. The Ninth Circuit approved

the reasoning of the Eleventh Circuit in *United States v. Long*, 122 F.3d 1360, 1365-1366

(11th Cir. 1997), which rejected an enhancement for abuse of position of trust for a

prison cook who by virtue of his job "'could enter the prison without being searched'"

because this freedom "did not demonstrate the necessary discretion." *Contreras*, 581

F.3d at 1168 (quoting *Long*, 122 F.3d at 1366). Similarly, the Presentence Report's

observation that Ms. Madden's closing of the crime lab gave her unfettered access to

cocaine stored in the lab does not demonstrate the required "professional or managerial

discretion." Other Circuits have similarly rejected the "freedom" given to an employee

or the "lax supervision" or the "trust" reposed by an employer in an employee as

sufficient to constitute a "position of trust" under Section 3B1.3. *See United States v. Tann,* 532 F.3d 868, 875-876 (D.C. Cir. 2008) (holding that employee maintaining check ledger "may have occupied a position of trust in the colloquial sense that she was trusted not to use her access for nefarious purposes," but she "did not have a job that required her to exercise professional or managerial discretion"); *United States v. Edwards,* 325 F.3d 1184, 1187 (10th Cir. 2003) (fact that accounting department employee "was trusted by her employer with significant responsibility – even to the point of allowing her to bypass usual accounting controls and pick up customer checks from incoming mail – is not determinative," because "[o]pportunity and access do not equate to authority, or to the kind of 'substantial discretionary judgment that is ordinarily given considerable deference'" (quoting U.S.S.G., § 3B1.3, application note 1)); *United States v. Helton*, 953 F.2d 867, 869-870 (4th Cir. 1992) (upholding district court ruling that cashier for government agency did not hold position of trust: "being subject to lax supervision alone does not convert one's job into a 'position of trust' under section 3B1.3.").

It is worth noting that the Presentence Report does not rely on (or address) the "Use of Special Skill" prong of Section 3B1.3 to justify a sentencing enhancement. The Government did not object to its lack of inclusion in the Report, and it would be inappropriate to rely on it at this point. Nor could it serve as a basis for a sentencing enhancement because no special skill was employed "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G., §3B1.3. The Government's contention is that Ms. Madden took cocaine while working in the crime lab. She is not a "chemist" (and the job did not require a chemistry degree), and

"substantial education, training or licensing" was not needed to take or conceal cocaine from samples stored in the crime lab. *See id.*, application note 4.

With a reduction of two levels for the acceptance of responsibility, Ms. Madden's Total Offense Level should be fixed at 4, not 6. PSR, ¶ 29. Ms. Madden agrees that her Criminal History Category is II. PSR, ¶ 36. Her sentencing range is from zero to six months. U.S.S.G., Ch. 5, Sentencing Table. A grant of probation is permitted. U.S.S.G., § 5B1.1(a)(1).

Ms. Madden is an ideal candidate for probation. She successfully completed her domestic violence probation between 2008 and 2011 and successfully completed her drug counseling program relating to the state case arising from the Crime Lab investigation. Her conduct while on pretrial release in this case has been exemplary. Ms. Madden has been drug tested during both the drug counseling program and while on pretrial release. Given her successful recovery, participation in AA programs and meetings, and return to school, no doubt should exist about her capacity to perform well on probation.

Ms. Madden should not be put in custody. At age 63 and having survived a bout with cancer, she has a continuing concern that the cancer may recur. Every four months, Ms. Madden has to have her blood checked in that regard. In addition, she has been diagnosed and treated for depression. PSR, ¶ 97. Ms. Madden's age, in combination with her physical and mental health are proper considerations for a downward departure and a sentence below the advisory guidelines range. U.S.S.G., §§ 5H1.1, 5H.1.3; 18 U.S.C., § 3553(a)(1), (a)(2)(D).

A downward departure is also permitted because of the susceptibility to abuse in prison, given Ms. Madden's 30-year career as a police criminalist and her 2011 testimony for the prosecution in the *Culton* murder case. *Koon v. United States*, 518 U.S. 81, 94-95.

Also, a downward departure is permitted for post-offense rehabilitation. *Gall v. United States*, 552 U.S. 38 (2007). Ms. Madden's exceptional alcoholism recovery, which started on December 16, 2009, her dedication to helping others and seeking a degree in alcohol and drug abuse counseling, constitute grounds for such departure.

An upward departure for loss of public confidence is not warranted. The critical audits of the Crime Lab, especially the first one by ASCLD, and the wrongful staff resource policy of the San Francisco Police Department caused the loss of public confidence in the Crime Lab. Whatever impact Ms. Madden's actions may have had on public perception, they were dwarfed in actuality by the systemic failings of the Crime Lab that are documented by the audit reports.

An upward departure for disruption of governmental function is likewise not warranted. U.S.S.G., § 5K2.7. The lab's functions were disrupted when the department ran out of analysts to handle the case load and testify in court at a time when critical audits exposed managerial faults at the lab. Ms. Madden's only connection to this disruption was her retirement, an improper factor to construe against her.

### Conclusion

Ms. Madden requests to be placed on a grant of probation for three years with the following conditions: a modest amount of home detention if found appropriate by the Court; substance abuse counseling as deemed appropriate by the Probation Office; refrain

Defendant Madden's Sentencing Memo

from the consumption of alcohol; obey all laws; payment of a fine of $5,000 and a special assessment of $25.

DATED: July 15, 2013.

Respectfully submitted,


_____/s/_____
PAUL F. DeMEESTER
ALBERT J. BORO, JR.
Attorneys for Ms. Madden

ORG: SO JAIL NO: 0615529   DATE: 03/03/10 TM: 19:29   SMCSO ID: 1130897
INMATE NAME: MADDEN, DEBORAH JEAN
TRUE NAME: MADDEN, DEBORAH JEAN
RACE: W SEX: F AGE: 60 DOB: ▮▮▮▮▮▮ HT: 503 WT: 112 HR: BLN EYE: BLU
ADDRESS: ▮▮▮▮▮▮▮▮▮
SSN:           OLN: ▮▮▮▮▮▮▮   ST: CA EXP:          POB: ▮▮▮▮▮▮
HSNG: * NOT IN CSTDY *         CLASS CODE:              CURR LOC:
NEXT HEARING DATE: 04/05/10   TIME: 09:00   COURT: MCSSF   DIV/DEPT: AR
FOR: ARRAIGNMENT.                          COURT CASE: SO061552 90
SCHEDULED RLSE DT: 03/03/10 TM: 22:41   ACTUAL RLSE DT: 03/04/10 TM: 00:39
NUMBER OF BKNGS:  1
_ ALIASES           _ BOOKING DETAIL      _ CLASSIFICATION     _ MOVEMENTS
_ APPOINTMENTS
_ CUSTODY SUMMARY   _ BKG CHRONOLOGY
NEXT FUNCTION: _____ CURR FUNCTION: IMDSPREC ID: J21291-J212911   PF1=HELP

000019

000032

USAO0000900
USAO0000900



**SAN MATEO COUNTY REFERRAL
TO COUNSELING DRUG PROGRAM**

| | |
|---|---|
| NAME: | DEBORAH JEAN MADDEN |
| ADDRESS: | |
| PHONE#: | |
| PROB. FILE#: | 129439 |
| JAMS#: | 092000 |
| ( ) SPANISH SPEAKING ONLY | ( ) RE-REFERRAL |
| TODAY'S DATE: | 6/23/2011 |

**INSTRUCTIONS TO APPLICANT:**

1. You must select, contact, and register in one of the following programs for outpatient drug abuse counseling: (Check one box)

( ) **Pyramid Alternative**    (✓) **Archway**

( ) **El Centro de Libertad**   ( ) **Sitike**   ( ) **Out of County**

( ) **Other** _____

2. You must enroll in person by ___July 14, 2011___

3. ~~Upon admission to the program that you have chosen, you must complete 16 hours of treatment which include:~~ an assessment, random drug screening, and 12 step meetings as required by the program.

4. Pay a maximum fee of $ **770.00** _____ for counseling program.

**YOU WILL BE ADMINISTRATIVELY DISCHARGED FROM THE COUNSELING PROGRAM IF YOU:**

1. Miss any counseling sessions. Tardiness will be counted as an absence.
2. Do not participate in the counseling program or are disruptive.
3. Fail to pay the required fee for counseling.
4. Test positive through urinalysis for drug or alcohol use.

_____     _____
Participant Signature                                  Date

**PROOF OF ENROLLMENT**

(✗) Defendant enrolled in the Drug Counseling Program on ___7-5-11___

( ) Defendant did not enroll _____

I declare under penalty of perjury that the foregoing is true and correct.

_D. C. Yang_____     _DURAND C. YANG_____     _7/12/11_
SIGNATURE OF PROGRAM STAFF         TYPE OR PRINT NAME                    DATE

**PROOF OF COMPLETION**

(✓) Defendant completed the Drug Counseling Program on _____

( ) Defendant did not complete the Drug Counseling Program based on:
   a) non-payment.
   b) non-attendance: please provide dates _____
   c) positive U.A. (type of drug and dates; please attach lab results) _____

Comments/Recommendations  _Client had no absences and tested negative for alcohol and drugs._

I declare under penalty of perjury that the foregoing is true and correct.

_James J. Thomson_____     _James J. Thomson_____     _8/3/11_
SIGNATURE OF PROGRAM STAFF         TYPE OR PRINT NAME                    DATE

Distribution: White-P.O.   Green, Canary & Pink-Program   Gold-Defendant

Form 1943
Rev. 05/10

000033

CANARY RETURNED TO P.O. UPON ENROLLMENT
PINK RETURNED TO P.O. UPON COMPLETION

IN THE SUPERIOR COURT LIMITED JURISDICTION OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

ENDORSED FILED
SAN MATEO COUNTY

APR 2 6 2012

Clerk of the Superior Court
By___K.S. Womack_____
DEPUTY CLERK

The People of the State of California, )
                                    )
                    Plaintiff, )

vs. )
DEBORAH JEAN MADDEN )
                                      )
                          Defendant. )

Court Number NF392634A
Branch: Northern
Department

### PROBATION OFFICER'S PROGRESS REPORT AND ORDER TERMINATING DIVERSION/DEFERRED ENTRY OF JUDGMENT AND DISMISSING ACTION PURSUANT TO SECTION 1000.3 OF THE PENAL CODE OF CALIFORNIA

I, Paulina Fonseca. Deputy Probation Officer, hereby declare and report that the defendant, Deborah Jean Madden having been placed on Diversion/Deferred Entry of Judgment in the above-entitled case for a period of Eighteen (18) months on the 2nd day of June. 2011 and having fulfilled the usual terms and conditions, has:

   __X__ Maintained/completed outpatient treatment as directed at Archway on August 31, 2012.
   __X__ Other: The defendant has paid both her Probation and treatment program fees.

Respectfully submitted,

.Dated: April 12, 2012                    By: _Paulina Fonseca_____
                                       Paulina Fonseca
                                       Deputy Probation Officer

GOOD CAUSE APPEARING, said defendant, having fulfilled all the terms and conditions thereof to date;

IT IS HEREBY ORDERED that Diversion/Deferred Entry of Judgment be terminated and that the criminal charge of 11350(A) of the Health & Safety Code in the above-entitled case be dismissed according to the provisions of Section 1000.3 of the Penal Code of California.

Dated:   APR 2 0 2012              **JUDGE MARTA S. DIAZ**
                                    HONORABLE
                                    JUDGE OF THE ABOVE-ENTITLED COURT

Original:  File w/Court Clerk
Copies to: Defendant
          District Attorney
          Probation Dept. File
          Mental Health/for Mental Health Diversion only

File # 129439
Form4505
Rev.12/00

7-6-13

Honorable Judge Susan Illston

I met Debbie Madclen around 3 1/2 years ago in a Alcoholics Ancnomas meeting. She immediately got into service, meaning she took on commitments serving us as a coffee maker, a secretary - organizing sobriety chips etc.

Debbie put her hand out to be of service to AA when ever asked or when there was a need, she would volunteer to be of service with no questions asked. She wanted sobriety and went to any length to get and keep it.

Debbie is a sincere person and I respect her clearly. This program is not for people that need it but rather for people that want it. Debbie wants the program and walks her walk. She is an inspiration to me and has become a Loving, caring, helpful giving person and friend since I have had the honor to know her.

Sincerly  Andrea & Fadelli
650 678-1253

000035

Dear Honorable Judge Susan Illston,

My name is Elizabeth Tramble Crosmer. In 1996 when I was 4 years old as a sober alcoholic, I took a job as a computer programmer consultant with Owens Information Systems. OIS managed the Court Systems for San Francisco. Our office was in a former jury room, a locked in area, between courts 21 and 22 on the 3rd floor of the Hall of Justice. Part of my job was sitting outside the locked area to deliver reports to people or to take people into the locked area. As I sat outside several different people pointed out Debbie Madden from the crime lab as an example of admiration since she was willing to testify in court.

When I saw Debbie at an Alcoholics Anonymous meeting 3 1/2 years ago I went up to her and introduced myself. Debbie is indeed a person to be admired. Debbie is in service at many different meetings. She volunteers to speak at many different AA meetings. Debbie is studying to be able to help addicts of all varieties to give to others what she herself has gained. In AA we love each other until we can love ourselves.

Recently I met her niece and grand-niece from Atlanta, GA. They obviously adore her. When her niece called her to tell her her sister was in the hospital Debbie immediately got in the car and drove to Santa Cruz to see her sister in the hospital. I believe Debbie Madden is a person who will continue to bring joy to many others for years to come.

June 12, 2013

To/Honorable Judge Susan Illston

I have known Debra Madden for 3½ yrs, I met her in Alcoholics Anonymous, where she is an active and supportive member always ready to help and pitch in where needed. In AA Service is the key to staying Sober — and I don't know anyone who demonstrates that quality more than Debbie. A 90 yr old member recently moved to Alameda and Debbie drove over to pick her up to go to a meeting in Foster City, then drove her back to her New home after the meeting.

She has also gone back to school to be a drug and alcohol counselor. She gets very high grades and is a member of Phi Theta Kappa Honor Society. She is a good listener and has great instincts. She will be a great addition to the community as a counselor.

I am very proud to have her as a friend

000037

Valerie Blattes  age 77
AA member 20½ yrs

To Judge Susan Illston,                                 July 11, 2013


I have been in Alcoholics Anonymous for about 28 ½ years since Oct 1984. I meet Debbie Madden about 3 ½ years ago in that Fellowship.

She has stood out to me in many ways but first was how she dove in to service to others which is what the whole program of AA is about helping each other.

I have worked with her on her program at times as well I have spent many days/nights at Debbie's house as a good friend over dinner or appetizers with a ball game or some kind of sports. She has a great love of foot ball and baseball. So she has opened   her home to me and my partner as good friend over the years.

Her house is very fun to visit it is like going to a museum of art. She is a collector of many things and I find it just a fun place to go when invited.


So I know her in many ways but most of all through her action in Alcoholics Anonymous. As a matter fact we just got done this past weekend   June 7th-9th 2013 over a three day AA convention which we spent many hours together there in good company of many other sober Alcoholics trying to do the next right thing in life.

Last I've watched Debbie Madden over the past 2 years get very involved with helping out in many ways one of our older member of AA being she is 90 years old. Debbie picks her up and drives her places all the time and loves Trim's company which many of us do. She is a very wise sole for many of us to talk to.

Last and what I can't say enough about is Debbie's service in and out of the program of Alcoholics Anonymous.

Sincerely,

Kimberly Stevens

1151 compass Ln #204

Foster City, Ca. 94404

Cell 650/678-8050

Honorable Judge Susan Ihhston

From: Nancy Griffin
      1108 Laguna Ave #6
      Burlingame, CA. 94010
RE: Debbie Madden

I had the Pleasure of meeting Debbie
About three years ago- we met through
going to Alcoholics Anonymous Meetings
in San Mateo, Foster City and Burlingame.
I Noticed Right away that Debbie
was so glad to Be Sober and she
always said so Many good things about
Staying Sober when she Shared with the
group- I have been a Member of A.A.
for Some time, and I Needed and wanted
to hear what true Members have to Say.
Through the years and alot of A.A.
Meetings Debbie and I have Become friends.
I Love Animals and Debbie has Shared
with me About her Dog and alh the

con't

2-

Dog Shows she goes to. I like to have fun and laugh, it is always good to be with Debbie and others, Debbie has a wonderful smile and she likes to enjoy good times. Through the Program of A.A. we learn to get out of ourself and Help Others. Debbie is at the top of the list when it comes to Helping Others. Debbie has some A.A. friends that do not drive and need Assistance. Debbie always sees that they get to Meetings and she does it with a smile and love — we have a saying. "Stick With The Winners" — I can truly say Debbie is a True Winner. I Also have enjoyed when Debbie tells me About her Classes she is going through — I truly think Debbie will Be Great in the Field of helping Others with Alcohol and Drug problems. This day and age, we all seem to be in A Hurry and seem to not Have time to Show down and Be with people and listen to what they have to say. Again, Debbie

Con't

Stands out in that AREA. Debbie seems to always have time for people and she seems interested in what people have to say. I notice at a couple meetings I go to that Debbie is also there. When Debbie is not there, people always say, "Where is Debbie" the Reason, people like Debbie and want her to Be there.

I said, people told me many years ago when I started my life in AA. Nancy, stick with The Winners, Go where they Go, Do what they Do and you Will Do fine in A-A- So To end this, I stick with Debbie Madden, Because I truly think Debbie is a Winner and a "True Friend" —

Yours truly

Nancy J. Griffin



**Nancy Griffin**
**(650) 548-1187**
nancygriffin54@gmail.com

June 14, 2013

Honorable Judge Susan Illston
United States District Court
for the Northern District of California

Honorable Judge Illston,

I met Debbie Madden at a meeting of Alcoholic's Anonymous in the fall of 2010. Her attitude was one of sincere humility that comes from the admission of total defeat and complete surrender. Since then, I have observed her attendance at numerous meetings of Alcoholics Anonymous.

Although attending a variety of AA meetings, she has become an integral part of my home group, the Peninsula Primetime Group of Alcoholics Anonymous, which she attends weekly; and has continuously held a service commitment since the fall of 2010.

I have observed Debbie walk with courage and dignity through her legal challenges; and although expressing frustration, never expressed any animosity toward the judicial system or the courts. Her attitude and outlook on life has been an inspiration to me, and to many newly recovering alcoholics and addicts that face similar difficulties.

Debbie remains an active member of our AA group; she regularly attends our book study, accompanied other AA members on a weekend retreat, and participated in our outreach dinner for the homeless. By her continued actions and attitude, Debbie Madden demonstrates gratitude, first for her sobriety and her newfound freedom, but in fact for the arduous path that brought her to a new perspective on life.

As many, I love and respect the women Debbie Madden has become.

Sincerely,

John J Syracuse
415 California Drive
Burlingame, Ca 94010

June 22, 2013

From:
Virginia Fortmiller
153 Arroyo Court, #1
San Mateo, Ca 94402

Dear Judge Illston:

My name is Virginia Fortmiller. I am acquainted with Deborah Madden through her AA Home Group, Saturday AM at Foster City Recreation Center. I have known her for over three years.

I have been a member of AA for over 27 years and am a retired Personnel Analyst for the City of Burlingame.

Deborah is an example of courage and perseverance. She has grown to express her need for friendship and support. She has become an integral part of our group by assisting our fellow members and taking on a leadership role as secretary of the AA group. She has often driven us, vision impaired members, to and from the meetings. She has not taken into account the long distances thus traversed. She takes care of the grandchildren of her neighbor frequently and she does that with great responsibility and loving care.

Deborah is studying to be a *Substitute Abuse Counselor* and appears to be an outstanding candidate.

I thank you for your attention.

Virginia Fortmiller

To:
The Honorable Judge Susan Illston
From:
Jeffrey Phillips
Dear Judge Illston,

I am writing this letter in support of my friend and AA partner, Debbie Madden.
I first met Debbie in the SF Chronicle when she was a big news story locally. Soon after that, I met the actual Debbie at the Sunday night meeting in San Mateo. Recognizing her from the paper, I said to her "we've been waiting for you."
Debbie is our trusted timekeeper at the Saturday night "Primetime AA" meeting in Burlingame. She is always quick to greet the AA newcomer, and I know she performs lots of selfless service in Alcoholics Anonymous. Debbie's whole life has become about service to others. She is heavily involved with the "Hospitals and Institutions" arm of Alcoholics Anonymous, regularly bringing AA meetings into hospitals and rehab centers where people cannot yet attend outside meetings. She regularly drives elderly AA members to meetings because they can no longer drive. I know she has been helpful to elderly residents in her neighborhood by taking care of their grandkids, taking them for ice cream and to the park, the zoo and babysitting them.
A dog aficionado, Debbie is the go-to person on her block when neighbor's dogs are ill, personally tending to the ill dog, caring for them overnight etc. She is a shining light in AA, a model citizen in her community, a delight to be with, and an all around asset locally and for the planet.
I am writing these truths with all sincerity and heart.

With best wishes,

6/30/13

Jeffrey Phillips
650-888-6773

July 8, 2013

To: The Honorable Judge Susan Illston

Re: Deborah Madden

Dear Judge Illston,

I have known Debbie Madden for 3 years and have had the pleasure of her being my AA- H&I (Hospitals and Institutions) partner for approx. the same length of time which still includes Maple Street Homeless Shelter in Redwood City and Our Common Ground in East Palo Alto. In that time I have watched Debbie's AA program and her spirituality growing stronger every time I see her, which is remarkable considering her life issues. She is a constantly working with others to help them with their battles with alcohol and drugs and remains a model for me to follow when I start letting my small problems interfere with my sobriety.

I there are any questions I can answer or any other way I can help please contact me at the following,

Phone – 650-399-5571

Email - susan_roney@msn.com

Sincerely,

Roney Anderson

June 21, 2013

To: Honorable Judge Susan Illston

RE: Debbie Madden

I have known Debbie for 5 yrs.

We attend the same AA meetings.

She is a good example of how she has applied the program of Alcoholics Anonymous to her life on a daily basis. She has proven over time she has changed her thought patterns. This has changed her decision making process, which leads to her actions in day to day living.

Debbie is making living amends today. I see her driving elderly women to meetings whom can no longer drive. She is being of service to others.

Regards,

*Barbara Black*

Barbara Black

650-773-7924

To: Honorable Judge Susan Illston

My name is Robert Evans, I'm a student at College of San Mateo, and also a member of Alcoholics Anonymous. I just wanted to say that I've seen Debbie Madden grow in the fellowship and at school. I've known her for about 3 years and I see her helping others quite a bit (schoolwork, and recovery both). She has always been very nice to me, she is always in the library, and I see her at lots of meetings. It has been a pleasure to get to know her and I consider her a friend. I think the community would do well to have more people like her around.

Sincerely;

Robert Evans

650-918-8581

Honorable Susan Illston                    Refer: Deborah Madden

Your Honor:                                June 8th, 2013

My name is John Walsh and I have been a sober, active member of
Alcoholics Anonymous for 45 years.

I met Debbie Madden in AA over three years ago and have witnessed
her efforts toward building a clean and sober life. She has been a
conscientious, active member of the program, active in service and
helping others in recovery. She attends regular meetings and is
responsive to advice.

I may be reached at my home 99 - 27th Ave., apt.209, San Mateo, CA
94403, phone 650 350-1081.

Sincerely Yours,

John Walsh

July 13, 2013

Dear Honorable Judge Susan Illston,

I would like to submit my personal reference on behalf of Deborah Madden.

Debbie and I met in a recovery program over 3 years ago. I noticed that Debbie was a quiet and unassuming woman. Whenever called upon Debbie would respond positively.

Her acceptance of service commitments has been admirable. When dealing with members she was always there to lend a helping hand, especially with our older members.

Debbie has been working hard to obtain her Drug and Alcohol Citification from the College of San Mateo. She will be an asset to our community.

Debbie helps her neighbor care for her granddaughter. My feeling is that Debbie not only enjoys caretaking but has a great love for the little girl.

I have been to her home to see her favorite hobby, her award winning show dogs. Her other hobby is a collection of lunch boxes which she proudly displays on the wall in her home.

Deborah has become a woman of service to others with unselfish kindness.

Sincerely,

Joan La Macchia, Real Estate Broker and Manager

720 Promontory Point #2304, Foster City, CA 94404

Cell: 650-533-3628

Email: joan@coldwellbanker.com

June 10, 2013


Honorable Judge Susan Illston:


Dear Judge Illston:

     My husband and I met Deb Madden almost six years ago when she moved into the condo next door to us.  At the time she seemed sad and depressed.  After gradually hearing about the recent problems in her life, we understood why she was feeling lost and depressed.  We offered her our friendship and have remained very close ever since.

     The real Deb is not anything like the person we met six year ago.  She loves to laugh and is very outgoing.  She has many friends through AA who she sees or talks to daily.   She has taken an AA friend who is 90 and unable to drive, under her wing and makes sure she gets where she needs to go and also makes sure she has some fun outings.  She is a very kind and generous and you couldn't ask for a more loyal friend.

     She loves children and has become very close to my seven grandchildren.  It's now a tradition that she takes them to the county fair every year.  I'm not sure who's most excited about the day.   Most mornings, you'll find Deb and Aliyah (my 3 year old granddaughter) sitting on her couch watching Dora The Explorer and eating cereal.

     Deb will be part of my family forever.

               Sincerely,

               Diane Scheller

July 13, 2013

Honorable Judge Susan Illston

Re: Deborah Madden

Dear Judge Illston,

Over the past five years Deb has been a very important person to our family. She lives next door to my Parents house in San Mateo we spend time with her at least once a week sometimes more.

Between my brother and I we have 7 children ages (three (3 of them) eight (2 of them), eleven and thirteen. My Mom and Dad are wonderful grandparents and take care of four of the children full-time with the help of Deb almost daily. We call her Auntie Deb and refer to her house as Camp Deb. She takes the kids to the park, to the swimming pool, to the fair, the museum and the zoo, sometimes all by herself! She has a great loving generous heart and is a tremendous help to our family and the commitments that they have made to helping raise our family (or small village). She attends all of our family functions since the first time we met her. We shared birthdays ( almost one every month), as well as every holiday, Valentine's Day, St.Patricks Day, Easter, fourth of July, Labor Day, Memorial, Halloween, Thanksgiving and Christmas, as well as Sunday dinners with the family. Deb is one to celebrate the holidays and always has fun things for us to look at and treats to share. The children love to play games with her, walks with her and sometimes just a cuddle or a rub on the back.

Though I have only known Deb for five years, I have grown to love the person she is and can see how hard she works at being a good person that helps others.

If you have any questions or if I can be of further assistance please feel free to contact me.

Regards,

Kathleen Warner

Kathleen Warner

650-585-4522

Jeff Scheller
852 Kipling Avenue
South San Francisco, Ca 94080
July 14, 2013

Honorable Judge Susan Illston,

I'm writing this letter on behalf of Deborah Madden and my relationship and friendship
with her over the past five plus years.

I have known Deb since she moved next to my parents over five years ago. Honestly I
don't remember how long she's lived there because it seems like she's always been there.
Deb has become a part of the family.

I rely a lot on my family. My wife and I have four kids age ranging from 12 to 3. My
wife and I have full time jobs and my job in particular requires a lot of my time. I'm a
high school teacher; athletic director and head varsity football coach which certain times
of the year I'm at school for long hours. When that happens, the kids are at grandma and
grandpa's house and that tends to be a lot. But reality is, they aren't at grandma and
grandpas all the time because the kids can get overwhelming, they are at Aunt Deb's
house otherwise known as "Camp Deb's". She has become a big sister, an aunt, a friend
or a playmate for all four of my kids.

It hasn't always been that way. We didn't know Deb at first. She was a neighbor that had
dogs and liked tennis. The kids always liked animals and that's what started to draw the
kids toward her. They wanted to see the dogs all the time and they wanted to go to her
house. We didn't want the kids to be an intrusion, especially someone we didn't know
that well. But Deb was always around. She started to be invited to birthday celebrations,
BBQ's or just for dinner. When the kids wanted to spend time over at her house, my wife
and I were unsure just as any parent would with strangers. But over time, we got to know
Deb, especially through the kids. They would tell us all about their time at "Camp Deb's"
and all the collectible lunch boxes Deb would show them from the 60's, 70's and 80's.

July 8, 2013

We knew she was in the family when she went on vacation with us to Disneyland. She had the same enthusiasm as the kids and it was invigorating watching the kids and Deb ride as many roller coasters as possible, especially the scary ones.

My wife and I completely trust my kids with Deb and that is very important to us. She has taken all four of them, by herself, to the county fair this year for HOURS. I wouldn't have the patience or stamina to do that, but Deb does. My three-year old adores Aunt Deb and can't leave to go home until she gives her a hug.

Deb is more than a neighbor to us. She has become a member of the family. She has been

Sincerely,

Jeff Scheller



July 12th, 2013

To The Honorable Judge Roger Hutchen,

There has been many positive changes in my sister Debbie Madd(ere) life, since December 2009 Debbie went back to Rehab at The Camp in Scotts Valley Calif. After Rehab, Debbie attends college to become a Substance Abuse Counselor. Debbie also attends regular AA meetings regularly and menters and others transportation. I am so proud of my sister I wish I could be as positive about life as she is.

Thank you, please, for your consideration.

Sincerely,

(Rebecca Brown)

P. Excuse my errors.

July 4. 2013

To The Honorable Judge Illston:

I am writing this letter on behalf of my Aunt, Deborah Madden.

I have had a relationship with my aunt for as long as I can remember. She has been very important to me, but as I grew up, I was so excited to realize some of my "Quirkiness" came from her. And I'm so glad! Crazy nostalgia, Katsup on everything & an interest in criminalistics back before it was cool. Most importantly was seeing how my aunt could find the positive in everything - good, bad or absolutely the worst.

I had wanted to follow in my aunt's career path, but ended up down a different one. It resulted in the most amazing daughter. It was always remarkable how much joy was visable in my aunt Deb. Even more so was seeing how captivated my daughter, Jenevieve, was with her auntie. My aunt had such a great way of teaching Jenevieve different things.

It was no surprise that when my daughter was in her 3rd grade Gifted Class that the teacher invited Debbie to teach a module on solving a crime. It was amazing to see my aunt lay this all out for the kids, who frankly, just ate it up. It just seemed so natural all the way around.

**000055**

Fast forward to our current situation. We know why we are here. But what I need you to know is just how incredibly proud I am of my aunt. I'm proud of the example she is setting in turning such a negative into something so positive.

Recently I read this random poem on adversity through a site called "brainy quote." It went like this —
"All the adversity I've had in my life, all my troubles & obstacles have strengthened me. Obstacles possess the only strength that can overcome adversity."

I cannot imagine the adversity that my aunt has experienced through all of this. What I do know is that she has held her head up, cleaned herself up & in doing so has encouraged countless people. I would have crumbled at an 1/8th of what she has & crawled into a cave. But not my aunt. She has gone back to school to get a degree in the substance abuse counseling area.

So with all of this, Judge Illston, I pray you can catch a glimpse of the amazing woman my aunt has become through all of this. I think it takes an exceptional person to come out of such a dark place with the tenacity and gumpshun that she has shown. I'm so fortunate to have such a remarkable woman in my life & also that of my daughter.

Thank you for your time and consideration! Kristina Wahl

000056

## Cañada College
4200 Farm Hill Boulevard
Redwood City, California 94061

## College of San Mateo
1700 West Hillsdale Boulevard
San Mateo, California 94402

## Skyline College
3300 College Drive
San Bruno, California 94066

Student ID:
SSN:
Birthdate:
Level: Undergraduate
Date Issued: 13-JUN-2012

Page: 1

**Record of:** Deborah Jean Madden
**Events:** Phi Theta Kappa Beta Xi Eta Chapter

**Issued to:** Debbie Madden

| SUBJ | NO | COURSE TITLE | UNITS | GRD | PTS | E |
|------|----|-----|----|----|----|---|

**DISTRICT CREDIT:**

**Fall 2010**
College of San Mateo
| SOSC 301 | Intro to Alcohol/Drug Studies | 3.00 | B | 9.00 |
| SOSC 302 | Pharm & Phys Effects of Alcoh | 3.00 | A | 12.00 |

EUnits: 6.00 GPA-Units:6.00 Pts: 21.00 GPA: 3.50

**Spring 2011**
College of San Mateo
| SOSC 304 | Intervention, Treatment & Rec | 3.00 | A | 12.00 |
| SOSC 308 | Group AOD Counseling Process | 3.00 | A | 12.00 |
| SOSC 314 | Indiv. AOD Counseling Process | 3.00 | A | 12.00 |

EUnits: 9.00 GPA-Units:9.00 Pts: 36.00 GPA: 4.00

**Summer 2011**
College of San Mateo
| PSYC 100 | General Psychology | 3.00 | A | 12.00 |

EUnits: 3.00 GPA-Units:3.00 Pts: 12.00 GPA: 4.00

**Fall 2011**
College of San Mateo
| PSYC 220 | Introduction to Psychobiology | 3.00 | A | 12.00 |
| SOSC 307 | Family Systems in Addiction | 3.00 | A | 12.00 |
| SOSC 319 | Co-Occur Disorders I | 3.00 | A | 12.00 |

EUnits: 9.00 GPA-Units:9.00 Pts: 36.00 GPA: 4.00
Dean's List

**Spring 2012**
College of San Mateo
| PSYC 105 | Experimental Psychology | 3.00 | A | 12.00 |
| PSYC 200 | Developmental Psychology | 3.00 | A | 12.00 |
| PSYC 410 | Abnormal Psychology | 3.00 | A | 12.00 |
| SOSC 325 | Co-Occur DisordsII: Mgmt/Treat | 3.00 | A | 12.00 |

EUnits: 12.00 GPA-Units:12.00 Pts: 48.00 GPA: 4.00
Dean's List

**Summer 2012**
IN PROGRESS WORK
College of San Mateo
| OCEN 100 | Oceanography | 3.00 | IN PROGRESS |

***************** CONTINUED ON NEXT COLUMN *****************

In Progress Credits 3.00

**Fall 2012**
IN PROGRESS WORK
College of San Mateo
| SOSC 313 | AOD Treatment for Incarcerated | 3.00 | IN PROGRESS |
| SOSC 315 | Field Studies and Seminar I | 3.00 | IN PROGRESS |

In Progress Credits 6.00

***************** TRANSCRIPT TOTALS *****************
| | Earn Units | GPA Units | Points | GPA |
|---|---|---|---|---|
| TOTAL INSTITUTION | 39.00 | 39.00 | 153.00 | 3.92 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 39.00 | 39.00 | 153.00 | 3.92 |

***************** END OF TRANSCRIPT *****************

Kim Lopez, Cañada College

Dr. John R. Mosby, Skyline

Henry B. Villareal

SEE REVERSE SIDE FOR INFORMATION ON THE INTERPRETATION AND AUTHENTICITY OF THIS DOCUMENT.

**Record of:** Deborah Jean Madden
**Events:** Phi Theta Kappa Beta Xi Eta Chapter

Student ID: ▮▮▮▮▮ Page: 1
Birthdate: ▮▮▮▮▮
Level: Undergraduate
Date Issued: 04-JAN-2013

**Issued to:** Deborah Madden
unofficial

| SUBJ | NO | COURSE TITLE | UNITS | GRD | PTS | E |
|------|----|--------------|-------|-----|-----|---|

**DISTRICT CREDIT:**

**Fall 2010**
College of San Mateo
SOSC 301  Intro to Alcohol/Drug Studies  3.00 B   9.00
SOSC 302  Pharm & Phys Effects of Alcoh  3.00 A  12.00
EUnits: 6.00 GPA-Units:6.00  Pts:  21.00 GPA: 3.50

**Spring 2011**
College of San Mateo
SOSC 304  Intervention, Treatment & Rec  3.00 A  12.00
SOSC 308  Group AOD Counseling Process   3.00 A  12.00
SOSC 314  Indiv. AOD Counseling Process  3.00 A  12.00
EUnits: 9.00 GPA-Units:9.00  Pts:  36.00 GPA: 4.00

**Summer 2011**
College of San Mateo
PSYC 100  General Psychology  3.00 A  12.00
EUnits: 3.00 GPA-Units:3.00  Pts:  12.00 GPA: 4.00

**Fall 2011**
College of San Mateo
PSYC 220  Introduction to Psychobiology  3.00 A  12.00
SOSC 307  Family Systems in Addiction    3.00 A  12.00
SOSC 319  Co-Occur Disorders I           3.00 A  12.00
EUnits: 9.00 GPA-Units:9.00  Pts:  36.00 GPA: 4.00
Dean's List

**Spring 2012**
College of San Mateo
PSYC 105  Experimental Psychology   3.00 A  12.00
PSYC 200  Developmental Psychology  3.00 A  12.00
PSYC 410  Abnormal Psychology       3.00 A  12.00
SOSC 325  CO-Occur DisordsII: Mgmt/Treat  3.00 A  12.00
EUnits: 12.00 GPA-Units:12.00 Pts:  48.00 GPA: 4.00

**Summer 2012**
College of San Mateo
OCEN 100  Oceanography  3.00 A  12.00
EUnits: 3.00 GPA-Units:3.00  Pts:  12.00 GPA: 4.00

**Fall 2012**
College of San Mateo
SOSC 313  AOD Treatment for Incarcerated  3.00 A  12.00

******************** CONTINUED ON NEXT COLUMN ********************

District Information continued:
SOSC 315  Field Studies and Seminar I  3.00 B   9.00
EUnits: 6.00 GPA-Units:6.00  Pts:  21.00 GPA: 3.50

**Spring 2013**
IN PROGRESS WORK
College of San Mateo
SOSC 316  Field Studies/Seminar II  3.00 IN PROGRESS
In Progress Credits  3.00

******************** TRANSCRIPT TOTALS ********************

|  | Earn Units | GPA Units | Points | GPA |
|--|-----------|-----------|--------|-----|
| TOTAL INSTITUTION | 48.00 | 48.00 | 186.00 | 3.87 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 48.00 | 48.00 | 186.00 | 3.87 |

******************** END OF TRANSCRIPT ********************



**COLLEGE OF SAN MATEO**
1700 W. HILLSDALE BLVD.
SAN MATEO CA 94402-3757

March 5, 2012

Deborah Jean Madden

9
002536

Dear Deborah,

I am very pleased to inform you that your academic achievement in the Fall 2011 Semester at College of San Mateo has resulted in your being named to the Dean's List of Honor Students.

To qualify for the Dean's List, part-time students must accumulate 12 or more letter-graded units at a college or colleges within the San Mateo County Community College District with a grade point average of 3.30 or higher. Once qualified, the Dean's List recognizes part-time students who in a subsequent semester complete at least 6 but no more than 11.5 letter-graded units with a grade point average of 3.30 or higher in any given semester or summer session. The notation "Dean's List" for Fall 2011 will be posted on your transcript. You are among 524 of the 9,664 students enrolled at College of San Mateo in Fall 2011 so honored for this achievement.

The administration, faculty, staff, and students of College of San Mateo congratulate you on your accomplishment. We hope you will continue your high level of achievement as you pursue your educational goals in the years to come.

Very truly yours,

*Jennifer Hughes*

Jennifer Hughes
Vice President, Student Services

# College of San Mateo

1700 W. Hillsdale Boulevard
San Mateo, CA 94402-3757

Deborah Jean Madden

11
002563

Dear Deborah,

I am very pleased to inform you that your academic achievement in the Fall 2012 Semester at College of San Mateo has resulted in you being named to the Dean's List of Honor Students.

To qualify for the Dean's List, part-time students must accumulate 12 or more letter-graded units at a college or colleges within the San Mateo County Community College District. Once qualified, the Dean's List recognizes part-time students who in a subsequent semester complete at least 6 but no more than 11.5 letter-graded units with a grade point average of 3.30 or higher in any given semester or summer term. The notation "Dean's List" for Fall 2012 will be posted on your transcript. You are among 508 of the 9,121 students enrolled at College of San Mateo in Fall 2012 so honored for this achievement.

The administration, faculty, staff, and students of College of San Mateo congratulate you on your accomplishment. We hope you will continue your high level of achievement as you pursue your educational goals in the years to come.

Very truly yours,

Jennifer Hughes
Vice President, Student Services

# Phi Theta Kappa



This is to Certify That

## Deborah J. Madden

has complied with all the requirements for, and has been inducted into

## Phi Theta Kappa

### Honor Society

In witness of which we have caused the great seal of this Society to be hereto affixed and inscribed our signatures.

*Jean Mach*
Chapter Advisor

**Beta Xi Eta**
Chapter

*Executive Director*

April 27, 2012
Date



# Class Schedule Summary : Fall 2013

**Class Schedule for: Deborah J. Madden / Student ID No.** 

This is your class schedule for the semester. Individual meeting times and/or locations are listed for each class.

For best printing results, choose Landscape orientation.

| Status | CRN | Course | Course Title | Credits | Pending Grade | Date | Coll | Bldg | Room | Start | End | M T W R F S U | Note(s) | Last Refund Date | Attribute(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Registered | 92279 | SOSC 310 | Spec. Population Grp AOD Study | 3.00 | | 8/21/13 | CSM | 18 | 0308 | 6:30pm | 9:35pm | W | | 08/30/2013 | |

.: Refer to the following list if one or more letters appears in the "Notes" column.

- B = There are meeting times by arrangement with the instructor.
- C = Class was cancelled after you registered.
- S = Class is shorter than full semester. Check the Schedule of Classes for beginning and ending dates.

This is your Student Identification Card for the term. You may wish to print and carry this card to identify yourself as an enrolled student.



**RELEASE: 5.5A SMCCD**



San Mateo County
Behavioral Health & Recovery Services
2000 Alameda de las Pulgas, San Mateo, CA 94403

CONFIDENTIAL PATIENT
INFORMATION:
"See California Welfare and Institutions
Code Section 5328."

June 14, 2013

To: The Honorable Judge Susan Illston

Re: Deborah Madden

It with pleasure that I write this letter on behalf of Deborah Madden. In addition to my position as Program Specialist with the County of San Mateo, I am faculty at the College of San Mateo in the School of Social Sciences. I had the pleasure of having Debbie in my *Co-Occurring Disorders II: Management & Treatment* course in Spring of 2012. This course prepares those interested in the Addictions field to counsel and support individuals with Co-occurring Mental Health & Substance Abuse Disorders, with an emphasis on treatment of the co-occurring disorders and an empathic, hopeful, recovery approach.

Debbie was a model student; she arrived on time for each class, sat right up front prepared with whatever class assignment was due, and was always eager to participate. In reviewing my records from that semester, Debbie did not miss one class, submitted every assignment on time and obtained a 98.7% grade average earning her an "A" in my class.

I enjoyed having Debbie in my class; I appreciated her rich class participation and dedicated learning efforts. It was clear she not only strived to achieve good grades, but to truly absorb, understand, and assimilate knowledge of the course content.

Please do not hesitate to contact me with any further questions.

Kindly,

Mary Taylor Fullerton, MFT

Co-Occurring Program Specialist

San Mateo County Behavioral Health & Recovery Services

I am writing this letter with enthusiasm for Ms. Debbie Madden. Ms. Madden came to my attention as a student in the Introduction to Psychology class I teach at College of San Mateo. In this capacity I found Ms. Madden to be a well prepared, well organized, and intelligent in her class participations. Within this context I found Ms. Madden to be an inspiring person who showed a keen interest in several fields of psychological inquiry. Ms. Madden spent much time out of class continuing these discussions. In this capacity I found the applicant to be vociferous in her zeal to understand human behavior and mental processes. Towards this end Ms. Madden continued her search by enrolling in other more challenging Psychology courses I teach at the college, including Developmental Psychology, PsychoBiology, Cognitive/Experimental Psychology, and the Honors Program. As Debbie progressed through these classes she evolved several sophisticated problem-solving skills and attitudes and applied them towards very difficult and challenging topics. In this context I view Ms. Madden as a very mature learner. During this period, Debbie exemplified herself by being in the top 2% of students as judged by test performance.

Ms. Madden's cognitive capabilities, emotional stability, and general motivation come as no surprise to this writer. Ms. Madden has a tremendous sense of responsibility, ethics, and integrity that she regularly shares with those around her in class. Within this context I have witnessed Ms. Madden's exceptional ability to communicate complex ideas to fellow students when she leads group presentations and works as a peer tutor. For these reasons I feel strongly that this person can and will make significant contributions to several communities. I know that whether these are in the life sciences or any of the others she has expressed interest in, she will continue to ascend towards and achieve her academic goals with her tremendous spirit and discipline. Please receive this letter with the spirit in which I write it, and extend to this person any opportunity within your control. Ms. Madden is that type of rare student whose awesome skills and motivation are mixed into a very thought provoking person who adds to the performance of those around her.

If you have any questions, please feel free to contact me at 650-574-6380.

Thank you,

*J. O. Clifford.*

Dr. James O. Clifford, Jr.
College of San Mateo
Department of Psychology, Chair

Dale R Webdale
2040 Sutter Street #203
San Francisco, CA 94115
805-280-5095

16 June 2013

Re:  Deborah J Madden

Dear Honorable Judge Susan Illston:

This is a letter of character reference from a friend of Deborah Madden.  My name is Dale Webdale.  I am a retired engineer with a MS degree in Applied Mathematics with over 30 years experience in aerospace, medical systems, communications, and computer systems.  I have a California bilingual (Spanish) teaching certificates for the secondary and community college levels. Currently, I have a small business specializing in custom clothing and sewing instruction.

I met Ms. Madden in 1992 in a tennis clinic at the San Francisco Tennis Club.  We became friends and for many years practiced tennis weekday mornings before work.  I have found Ms Madden to be a very good friend who is extremely generous and understanding.  In my experience she has always been a very honest and truly caring person.

In addition to the tennis relationship, my husband and I have socialized with Ms Madden and her former partner.  We have attended charity auctions and other events with them on a number of occasions and they have been dinner guests at our home in San Francisco and as weekend guests at our home near Lake Tahoe. Most recently, Ms Madden attended a charity auction with us at the DeYoung Museum where one of my custom garments was featured.  I considered it most generous of her to give up her time and drive to the City to support me at this event.

We have always enjoyed Ms Madden's company and still look forward to it. Luncheons with long conversations have become regular and pleasurable activities. Lately, many of our discussions have centered on Ms Madden's studies in the Alcohol and Drug counseling program at the College of San Mateo.  She appears quite passionate and dedicated in her studies, and I believe this will be a career in which she will excel.

Thank you very much for your time and consideration in reading this letter.

Very truly yours,

Dale R Webdale

Dale R Webdale

## DECLARATION OF LINDA ALLEN

1. My name is Linda Allen. I am an Assistant District Attorney for the City and County of San Francisco.

2. I am writing to inform the court in the matter of United States v. Deborah Jean Madden (United States District Court Number CR-11-0879-SI) of Deborah Madden's role as a key witness in a homicide case that was prosecuted in San Francisco Superior Court. In People vs. Dwight Culton (Court Number 2292754 / 206260), I was the prosecutor assigned to the case up to, but not including, the jury trial which commenced in March, 2011.

3. On April 6, 1984, the body of Joan Baldwin was discovered inside a business at 555 Bryant Street. She was a victim of an apparent sexual assault-homicide. San Francisco Police Department Criminalist Deborah Madden responded to the scene to collect samples of blood stains. The case went unsolved for decades until a DNA profile developed from one of the blood samples was matched to Dwight Culton's DNA profile in a DNA database. The police were then able to match a bloody thumbprint from the victim's leg to Dwight Culton's thumbprint.

4. In August, 2008, I presented the preliminary hearing using only the bloody fingerprint match as evidence of the killer's identity. At trial, however, Ms. Madden would be a critical witness to establish the chain of custody of the DNA evidence in order to sustain the prosecution's higher burden of proof. I contacted Paul DeMeester, Ms. Madden's attorney, to inform him she was a material witness in this homicide trial. He informed me that she would cooperate with the prosecution and testify at trial.

5. In February, 2011, because I was engaged in another homicide trial, the Dwight Culton trial was reassigned to Assistant District Attorney Michael Swart. In March, 2011, we arranged through Mr. DeMeester to meet with Ms. Madden to discuss her testimony.

1  6.    On March 13, 2011, Mr. Swart and I met Mr. DeMeester and Ms. Madden at Mr.

2  DeMeester's office in San Francisco.   No promises were made to her, she was not subpoenaed

3  or required to participate, and she made no request for immunity before meeting with us.  Ms.

4  Madden was fully cooperative and assisted in the preparation of the trial.   In fact, as we were

5  reviewing the police reports, Ms. Madden noted that we did not have her written notes.  The

6  police had thought they located all of the 1984 documents generated in this case.  Her notes were

7  significant because they described in greater detail where the critical crime scene evidence had

8  been collected. Ms. Madden helped us locate her original notes in another division of the Police

9  Department.

10  7.    Ms. Madden testified on March 30, 2011, at a pre-trial hearing, and on April 19, 2011, at

11  the jury trial, after a grant of use immunity.  Her cooperation and testimony were instrumental in

12  obtaining a First Degree Murder conviction.

13      I declare under penalty of perjury under the laws of the State of California that the

14  foregoing is true and correct.

15

16  Dated:   July 10, 2013

    Linda Allen

17

18

19

20

21

22

23

24

**James Miller**
**PO Box 370759**
**Montara, California 94037**

June, 12, 2013

Honorable Susan Illtson
United States District Court
Northern District of California

Your honor,

I served as a patrol officer and sergeant with the San Francisco Police Department for thirty-four years. I was an active and engaged officer, and I had interaction with Debbie Madden frequently. For approximately twenty years, our contact was almost daily as I met with her to consult on narcotics cases that were going to preliminary hearing, other hearings or for trial. Of course, I worked with other criminalists, police officers, district attorneys and a variety of other professions that make up the criminal justice system. During the time that I worked with Debbie, the volume of cases coming into the system was at a high that has yet to be exceeded. The volume taxed all of us, no matter whether you were a court clerk, or bailiff, or police office, or criminalist.

Debbie Madden was working in a 'behind the scenes' position with little acknowledgement from the command staff at SFPD. I always admired the way she handled the constant demands and juggled the worked load with a cheerful attitude that eased my stressful job. I watched her perform tests and watched her testify. She was professional at all times, and during the long period that I was interacting with her, she was a productive employee who served in an exemplary way.

I considered myself a very hardworking member of SFPD and considered Debbie to be the same. Some police employees find ways to retreat from tasks but Debbie never did.

I knew of Debbie's life outside of the job. She had a partner, a dog, and a close relationship with her mom. We shared an interest in old houses and antiques. It was evident to me that she, like most of us, was balancing work and home life, and making it all work. Her life, at work and an outside work, was admirable. She constantly showed empathy to me, and other officers, asking about our home lives and problems.

Debbie Madden is a good person. She supported me and many other police officers when we were trying to deal with a surge in narcotics sales/use that came with the

000068

arrival of 'crack' cocaine.   There is no doubt in my mind that her service to the SFPD was of value.

Sincerely,

James Miller

July 8, 2013

Honorable Susan Illston                    **RE: Deborah Jean Madden**

Dear Judge Illston:

I have known Debbie since the early 1960's. We met in Latin class at junior high school. We roomed together during my last year in college and for a few years thereafter. We have been lifelong friends ever since. In the fifty years that I have known Debbie, she has always been a person of high integrity and moral character. It just made sense when she chose a career in Criminalistics while at the University of California at Berkeley.

Debbie has a pleasant, mild mannered personality. She enjoys spending time with her friends and family. She especially loves entertaining during the various holidays throughout the year (Easter, July 4th, Memorial Day, Christmas, etc.).

Debbie is also a very caring person. She was devoted to her mother, spending many, many hours taking her to doctor's appointments, shopping for groceries, visiting her in the hospital and rehabilitation facilities during her final years. Debbie did this unselfishly, and was able to maintain her professional life around these activities.

In more recent times, Debbie has become an "Auntie" to her neighbors' seven grandchildren. These children, ranging in ages from 3 to 13 I believe, visit Debbie quite a lot when staying with their grandparents. Debbie has spent time with them talking and listening to their daily experiences, attending school and sporting functions, taking them to the movies, etc. Debbie is also invited to many of their family functions. The youngest grandchild (Aliyah), a very bright girl of 3, usually visits Debbie on a daily basis. Aliyah watches age-appropriate movies with Debbie, "helps" Debbie with light housekeeping, etc.

Debbie has also become good friends with a ninety year old woman this last year. Since this lady gave up driving last year, Debbie has been helping her out with errands and giving her transportation to events.

In addition, Debbie had been taking courses for counseling at the local junior college with the intent of becoming a counselor for those with substance abuse issues. This falls in line with her predilection for helping others.

In closing, I wish to say that I am very thankful to call Debbie a dear and close friend. She has graciously let me use her laundry facilities and I get the pleasure of her company. It's really wonderful that we can share a meal, watch golf and football, go to the movies, just talk, and best of all, I can bounce ideas off of her when I need help thinking. Debbie is probably only one of two people whom I can count on to help me when asked for any reason. The other person is my sister.

Should you have any questions, please contact me.

Respectfully,

*Lana M. Lau*

Lana M. Lau                                         510-483-1264 (home)
2255 Fairway Drive #5                              510-710-1264 (cell)
San Leandro, CA 94577                              llau@sbcglobal.net



**San Mateo County Sheriff's Office**
**Forensic Laboratory**

*Feb*

## Controlled Substances Balance Calibration Checks

Date 2/26/10   Criminalist _ALM_   Station **A**

| Balance Manufacturer / Model | Mettler Toledo PG203 | Serial # | 1115211232 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|
| 10 mg | 0.010 g | 1.0 g | 1.000 g | 50.0 g | 50.001 g |
| 100 mg | 0.099 g | 5.0 g | 5.000 g | 100.0 g | 100.001 g |
| 500 mg | 0.500 g | 10.0 g | 10.001 g | | |

2/9/10
Date 1/27/SR   Criminalist _SR_   Station **B**
1/27/10

| Balance Manufacturer / Model | Mettler Toledo PG203 | Serial # | 1115211234 | Cal. Due | Jan 2010 | |
|---|---|---|---|---|---|---|
| 10 mg | 0.001 g | 1.0 g | 1.000 g | 50.0 g | 50 49.998 g | SR 2/9/10 |
| 100 mg | 0.101 g | 5.0 g | 5.000 g | 100.0 g | 100.001 g | |
| 500 mg | 0.500 g | 10.0 g | 10.000 g | | | |

Date 2/5/10   Criminalist _E. Cl_   Station **C**

| Balance Manufacturer / Model | Mettler Toledo XS403S | Serial # | 1127261968 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|
| 10 mg | 0.002 g | 1.0 g | 1.001 g | 50.0 g | 49.999 g |
| 100 mg | 0.100 g | 5.0 g | 4.999 g | 100.0 g | 100.00 g |
| 500 mg | 2.499 g | 10.0 g | 10.001 g | | |

Date 2/5/10   Criminalist _E. Cl_

| OHAUS I 10 (Serial # 20921) | | Weight | Result |
|---|---|---|---|
| Cal. Due | Jan-10 | 100 g | 0.100 kg |
| | | 300 g | 0.300 kg |
| | | 500 g | 0.500 kg |
| | | 1.0 kg | 0.999 kg |

Weights: Heusser Neweigh Test Sets 487-09 10; 3895-09 10; 3896-09 SR 2/9/10

**000071**

San Mateo County Sheriff's Office
Forensic Laboratory

*March*

## Controlled Substances Balance Calibration Checks

Date 3/31/10   Criminalist   ALM   Station   A

| Balance Manufacturer / Model | Mettler Toledo PG203 | Serial # | 1115211232 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|
| 10 mg | 0.008 g | 1.0 g | 0.998 g | 50.0 g | 50.001 g |
| 100 mg | 0.101 g | 5.0 g | 4.999 g | 100.0 g | 99.775 g |
| 500 mg | 0.500 g | 10.0 g | 10.000 g | | |

Date 2/26/10   Criminalist   SER   Station   B

| Balance Manufacturer / Model | Mettler Toledo PG203 | Serial # | 1115211234 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|
| 10 mg | 0.010 g | 1.0 g | 1.000 g | 50.0 g | 49.999 g |
| 100 mg | 0.100 g | 5.0 g | 5.000 g | 100.0 g | 100.001 g |
| 500 mg | 0.799 g | 10.0 g | 9.999 g | | |

Date 05/03/10   Criminalist   D. Cle   Station   C

| Balance Manufacturer / Model | Mettler Toledo XS403S | Serial # | 1127261968 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|
| 10 mg | 0.010 g | 1.0 g | 1.000 g | 50.0 g | 49.999 g |
| 100 mg | 0.100 g | 5.0 g | 5.000 g | 100.0 g | 99.999 g |
| 500 mg | 0.501 g | 10.0 g | 9.999 g | | |

Date 2/26/10   Criminalist   SER

| OHAUS I 10 (Serial # 20921) | | Weight | Result |
|---|---|---|---|
| Cal. Due | Jan-10 | 100 g | 0.100 Kg |
| | | 300 g | 0.300 Kg |
| | | 500 g | 0.500 Kg |
| | | 1.0 kg | 1.000 Kg |

Weights: Heusser Neweigh Test Sets #00487-10, #03895-10 and #03896-10 - next calibration due 1/2

**San Mateo County Sheriff's Office**
**Forensic Laboratory**

*April*

## Controlled Substances Balance Calibration Checks

Date ~~AD~~ 4/19/10 Criminalist ~~AD~~ Station **A**

| Balance Manufacturer / Model | | Mettler Toledo PG203 | Serial # | 1115211232 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|---|
| 10 mg | 0.011 g | 1.0 g | 1.000 g | 50.0 g | 49.997 g |
| 100 mg | 0.100 g | 5.0 g | 5.000 g | 100.0 g | 99.998 g |
| 500 mg | 0.500 g | 10.0 g | 10.000 g | | | |

Date 3/31/10 Criminalist SER Station **B**

| Balance Manufacturer / Model | | Mettler Toledo PG203 | Serial # | 1115211234 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|---|
| 10 mg | 0.010 g | 1.0 g | 1.000 g | 50.0 g | 49.996 g |
| 100 mg | 0.100 g | 5.0 g | 5.000 g | 100.0 g | 99.998 g |
| 500 mg | 0.499 g | 10.0 g | 10.000 g | | | |

Date 04/01/10 Criminalist B. Chr Station **C**

| Balance Manufacturer / Model | | Mettler Toledo XS403S | Serial # | 1127261968 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|---|
| 10 mg | 0.010 g | 1.0 g | 1.002 g | 50.0 g | 49.998 g |
| 100 mg | 0.101 g | 5.0 g | 5.001 g | 100.0 g | 99.999 g |
| 500 mg | 0.500 g | 10.0 g | 10.000 g | | | |

Date 3/31/10 Criminalist SER

| OHAUS I 10 (Serial # 20921) | | Weight | Result |
|---|---|---|---|
| Cal. Due | Jan-10 | 100 g | 0.100 Kg |
| | | 300 g | 0.300 Kg |
| | | 500 g | 0.500 Kg |
| | | 1.0 kg | 1.000 Kg |

Weights: Heusser Neweigh Test Sets #00487-10, #03895-10 and #03896-10 - next calibration due 1/2



**San Mateo County Sheriff's Office**
**Forensic Laboratory**

## Controlled Substances Balance Calibration Checks

Date _____ Criminalist _____ Station __A__

| Balance Manufacturer / Model | | Mettler Toledo PG203 | Serial # | 1115211232 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|---|
| 10 mg | | 1.0 g | | 50.0 g | | |
| 100 mg | | 5.0 g | | 100.0 g | | |
| 500 mg | | 10.0 g | | | | |

Date _5/1/10_ Criminalist _CeR_ Station __B__

| Balance Manufacturer / Model | | Mettler Toledo PG203 | Serial # | 1115211234 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|---|
| 10 mg | 0.011 g | 1.0 g | 1.000 | 50.0 g | 49.999 g |
| 100 mg | 0.099 g | 5.0 g | 4.999 | 100.0 g | 100.000 |
| 500 mg | 0.499 g | 10.0 g | 9.999 | | |

Date _05/03/10_ Criminalist _B.Clk_ Station __C__

| Balance Manufacturer / Model | | Mettler Toledo XS403S | Serial # | 1127261968 | Cal. Due | Jan 2010 |
|---|---|---|---|---|---|---|
| 10 mg | 0.009 g | 1.0 g | 0.999 g | 50.0 g | 49.998 |
| 100 mg | 0.099 g | 5.0 g | 4.999 g | 100.0 g | 99.999 g |
| 500 mg | 0.500 g | 10.0 g | 9.998 g | | |

Date _5/11/10_ Criminalist _ar_

| OHAUS I 10 (Serial # 20921) | | Weight | Result |
|---|---|---|---|
| Cal. Due | Jan-10 | 100 g | 0.100 kg |
| | | 300 g | 0.300 kg |
| | | 500 g | 0.499 kg |
| | | 1.0 kg | 0.999 kg |

Weights: Heusser Neweigh Test Sets #00487-10, #03895-10 and #03896-10 - next calibration due 1/2

# Heusser Neweigh, LLC
# Mass
# Certificate of Calibration

Issued to:

San Mateo County Sheriff
50 Tower Road
San Mateo, CA 94402

Heusser Neweigh Test Number:
**03895-10**

Date of Calibration:
26 January 2010

**Order Information:**

| | |
|---|---|
| Purchase Order No.: | 30000-09-D041 |
| Date Received: | 22 January 2010 |
| Submitted By: | Bill Lewellen |

**Description of the Mass Artifacts:**

| | |
|---|---|
| Manufacturer: | Heusser Neweigh |
| Serial Number: | None |
| ID/Asset Number: | None |
| Accuracy Class: | ASTM 1 |
| Description: | 10 thru 500 milligram weights |

This is to certify that the information contained in this Certificate of Calibration is true and correct as of the date of calibration. This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.



Authorized Signature

Date of Issue



**ACCREDITED**

Calibration
A2LA Certificate No.: 1823.01
ISO/IEC 17025-2005
ANSI/NCSL Z540-1-1994

Test # 03895-10
Page: 1 of 4
Date: 26 Jan 2010

**HEUSSER NEWEIGH, LLC** 1400 Willow Pass Court, Concord, California 94520  800.672.1440
This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.
Rev.100115

000075

**Calibration Information:**

| | |
|---|---|
| Metrologist 1: | ALC |
| Metrologist 2: | |
| Metrologist 3: | |

Test Method  WP-303 (Rev.2002-1)

**Environmental Conditions:**

| | | |
|---|---|---|
| Temperature: | 21.5 | ºC |
| Pressure | 1005.8 | hPa |
| Humidity: | 45.0 | % |

**Reference Standards Used:**          **Mass Comparator Used:**

| Cal ID # | Calibration Date | Calibration Due Date | | Cal ID # | Model |
|---|---|---|---|---|---|
| 56 | 1 January 2010 | January 2011 | | 18 | Mettler a5 |

**As Found / As Left Data** (unless reported In 'As Found' data):

| Nominal Mass | ID | Assumed Density g/cm³ | Conventional Mass | Correction mg | Estimated Uncertainty mg | Reference Standard ID | Comparator ID |
|---|---|---|---|---|---|---|---|
| 500 mg | | 7.95 | 499.99768 mg | -0.00232 | 0.00080 | 56 | 18 |
| 200 mg | | 7.95 | 199.99279 mg | -0.00721 | 0.00063 | 56 | 18 |
| 100 mg | | 7.95 | 99.99331 mg | -0.00669 | 0.00050 | 56 | 18 |
| 50 mg | | 7.95 | 49.99205 mg | -0.00795 | 0.00045 | 56 | 18 |
| 20 mg | | 2.7 | 20.00107 mg | +0.00107 | 0.00041 | 56 | 18 |
| 10 mg | | 2.7 | 10.00161 mg | +0.00161 | 0.00044 | 56 | 18 |

**Comments:**

The calibration interval specified is 12 months with due date of January 2011.

**Pertinent Information:**

| | |
|---|---|
| Test # | 03895-10 |
| Page: | 2 of 4 |
| Date: | 26 Jan 2010 |

HEUSSER NEWEIGH, LLC 1400 Willow Pass Court, Concord, California 94520  800.672.1440

This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.

Rev.100115

000076

The weights listed on this *Certificate of Calibration* have been compared to mass reference standards that are directly traceable to the National Institute of Standards and Technology (NIST). NIST # 822/275890 & NIST # 822/272103

The procedure used to calibrate the herein described weights and this *Certificate of Weight Calibration* meets the requirements and guidelines of ISO 17025, ISO 9002, ANCI/NCSL Z540-1-1994, ASTM E 617-97, or OIML R111, the Heusser Neweigh Quality Assurance Program (Revision 2007-1) and the purchase order referenced herein, if any.

The procedure used to disseminate an assigned value for each weight was performed through a series of intercomparisons between NIST traceable mass reference standards and the weights listed on this *Certificate of Calibration*.

Uncertainty has been calculated using the root-sum-square method to include both Type A components, assuming a normal distribution, and Type B components; with a coverage factor of k = 2 to express the expanded uncertainty with an approximate 95% confidence level.

The calibration of the weights listed on this Mass Certificate of Calibration is based on an assumed apparent mass vs. material of density 8.0 g/cm³, unless otherwise noted.


Definitions:

As Found Data—the conventional mass as it was received by Heusser Neweigh, after cleaning, but prior to adjustment or replacement.

As Left Data—the conventional mass after adjustment, repair, or replacement of the weight. The As Left data will equal the As Found data if there were no adjustment, repair, or replacement of the weight.

Calibration—the acts of determining the mass difference between a standard of known mass value and an "unknown" test weight or set of test weights, establishing the conventional mass value of the "unknown", and of determining a quantitative estimate of the uncertainty to be assigned to the stated conventional mass value of the "unknown".

Certificate of Calibration—a document that presents calibration results and other information relevant to a calibration, including the nominal mass values and corrections, together with a statement of the uncertainty of the values.

Class Tolerance—the maximum amount by which the conventional mass of the weight is allowed to deviate from the assigned nominal value, plus/minus the estimated uncertainty.

Conventional Mass—conventional value of the result of a weight at 20 °C.

Correction—mass values are traditionally expressed by two numbers, one being the nominal mass of the weight, and the second being a correction. The mass of the weight is then the assigned nominal value plus the assigned correction. Positive corrections indicate that the weight embodies more mass than is indicated by the assigned nominal value.

Nominal Mass—the mass value as indicated on the weight.

Traceability—the property of the result of a measurement or the value of a standard whereby it can be related to national or international standards, through an unbroken chain of comparisons.

Uncertainty—in any measurement of mass, there are a number of sources of uncertainty. The uncertainty figure is an expression of the expanded overall uncertainty for the measurement, using two standard deviations as a limit to the effect of both random errors and systematic errors associated with the measurement process.

HEUSSER NEWEIGH, LLC 1400 Willow Pass Court, Concord, California 94520  800.672.1440

This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.

Rev.100115                                              000077

| Nominal Mass | ASTM Class 0 Tolerance | ASTM Class 1 Tolerance | ASTM Class 2 Tolerance | ASTM Class 3 Tolerance | ASTM Class 4 Tolerance | ASTM Class 5 Tolerance | ASTM Class 6 Tolerance | ASTM Class 7 Tolerance | NIST Class F Tolerance |
|---|---|---|---|---|---|---|---|---|---|
| kg | mg | mg | mg | mg | mg | mg | mg | mg | mg |
| 50 | 63.000 | 125.000 | 250.000 | 500.000 | 1000.000 | 2500.000 | 5000.000 | 7500.000 | 5000.000 |
| 30 | 38.000 | 75.000 | 150.000 | 300.000 | 600.000 | 1500.000 | 3000.000 | 4500.000 | 3000.000 |
| 25 | 31.000 | 62.000 | 125.000 | 250.000 | 500.000 | 1200.000 | 2500.000 | 4500.000 | 2000.000 |
| 20 | 25.000 | 50.000 | 100.000 | 200.000 | 400.000 | 1000.000 | 2000.000 | 3800.000 | 2000.000 |
| 10 | 13.000 | 25.000 | 50.000 | 100.000 | 200.000 | 500.000 | 1000.000 | 2200.000 | 1000.000 |
| 5 | 6.000 | 12.000 | 25.000 | 50.000 | 100.000 | 250.000 | 500.000 | 1400.000 | 500.000 |
| 4 | 3.800 | 7.500 | 15.000 | 30.000 | 60.000 | 150.000 | 300.000 | 1000.000 | 300.000 |
| 3 | 3.800 | 7.500 | 15.000 | 30.000 | 60.000 | 150.000 | 300.000 | 1000.000 | 300.000 |
| 2 | 2.500 | 5.000 | 10.000 | 20.000 | 40.000 | 100.000 | 200.000 | 750.000 | 200.000 |
| 1 | 1.300 | 2.500 | 5.000 | 10.000 | 20.000 | 50.000 | 100.000 | 470.000 | 100.000 |
| g | mg | mg | mg | mg | mg | mg | mg | mg | mg |
| 500 | 0.600 | 1.200 | 2.500 | 5.000 | 10.000 | 30.000 | 50.000 | 300.000 | 70.000 |
| 300 | 0.380 | 0.750 | 1.500 | 3.000 | 6.000 | 20.000 | 30.000 | 210.000 | 60.000 |
| 200 | 0.250 | 0.500 | 1.000 | 2.000 | 4.000 | 15.000 | 20.000 | 160.000 | 40.000 |
| 100 | 0.130 | 0.250 | 0.500 | 1.000 | 2.000 | 9.000 | 10.000 | 100.000 | 20.000 |
| 50 | 0.060 | 0.120 | 0.250 | 0.600 | 1.200 | 5.600 | 7.000 | | 10.000 |
| 30 | 0.037 | 0.074 | 0.150 | 0.450 | 0.900 | 4.000 | 5.000 | 44.000 | 6.000 |
| 20 | 0.037 | 0.074 | 0.100 | 0.350 | 0.700 | 3.000 | 3.000 | 33.000 | 4.000 |
| 10 | 0.025 | 0.050 | 0.074 | 0.250 | 0.500 | 2.000 | 2.000 | 21.000 | 2.000 |
| 5 | 0.017 | 0.034 | 0.054 | 0.180 | 0.360 | 1.300 | 2.000 | 13.000 | 1.500 |
| 3 | 0.017 | 0.034 | 0.054 | 0.150 | 0.300 | 0.950 | 2.000 | 9.400 | 1.300 |
| 2 | 0.017 | 0.034 | 0.054 | 0.130 | 0.260 | 0.750 | 2.000 | 7.000 | 1.100 |
| 1 | 0.017 | 0.034 | 0.054 | 0.100 | 0.200 | 0.500 | 2.000 | 4.500 | 0.900 |
| mg | mg | mg | mg | mg | mg | mg | mg | mg | mg |
| 500 | 0.005 | 0.010 | 0.025 | 0.080 | 0.160 | 0.380 | 1.000 | 3.000 | 0.720 |
| 300 | 0.005 | 0.010 | 0.025 | 0.070 | 0.140 | 0.300 | 1.000 | 2.200 | 0.610 |
| 200 | 0.005 | 0.010 | 0.025 | 0.060 | 0.120 | 0.260 | 1.000 | 1.800 | 0.540 |
| 100 | 0.005 | 0.010 | 0.025 | 0.050 | 0.100 | 0.200 | 1.000 | 1.200 | 0.430 |
| 50 | 0.005 | 0.010 | 0.014 | 0.042 | 0.085 | 0.160 | 0.500 | 0.880 | 0.350 |
| 30 | 0.005 | 0.010 | 0.014 | 0.038 | 0.075 | 0.140 | 0.500 | 0.680 | 0.300 |
| 20 | 0.005 | 0.010 | 0.014 | 0.035 | 0.070 | 0.120 | 0.500 | 0.560 | 0.260 |
| 10 | 0.005 | 0.010 | 0.014 | 0.030 | 0.060 | 0.100 | 0.500 | 0.400 | 0.210 |
| 5 | 0.005 | 0.010 | 0.014 | 0.028 | 0.055 | 0.080 | 0.200 | | 0.170 |
| 3 | 0.005 | 0.010 | 0.014 | 0.026 | 0.052 | 0.070 | 0.200 | | 0.140 |
| 2 | 0.005 | 0.010 | 0.014 | 0.025 | 0.050 | 0.060 | 0.200 | | 0.120 |
| 1 | 0.005 | 0.010 | 0.014 | 0.025 | 0.050 | 0.050 | 0.100 | | 0.100 |

[1] ASTM E 617-97 Standard Specifications for Laboratory Weights and precision Mass Standards, Table 1
[2] NIST Handbook 105-1

Test #   03895-10
Page:   4 of 4
Date:   26 Jan 2010

HEUSSER NEWEIGH, LLC 1400 Willow Pass Court, Concord, California 94520 800.672.1440
This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.
Rev.100115
000078

# Heusser Neweigh, LLC
# Mass
# Certificate of Calibration

Issued to:

San Mateo County Sheriff
50 Tower Road
San Mateo, CA 94402

Heusser Neweigh Test Number:
**00487-10**

Date of Calibration:
26 January 2010

| Order Information: | | Description of the Mass Artifacts: | |
|---|---|---|---|
| Purchase Order No.: | 30000-09-D041 | Manufacturer: | Voland |
| Date Received: | 22 January 2010 | Serial Number: | None |
| Submitted By: | William Lewellen | ID/Asset Number: | None |
| | | Accuracy Class: | ASTM 1 |
| | | Description: | 1 – 100 gram weight set |

This is to certify that the information contained in this Certificate of Calibration is true and correct as of the date of calibration. This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.



_____
Authorized Signature


30 Jan 2010
Date of Issue

Calibration
A2LA Certificate No.: 1823.01
ISO/IEC 17025-2005
ANSI/NCSL Z540-1-1994

Test # 00487-10
Page: 1 of 4
Date: 26 Jan 2010

**Calibration Information:**

| | |
|---|---|
| Metrologist : | ALC |

**Environmental Conditions:**

| | | |
|---|---|---|
| Temperature: | 21.5 | °C |
| Pressure | 1009.2 | hPa |
| Humidity: | 45.0 | % |

Test Method          WP-303 (Rev.2002-1)

**Reference Standards Used:**                **Mass Comparator Used:**

| Cal ID # | Calibration Date | Calibration Due Date | | Cal ID # | Model |
|---|---|---|---|---|---|
| 56 | 1 January 2010 | January 2011 | | 18 | Mettler a5 |
| | | | | 22 | Mettler a107 |

**As Found / As Left Data** (unless reported in 'As Found' data):

| Nominal Mass | ID | Assumed Density g/cm³ | Conventional Mass | Correction mg | Estimated Uncertainty mg | Reference Standard ID | Comparator ID |
|---|---|---|---|---|---|---|---|
| 100 g | | 7.85 | 99.99993782 g | -0.06218 | 0.011 | 56 | 22 |
| 50 g | | 7.85 | 50.00008456 g | +0.08456 | 0.0084 | 56 | 22 |
| 30 g | | 7.85 | 30.00001953 g | +0.01953 | 0.0053 | 56 | 22 |
| 20 g | | 7.85 | 19.99995617 g | -0.04383 | 0.0044 | 56 | 22 |
| 10 g | | 7.85 | 10.00002552 g | +0.02552 | 0.0029 | 56 | 22 |
| 5 g | | 7.85 | 5.00001995 g | +0.01995 | 0.0018 | 56 | 18 |
| 3 g | | 7.85 | 2.99998079 g | -0.01921 | 0.0014 | 56 | 18 |
| 2 g | | 7.85 | 2.00001773 g | +0.01773 | 0.0011 | 56 | 18 |
| 1 g | | 7.85 | 0.99998364 g | -0.01636 | 0.00086 | 56 | 18 |

**As Found Data** (reported only if different than 'As Left' data):

| Nominal Mass | ID | Assumed Density g/cm³ | Conventional Mass | Correction mg | Estimated Uncertainty mg | Reference Standard ID | Comparator ID |
|---|---|---|---|---|---|---|---|
| 30 g | | 7.85 | 29.99992786 g | -0.07214 | 0.0053 | 56 | 22 |
| 3 g | | 7.85 | 2.99995074 g | -0.04926 | 0.0014 | 56 | 18 |
| 1 g | | 7.85 | 0.99996216 g | -0.03784 | 0.00086 | 56 | 18 |

**Comments:**

The calibration interval specified is 12 months with due date of January 2011.

HEUSSER NEWEIGH, LLC 1400 Willow Pass Court, Concord, California 94520  800.672.1440
This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.
Rev.100115                                        000080

**Pertinent Information:**

The weights listed on this *Certificate of Calibration* have been compared to mass reference standards that are directly traceable to the National Institute of Standards and Technology (NIST). NIST # 822/275890 & NIST # 822/272103

The procedure used to calibrate the herein described weights and this *Certificate of Weight Calibration* meets the requirements and guidelines of ISO 17025, ISO 9002, ANCI/NCSL Z540-1-1994, ASTM E 617-97, or OIML R111, the Heusser Neweigh Quality Assurance Program (Revision 2007-1) and the purchase order referenced herein, if any.

The procedure used to disseminate an assigned value for each weight was performed through a series of intercomparisons between NIST traceable mass reference standards and the weights listed on this *Certificate of Calibration*.

Uncertainty has been calculated using the root-sum-square method to include both Type A components, assuming a normal distribution, and Type B components; with a coverage factor of k = 2 to express the expanded uncertainty with an approximate 95% confidence level.

The calibration of the weights listed on this Mass Certificate of Calibration is based on an assumed apparent mass vs. material of density 8.0 g/cm³, unless otherwise noted.

**Definitions:**

As Found Data—the conventional mass as it was received by Heusser Neweigh, after cleaning, but prior to adjustment or replacement.

As Left Data—the conventional mass after adjustment, repair, or replacement of the weight. The As Left data will equal the As Found data if there were no adjustment, repair, or replacement of the weight.

Calibration—the acts of determining the mass difference between a standard of known mass value and an "unknown" test weight or set of test weights, establishing the conventional mass value of the "unknown", and of determining a quantitative estimate of the uncertainty to be assigned to the stated conventional mass value of the "unknown".

Certificate of Calibration—a document that presents calibration results and other information relevant to a calibration, including the nominal mass values and corrections, together with a statement of the uncertainty of the values.

Class Tolerance—the maximum amount by which the conventional mass of the weight is allowed to deviate from the assigned nominal value, plus/minus the estimated uncertainty.

Conventional Mass—conventional value of the result of a weight at 20 °C.

Correction—mass values are traditionally expressed by two numbers, one being the nominal mass of the weight, and the second being a correction. The mass of the weight is then the assigned nominal value plus the assigned correction. Positive corrections indicate that the weight embodies more mass than is indicated by the assigned nominal value.

Nominal Mass—the mass value as indicated on the weight.

Traceability—the property of the result of a measurement or the value of a standard whereby it can be related to national or international standards, through an unbroken chain of comparisons.

Uncertainty—in any measurement of mass, there are a number of sources of uncertainty. The uncertainty figure is an expression of the expanded overall uncertainty for the measurement, using two standard deviations as a limit to the effect of both random errors and systematic errors associated with the measurement process.

HEUSSER NEWEIGH, LLC 1400 Willow Pass Court, Concord, California 94520  800.672.1440

This certificate of calibration shall not be reproduced except in full, without the written authorization of Heusser Neweigh.

Rev.100115                    000081

none**APPENDIX 1: ASTM[1] & NIST[2] Tolerance Table**

| Nominal Mass | ASTM Class 0 Tolerance | ASTM Class 1 Tolerance | ASTM Class 2 Tolerance | ASTM Class 3 Tolerance | ASTM Class 4 Tolerance | ASTM Class 5 Tolerance | ASTM Class 6 Tolerance | ASTM Class 7 Tolerance | NIST Class F Tolerance |
|---|---|---|---|---|---|---|---|---|---|
| kg | mg | mg | mg | mg | mg | mg | mg | mg | mg |
| 50 | 63.000 | 125.000 | 250.000 | 500.000 | 1000.000 | 2500.000 | 5000.000 | 7500.000 | 5000.000 |
| 30 | 38.000 | 75.000 | 150.000 | 300.000 | 600.000 | 1500.000 | 3000.000 | 4500.000 | 3000.000 |
| 25 | 31.000 | 62.000 | 125.000 | 250.000 | 500.000 | 1200.000 | 2500.000 | 4500.000 | 2000.000 |
| 20 | 25.000 | 50.000 | 100.000 | 200.000 | 400.000 | 1000.000 | 2000.000 | 3800.000 | 2000.000 |
| 10 | 13.000 | 25.000 | 50.000 | 100.000 | 200.000 | 500.000 | 1000.000 | 2200.000 | 1000.000 |
| 5 | 6.000 | 12.000 | 25.000 | 50.000 | 100.000 | 250.000 | 500.000 | 1400.000 | 500.000 |
| 4 | 3.800 | 7.500 | 15.000 | 30.000 | 60.000 | 150.000 | 300.000 | 1000.000 | 300.000 |
| 3 | 3.800 | 7.500 | 15.000 | 30.000 | 60.000 | 150.000 | 300.000 | 1000.000 | 300.000 |
| 2 | 2.500 | 5.000 | 10.000 | 20.000 | 40.000 | 100.000 | 200.000 | 750.000 | 200.000 |
| 1 | 1.300 | 2.500 | 5.000 | 10.000 | 20.000 | 50.000 | 100.000 | 470.000 | 100.000 |
| g | mg | mg | mg | mg | mg | mg | mg | mg | mg |
| 500 | 0.600 | 1.200 | 2.500 | 5.000 | 10.000 | 30.000 | 50.000 | 300.000 | 70.000 |
| 300 | 0.380 | 0.750 | 1.500 | 3.000 | 6.000 | 20.000 | 30.000 | 210.000 | 60.000 |
| 200 | 0.250 | 0.500 | 1.000 | 2.000 | 4.000 | 15.000 | 20.000 | 160.000 | 40.000 |
| 100 | 0.130 | 0.250 | 0.500 | 1.000 | 2.000 | 9.000 | 10.000 | 100.000 | 20.000 |
| 50 | 0.060 | 0.120 | 0.250 | 0.600 | 1.200 | 5.600 | 7.000 | | 10.000 |
| 30 | 0.037 | 0.074 | 0.150 | 0.450 | 0.900 | 4.000 | 5.000 | 44.000 | 6.000 |
| 20 | 0.037 | 0.074 | 0.100 | 0.350 | 0.700 | 3.000 | 3.000 | 33.000 | 4.000 |
| 10 | 0.025 | 0.050 | 0.074 | 0.250 | 0.500 | 2.000 | 2.000 | 21.000 | 2.000 |
| 5 | 0.017 | 0.034 | 0.054 | 0.180 | 0.360 | 1.300 | 2.000 | 13.000 | 1.500 |
| 3 | 0.017 | 0.034 | 0.054 | 0.150 | 0.300 | 0.950 | 2.000 | 9.400 | 1.300 |
| 2 | 0.017 | 0.034 | 0.054 | 0.130 | 0.260 | 0.750 | 2.000 | 7.000 | 1.100 |
| 1 | 0.017 | 0.034 | 0.054 | 0.100 | 0.200 | 0.500 | 2.000 | 4.500 | 0.900 |
| mg | mg | mg | mg | mg | mg | mg | mg | mg | mg |
| 500 | 0.005 | 0.010 | 0.025 | 0.080 | 0.160 | 0.380 | 1.000 | 3.000 | 0.720 |
| 300 | 0.005 | 0.010 | 0.025 | 0.070 | 0.140 | 0.300 | 1.000 | 2.200 | 0.610 |
| 200 | 0.005 | 0.010 | 0.025 | 0.060 | 0.120 | 0.260 | 1.000 | 1.800 | 0.540 |
| 100 | 0.005 | 0.010 | 0.025 | 0.050 | 0.100 | 0.200 | 1.000 | 1.200 | 0.430 |
| 50 | 0.005 | 0.010 | 0.014 | 0.042 | 0.085 | 0.160 | 0.500 | 0.880 | 0.350 |
| 30 | 0.005 | 0.010 | 0.014 | 0.038 | 0.075 | 0.140 | 0.500 | 0.680 | 0.300 |
| 20 | 0.005 | 0.010 | 0.014 | 0.035 | 0.070 | 0.120 | 0.500 | 0.560 | 0.260 |
| 10 | 0.005 | 0.010 | 0.014 | 0.030 | 0.060 | 0.100 | 0.500 | 0.400 | 0.210 |
| 5 | 0.005 | 0.010 | 0.014 | 0.028 | 0.055 | 0.080 | 0.200 | | 0.170 |
| 3 | 0.005 | 0.010 | 0.014 | 0.026 | 0.052 | 0.070 | 0.200 | | 0.140 |
| 2 | 0.005 | 0.010 | 0.014 | 0.025 | 0.050 | 0.060 | 0.200 | | 0.120 |
| 1 | 0.005 | 0.010 | 0.014 | 0.025 | 0.050 | 0.050 | 0.100 | | 0.100 |

[1] ASTM E 617-97 Standard Specifications for Laboratory Weights and precision Mass Standards, Table 1
[2] NIST Handbook 105-1

noneTest #   00487-10
Page:   4 of 4
Date:   26 Jan 2010

# Heusser Neweigh
# Certificate of Calibration



| | | | |
|---|---|---|---|
| Customer Name: | San Mateo County Sheriff | Weighing Instrument: | Balance |
| Address: | 50 Tower Road | Manufacturer: | Mettler |
| City, State, Zip: | San Mateo, CA 94402 | Model: | PG203 |
| | | Serial Number: | 1115211234 |
| Purchase Order Number: | 30000-09-D041 | Identification No.: | None |
| | | As Found Condition: | Good |
| Calibration Date: | 22 January 2010 | Approximate Capacity (g): | 200 |
| **Next Calibration Due:** | **January 2011** | Readability (g): | 0.001 |
| Metrologist: | BDC | | |

Reference Weights

| Cal ID # | Calibration Date | Calibration Due |
|---|---|---|
| 27 | 1 January 2010 | January 2011 |

Environmental Conditions
Temperature:     22 °C     Humidity:     37 %

**Calibration Data & Estimated Measurement Uncertainty:** See Page 2

Comments Pertaining to the Calibration:
None

Information Pertaining to the Estimated Calibration Uncertainty:
The expanded uncertainty has been calculated using the root-sum-square method to include both Type A components (repeatability), assuming a normal distribution, and Type B components (errors of indication, eccentricity, & uncertainty of the reference standards); with a coverage factor of k = 2 to express the expanded uncertainty with an approximate 95% confidence level.

The procedure used to calibrate the herein described weighing instrument and this Certificate of Calibration meets the requirements and guidelines of ISO 17025-2005, ANCI/NCSL Z540-1-1994 and the Heusser Neweigh Quality Assurance Program (Revision 2007-1), and the purchase requisition referenced herein, if any. The weights listed on this Certificate of Calibration have been compared to mass reference standards that are directly traceable to the National Institute of Standards and Technology (NIST). NIST # 822/275890. This is to certify that the information contained in this Certificate of Calibration is true and correct as of the date of calibration.

**A2LA ACCREDITED**

Calibration
ISO/IEC 17025-2005
ANSI/NCSL Z540-1-1994
A2LA Certificate No.: 1823.01

Approved Signatory: _____     Date: 1/28/10

Heusser Neweigh, LLC
1400 Willow Pass Court, Concord, California 94520
Telephone: 925-798-8900     Fax: 925-798-8905     Email: info@neweigh.com

Rev. 091011

# Heusser Neweigh
# Calibration Data

Manufacturer: Mettler       Model:   PG203       Serial #:   1115211234       ID #:   None

## As Found Data

### Linearity & Hysteresis

| Nominal g | Indication g | Error g |
|---|---|---|
| 1 | 1.000 | 0.000 |
| 50 | 49.998 | -0.002 |
| 100 | 100.002 | 0.002 |
| 150 | 150.011 | 0.011 |
| 200 | 200.024 | 0.024 |
| 0 | 0.000 | 0.000 |
| 0 | 0.000 | 0.000 |

### Eccentricity (Corner Load Errors)

Nominal Mass:        100 g

| Position: | Error |
|---|---|
| Center: | 0.000 g |
| Front Left: | 0.006 g |
| Back Left: | 0.000 g |
| Back Right: | -0.008 g |
| Front Right: | 0.001 g |

## As Left Data

### Linearity & Hysteresis

| Nominal g | Indication g | Error g |
|---|---|---|
| 1 | 1.000 | 0.000 |
| 50 | 49.998 | -0.002 |
| 100 | 100.000 | 0.000 |
| 150 | 150.008 | 0.008 |
| 200 | 200.009 | 0.009 |
| 0 | 0.000 | 0.000 |
| 0 | 0.000 | 0.000 |

### Eccentricity (Corner Load Errors)

Nominal Mass:        100 g

| Position | Error |
|---|---|
| Center: | 0.000 g |
| Front Left: | 0.000 g |
| Back Left: | 0.000 g |
| Back Right: | -0.001 g |
| Front Right: | 0.004 g |

### Repeatability

Nominal Mass:        100 g

| | Indication |
|---|---|
| Indication 1: | 100.000 g |
| Indication 2: | 100.000 g |
| Indication 3: | 100.000 g |
| Indication 4: | 100.000 g |
| Indication 5: | 100.000 g |
| Indication 6: | 100.000 g |
| Indication 7: | 100.000 g |
| Indication 8: | 100.001 g |
| Indication 9: | 100.001 g |
| Indication 10: | 100.001 g |
| Standard Deviation: | 0.00048 g |

## Estimated Calibration Uncertainty

**Expanded Uncertainty:**        **0.0025 grams**

This certificate shall not be reproduced except in full, without written permission of Heusser Neweigh.

Heusser Neweigh, LLC
1400 Willow Pass Court, Concord, California 94520
Telephone: 925-798-8900    Fax: 925-798-8905    Email: info@neweigh.com

# Heusser Neweigh Balance Certificate of Calibration
## Appendix A

**The following information supplements the Heusser Neweigh Balance Certificate of Calibration. This information is not part of the accredited calibration certificate.**

## CALIBRATION INFORMATION

The object of the calibration is an appraisal of performance of the closeness of agreement of the indication provided by the instrument in response to a variety of applied loads using reference weights. The results are expressed in units of mass. The calibration of the standard weights is based on conventional mass vs. material of density 8.0 g/cm$^3$ unless otherwise noted.

The user's value of the load indicated by the instrument will be affected by local gravity, the temperature and density of the loads, and the temperature and density of the surrounding air. The user's uncertainty of measurement depends significantly on properties of the calibrated instrument itself, laboratory environmental conditions, skills of the operator, the method of use, and the estimated uncertainty of calibration provided on the Certificate of Calibration.

## DEFINITIONS

**Repeatability Test:** closeness of agreement between the results of successive measurements of the same measurand carried out under reasonably constant test conditions. Repeatability is presented as one standard deviation in units of mass.

**Linearity and Hysteresis:** an appraisal of performance of the closeness of agreement between the result of a measurement and a true value of the measurand over the weighing range(s).

**Eccentricity (Corner Load Errors):** an appraisal of performance of the closeness of agreement between the result of the measurand in different positions on the load receptor in such a manner as the center of gravity of the load takes the positions as indicated.

**Readability (Resolution):** the smallest difference between indications of a weighting instrument that can be meaningfully distinguished. For a digital weighing instrument this is the change in the indication when the least significant digit changes by one step.

**Traceability:** the property of the result of a measurement of the value of a standard whereby it can be related to stated references, usually national (NIST) or international (SI) standards, through an unbroken chain of comparisons all having stated uncertainties. The unbroken chain of comparisons, with associated estimates of uncertainty, is called a traceability chain.

## REFERENCES

SIM (Inter-Americas Metrology Regional System of Metrology) Guidelines on the Calibration of Non-automatic Weighing Instruments (Revision 2008-2).

Euramet/cg-18/v.02 Guidelines on the Calibration of Non-automatic Weighing Instruments.

NISTIR 6919, Recommended Guide for Determining and Reporting Uncertainties for Balances & Scales.

ISO Guide 98, Guide to the Expression of Uncertainty of Measurement (Revision 2008).

ASTM E898, Standard Test Method of Testing Top-Loading, Direct-Reading Laboratory Scales and Balances (Revision 1988 & Reapproved in 2005).

**Heusser Neweigh, LLC**
**1400 Willow Pass Court, Concord, California 94520**
**Telephone: 925-798-8900   Fax: 925-798-8905   Email: info@neweigh.com**

PAGES 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. CR 05-0324 MMC |
| | ) | |
| DENNIS CYRUS, JR. | ) | |
| | ) | SAN FRANCISCO, CALIFORNIA |
| DEFENDANT. | ) | FRIDAY, NOVEMBER 19, 2010 |
| _____ | ) | |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR THE GOVERNMENT:      JOSEPH P. RUSSONIELLO
                         UNITED STATES ATTORNEY
                         450 GOLDEN GATE AVENUE
                         SAN FRANCISCO, CALIFORNIA  94102
               BY:  **WILLIAM FRENTZEN, ESQUIRE**
                    **ROBERT DAVID REES, ESQUIRE**


FOR THE DEFENDANT:       LAW OFFICES OF JAMES S. THOMSON
                         819 DELAWARE STREET
                         BERKELEY, CALIFORNIA  94710
               BY:  **JAMES S. THOMSON, ESQUIRE**


                    LAW OFFICES OF JOHN T. PHILIPSBORN
                         507 POLK STREET, SUITE 350
                         SAN FRANCISCO, CALIFORNIA  94102
               BY:  **JOHN T. PHILIPSBORN, ESQUIRE**


REPORTED BY:  JOAN MARIE COLUMBINI, CSR, RPR
              OFFICIAL REPORTER, U.S. DISTRICT COURT

1  POSSESSION WITH INTENT TO SELL, OR IS THE CHARGE POSSESSION

2  WITH INTENT TO SELL MORE THAN THE CERTAIN AMOUNT?

3          **MR. REES:**  THE ELEMENTS OF THE CRIME ARE ONLY

4  POSSESSION WITH INTENT TO DISTRIBUTE.

5          **THE COURT:**  THAT'S ALL THAT I'M INQUIRING.  YOU

6  PUT THE AMOUNT IN TO GET A JURY FINDING SO THAT IF THE COURT

7  WERE REQUIRED THEN TO SENTENCE ON THE CHARGE, THE COURT WOULD

8  HAVE THAT EVIDENCE ALREADY AS A FINDING.

9          **MR. REES:**  AND THERE WOULD BE A MANDATORY MINIMUM

10  TRIGGERED.

11          **THE COURT:**  YES.  THAT'S WHY YOU WOULD DO IT,

12  BECAUSE YOU WERE TRYING TO GET A MANDATORY MINIMUM THAT IF

13  THE OTHER CHARGES REMAIN, IS, FOR ALL INTENTS AND PURPOSES,

14  MOOT.

15          **MR. REES:**  I DON'T HAVE MUCH DISPUTE WITH THAT,

16  YOUR HONOR.

17          **THE COURT:**  ALL RIGHT.  SO I JUST WANTED TO GET

18  CLEAR WHAT THE SIGNIFICANCE OF IT IS FOR THE INDIVIDUAL

19  CHARGE.

20          NOW, THE DEFENDANT IS NOT GIVING UP THEIR ARGUMENT

21  THAT THE ENTIRETY OF THE LAB PROCESS IS SUBJECT TO CHALLENGE,

22  NOT JUST THE WEIGHT.  BUT, AGAIN, THE WEIGHT SEEMED TO ME TO

23  BE SOMETHING OF SOME SIGNIFICANCE BECAUSE OF THE INFREQUENT

24  CALIBRATION, ALTHOUGH, FRANKLY, IT WAS BROUGHT UP TO THE JURY

25  THAT THEY DIDN'T HAVE PERHAPS THE MOST PRISTINE PRACTICE IN

1  THE LAB; IT WASN'T MADE TO LOOK LIKE A MODEL OF LAB SCIENCE.

2       **MR. REES:**  WHAT I WOULD ALSO EMPHASIZE WITH

3  RESPECT TO THE CALIBRATION, THERE'S REALLY TWO DIFFERENT

4  ISSUES.  ONE IS MISCALIBRATION, WHICH WOULD BE A PROBLEM.

5  THE OTHER IS PROPER RECORDS OF CALIBRATION.  AND THERE'S

6  NOTHING THAT I HAVE SEEN SUBMITTED BY THE DEFENDANTS THAT

7  SUGGESTS THERE WAS ANY ACTUAL PROBLEMS WITH THE WEIGHTS.

8  IT'S JUST SIMPLY THAT THE RECORDS WERE NOT ACCURATELY OR

9  ADEQUATELY KEPT.

10      **THE COURT:**  OKAY.  BUT I JUST WANTED TO GET ONE

11 THING CLEAR HERE FOR PURPOSES OF -- IF I WERE TO ACCEPT, FOR

12 EXAMPLE, MR. PHILIPSBORN'S ARGUMENT THAT THE ADDITIONAL

13 INFORMATION MAY HAVE GIVEN THE JURY A DOUBT AS TO HOW MUCH

14 WEIGHT WAS THERE AND I MUST HAVE LOOKED AT THE WRONG LAB

15 NOTE, SO IF IT WAS CLOSE, AS OPPOSED TO NOT CLOSE -- ALL

16 RIGHT?  WITH MR. PETERSON, IT WAS NOT CLOSE IN THAT RESPECT,

17 BUT WITH MR. CYRUS, IF IT CONCEDINGLY WAS, THAT COULD HAVE AN

18 EFFECT, BUT THE EFFECT WOULD BE ON THE PUNISHMENT THAT I

19 WOULD IMPOSE, NOT ON THE JURY'S FINDING.

20      **MR. REES:**  CORRECT, OF GUILT, YES.

21      **THE COURT:**  ALL RIGHT.  NOW I WANT TO GO BACK FOR

22 A MOMENT TO THE DEFENDANTS, BECAUSE I DON'T WANT THE DEFENSE

23 TO THINK THAT I'M OVERLOOKING THE OTHER ARGUMENTS THAT THEY

24 MADE, BUT THAT WAS ONE QUESTION THAT I HAD.

25      **MR. PHILIPSBORN:**  AND WE AGREE WITH THE COURT'S



**EDMUND G. BROWN JR.**
*Attorney General*

**State of California**
**DEPARTMENT OF JUSTICE**

Telephone: 1-209-599-1400
Fax: 1-209-599-1240
E-Mail Address: john.yoshida@doj.ca.gov

April 14, 2010

Inspector Peter Walsh
San Francisco Police Department
850 Bryant Street
San Francisco, CA 94103

Re: SFPD Drug Analyses

Dear Inspector Walsh:

Per the Memorandum of Understanding between the San Francisco Police Department (SFPD) and the California Department of Justice, the BFS-Central Valley Laboratory received the first 157 cases from SFPD on April 1, 2010. The Laboratory analyzed 323 items in these cases. The attached spreadsheet summarizes the results of the reanalysis.

The discrepancies can be placed into two categories. The first category is weight differences. The differences in original weight to the reanalysis weight - range from 0 to 29.43 grams. The drug types range from cocaine to methamphetamine to heroin. Marijuana was also submitted, differences in weights could be attributed to the loss of water in plant material. The evaluation of weight losses was further complicated by the inappropriate use of weighing boats, papers or ziplock bags. The weighing boats and papers are supposed to be tared out (zero out the balance after the weighing boat/paper is placed on the weighing pan). This good laboratory practice appears to be sporadically used. Lab staff indicates that sometimes they forget to zero the weighing boat/paper which adds weight to the sample or remove the weighing boat/paper after the zero out of the balance which would make the sample weigh less than it really is. The weights of the ziplock bags are also listed below. The controlled substances were placed in ziplock bags and could have been used in determining gross weights. Below are the weights of the boats, paper, and ziplock bags:

- Weighing paper 6"x6" = 0.96g
- Weighing boat 3.5"x3.5" = 2.18g
- Weighing boat 5.5"x5.5" = 5.85g
- Label ziplock bag 4"x6" = 2.24g
- Ziplock bag 4"x6" = 2.28g
- Ziplock bag 2"x3" = 0.65g

There were 52 of 323 items that had significant weight issues (see next 3 pages).

USAO0004363

The second set of discrepancies is misidentifications. Below are a list of cases and the reanalysis.

- SFPD 090-725-622 report indicates 5 bags of methamphetamine and 2 bags of non-controlled substance. Reanalysis (CV-10-002805-01) indicates 6 bags of methamphetamine and 1 bag with a non-controlled substance.

- SFPD case, 091-078-064 identifies 2 samples as no controlled substance detected but reanalysis (CV-10-002814-01) identified the powders as Fentanyl (SCH. II) and MDMA.

- SFPD case 091-087-106 Item 5 was reported as **heroin** but reanalysis (CV-10-002896-01) identifies the sample as **cocaine**.

- SFPD case 091-034-066 reports 6 bags containing cocaine. Reanalysis (CV-10-002905-01) of the samples indicates that only 5 bags contain cocaine and the other contains a non-controlled substance.

- SFPD case 090-725-569 Item E4 was reported as **cocaine**. The reanalysis (CV-10-002937-01) identifies the sample as containing **methamphetamine and cocaine**.

**Summary:**

The reanalyses of 157 SFPD controlled substance cases revealed problems in weight discrepancies and analytical scheme. Approximately 66% of the 323 items were within +/- 0.10 grams of the original weight. There were larger weight differences in approximately 1/3 of the remaining samples. These weight differences can be partially explained by improper use of weighing boats/papers by not accounting for the weight of the boat or paper or ziplock bag. But, this does not explain some of the larger losses such as the 29.43 grams difference in SFPD case 091-086-0904. In addition, reanalyses showed discrepancies in the identification of items in five of the cases.

Sincerely,

John S. Yoshida
Laboratory Director

For     EDMUND G. BROWN JR.
Attorney General

USAO0004367

# San Francisco Police Department Criminalistics Laboratory

# Audit of the Controlled Substances Unit

**Purpose**
The purpose of this audit is to assist the San Francisco Police Department (hereinafter referred to as SFPD) in assessing the operation of the Criminalistics Laboratory's Controlled Substance Unit. The audit process is intended to be a systematic, independent, and documented review of laboratory records and other relevant information, interviews of staff, and assessing them objectively to determine the extent to which the specified requirements are fulfilled.

The audit focused on:
- Analytical procedure selection, control and validation
- Control of reagents and standards
- Equipment calibration and maintenance records
- Adequacy of case reports and notes and their disposition
- Staff's awareness of the laboratory's Quality Manual
- Evidence handling procedures
- Proficiency testing and interlaboratory comparison studies
- Personnel training records
- Handling deficiencies and remedial action
- Laboratory orderliness, health and safety measures

**Audit dates**
The audit was conducted March 23-25, 2010.

**Records and other relevant information**
The auditors reviewed the following documents:
- Criminalistics Laboratory Controlled Substances SOP
- Report of SFPD Crime Lab Narcotics Analysis
- Criminalistics Laboratory Operations and Quality Assurance Manual sections:
  - 3.1 Access Control and Security
  - 3.2.4 Case File Preparation
  - 3.2.5 Case Review and Report Publication
  - 3.2.6 Case File Storage and Access
  - 3.8 Quality Assurance Manual
  - 4.3 Work Conditions and Professional Conduct
- ASCLD/LAB Inspection Report of November 17-20, 2009
- SFPD Criminalistics Laboratory response of February 5, 2010 to ASCLD/LAB Inspection Report and supporting documentation

*Continued on next page*

## Audit of the Controlled Substances Unit, Continued

**Staff interviews**    Interviews of the following staff members were conducted by the auditors:
- Martha Blake, Quality Assurance Manager
- Lois Woodworth, Criminalist III
- Tasha Smith, Criminalist
- Theresa Wong, Criminalist

**Observations**
- Analytical procedure selection, control and validation
  - Recordation of "gross" weight versus "net" weight of drug evidence. Controlled Substances SOP (page 11 of 64) states recording gross or net weight is at the discretion of the analyst depending on sample amount. Gross weight refers to the weight of the drug substance plus the weight of the packaging (e.g., plastic bag or paper bindle) containing the drug evidence. Net weight refers to the weight of the drug evidence exclusive of the packaging material. Typically net weight of drug evidence is recorded for legal purposes.
  - Validation of new GC/MS and FTIR instruments has exceeded 6 months. Validation should be completed in a timely manner to insure instruments remain under warranty. The instruments cannot be used for the analysis of drug evidence until validation is completed and properly reviewed.

**Observations**
- Control of reagents and standards
  - Chemical reagent bottles in the analyst's work areas are not properly labeled with hazardous warning labels. This is mandated under Cal-OSHA requirements. This is required for both prepared reagents and neat chemicals that have been removed from the original container.

**Observations**
- Equipment calibration and maintenance records
  - There is a lack of documented instrument operational parameters for the GC/MS and FTIR in the Controlled Substances SOP
  - There are no written instructions for the maintenance/repair of balances or microscopes
  - There is no organized maintenance/repair documentation for microscopes and balances (also noted in ASCLD/LAB Inspection Report 11/17-20/09)
  - Instrument calibration is to be conducted weekly per Controlled Substances SOP and there were recordkeeping inconsistencies for the GC/MS instruments. Therefore, consider doing the calibrations monthly and set up calibration checks (standards with specific ion ratio criteria).

*Continued on next page*

001223

## Audit of the Controlled Substances Unit, Continued

**Observations**
- **Adequacy of case reports and notes and their disposition**
  - The management of the laboratory needs to set a quality-directed (not quantity-directed) approach to casework.
  - The analyst's case notes and laboratory report of results are one and the same document. Although the *Report of SFPD Crime Lab Narcotics Analysis* has a check box to indicate there is instrumental data relevant to the analysis, the combination notes and report format makes page numbering of the notes incomplete and possibly misleading if there are attachments of FTIR or GC/MS instrumental data. The total number of note pages is never indicated on the *Report of SFPD Crime Lab Narcotics Analysis*
  - Case notes on selectively reviewed cases do not reflect dates on GC/MS library comparison spectra in the case file. Interviewees report that only 10-15% of the drug cases are analyzed using instrumental analysis; i.e., GC/MS or FTIR.
  - Additionally, dates should be recorded throughout the documentation to indicate when work was performed as well as indicating at a minimum the starting and ending dates of the analysis – 3.2.4 Case File Preparation (page 5 of 6) – however this is not clearly indicated in the notes/drug report format.
  - The Controlled Substances SOP (page 30 of 64) and 3.2.4 Case File Preparation (page 4 of 6) both state that the analyst's notes include a "description of packaging," and this was lacking in the earlier reports of Madden and Woo. The unit supervisor indicated that she had addressed this issue with Madden and the description of packaging improved in later reports. This issue was not seen in later reports of Madden.
  - There is no clear indication whether the signature indicating "Reviewed by:" refers to the technical or administrative review of the *Report of SFPD Crime Lab Narcotics Analysis*. In response to the ASCLD/LAB Inspection Report of 11/17-20/09 the laboratory manager states "The Controlled Substances Unit has moved to 100% technical reviews with the signature on the report form indicating a complete administrative and technical review." This may be inadequate because the administrative and technical reviews are not clearly delineated in the report.

**Observations**
- **Staff's awareness of the laboratory's Quality Manual**
  - The laboratory has a comprehensive *Operations and Quality Assurance* manual that is available to laboratory analysts. Analysts are generally familiar with the procedures outlined in the manual.

*Continued on next page*

001224

## Audit of the Controlled Substances Unit, Continued

**Observations**

- • **Evidence handling procedures**
  - – The chain-of-custody (COC) is not properly documented for internal evidence transfers; i.e., any analyst in the Controlled Substances Unit was able to gain access to any other analyst's short-term drug evidence storage locker, remove drug cases and assign themselves a controlled substance case when the evidence is shown to be in another analyst's possession. Spare keys to the analysts' short-term drug evidence storage locker were accessible to all analysts at all times. A universal barcode sheet is posted at the evidence control computer workstation to expedite evidence "transfers." Drug evidence transfers are generally not correctly recorded in the barcode transfer system.
  - – Access to analyst drug storage lockers has now been limited. Spare keys to short-term drug evidence storage lockers are now in the possession of the Quality Assurance Manager. However, a supervisor can remove drug cases for barcode reassignment to another analyst when they are in the possession and secure storage of the analyst originally assigned the case. **This limitation was imposed in March 2010**
  - – Casework is frequently removed for reassignment from an analyst's short term storage without an appropriate barcode transfer. The COC is missing a documented transfer of evidence.
  - – Analyst's report that they use various techniques to indicate security of in-progress casework; i.e., stapling the outer drug evidence envelope or using a paper clip to "seal" the outer drug evidence envelope.
  - – Items within the controlled substance envelope are placed in zip lock bags but are not securely sealed by tape or heat seal. This measure would have prevented the tampering with the in-progress casework that was placed in short-term storage conditions.
  - – Drug evidence is delivered by the PCD couriers to the Controlled Substances laboratory and bar-coded in and deposited in an unsecured cardboard box on the floor. The security and COC of these cases could be called into question. Likewise cases to be returned to central narcotics storage are placed in a box for pick-up by PCD couriers.
  - – Evidence handling procedures as detailed in the *Operations and Quality Assurance* manual are not being followed. On page 3 of 5 of section 3.1 Access Control and Security of the *Operations and Quality Assurance* manual it states an analyst "may open a (short-term security) container assigned to an(other) analyst for a compelling reason. In that event, the analyst will be notified, in verbal or written form and provided with the following information: 1) identities of person(s) accessing the container, 2) reason for doing so, and 3) date and time of access." Interviewees indicated that this procedure was not being followed in all instances.

*Continued on next page*

Page 4

## Audit of the Controlled Substances Unit, Continued

**Observations**
- Proficiency testing and interlaboratory comparison studies
  - No deficiencies noted

**Observations**
- Personnel training records
  - Staff members assigned to the Controlled Substances Unit are not current with required training and infrequently (or do not) attend professional meetings to keep abreast of current technology.
  - Imposed time constraints (48-hour turnaround time) severely impact professional development of the unit's staff.

**Observations**
- Handling deficiencies and remedial action
  - In the instance where Madden failed to record the description of the packaging in her notes, the Supervising Criminalist reports that Madden was repeatedly counseled and the issue brought to the attention of all analysts at a unit meeting.

**Observations**
- Laboratory orderliness, health and safety measures
  - The laboratory is approximately ten years old. In its present configuration there does not appear to be adequate room or design features to effectively handle the volume of drug evidence submitted annually for analysis. There is, at best, only three (3) workstations for drug analysts. Current instrumentation could be relocated to add at least two (2) more analyst workstations.
  - There appears to be insufficient space when cleaning supplies, water carboys and flammables cabinets sit in hallways.
  - As noted earlier, chemical reagent bottles are not properly labeled with hazardous labels are mandated by Cal-OSHA.

*Continued on next page*

001226

## Audit of the Controlled Substances Unit, Continued

**Other observations**

There are additional observations noted by the auditors:

- The combination of a 48-hour turnaround time coupled with an annual drug caseload that exceeds 14,000 cases and the limited staff of drug analysts (2-3 analysts during the period July-December 2009) creates an untenable situation and directly affects the quality of the analytical work. Good laboratory practices have been repeatedly short-changed in favor of high case throughput. Staff oftentimes commented that any change to the present drug analysis protocol; e.g., using instrumental analysis versus crystal tests for confirmatory tests, or recording net weight of the drug substances versus gross weight, or sealing inner drug evidence packages versus not sealing the evidence, would result in case turnaround times beyond 48-hours.

- The auditors believe that the matter of a 48-hour turnaround time for drug cases has seriously hampered the growth and quality of work in the Controlled Substances Unit. The stress and strain of trying to meet the demands of court has resulted in sacrificing quality for quantity. This is evident throughout the laboratory processes used in the Controlled Substances Unit; and, possibly provided the opportunity for evidence tampering and abuse of the evidence control system.

- The auditors heard on a number of occasions from the interviewees that the conditions and operations of the Controlled Substances Unit were dissimilar to the operations of the other forensic disciplines at the laboratory. Oftentimes the staff referenced the impact that 48-hour turnaround time imposed on unit procedures and casework productivity. The Controlled Substances Unit should not be singled out nor excuses made to operate the unit differently than other forensic disciplines.

- Evidence tampering could have been prevented had good laboratory practices been in place and practiced by Controlled Substances Unit staff:
  - Sealing the inner drug evidence packaging, either by a tape seal or heat seal upon completion of the analysis is a good forensic laboratory and evidence handling practice. Since the evidence packaging was, for all intents and purposes, "open and accessible" for whatever reason prior to completing the analysis and inserting a certified copy of the report in the drug evidence envelope this practice provided the opportunity for early and undetected evidence tampering

*Continued on next page*



001227

## Audit of the Controlled Substances Unit, Continued

**Other observations (continued)**

– Accessibility of spare keys to the analyst's short-term drug evidence storage locker was a questionable violation of good laboratory practices. The fact that the spare keys to an analyst's short-term drug evidence storage locker were readily available – albeit in a semi-controlled key cabinet – provided the opportunity for undetected entry into a secure evidence storage cabinet as well as undetected evidence tampering. Although the spare evidence locker keys are now secured with the Quality Assurance Manager, the practice of allowing access to an analyst's short-term drug evidence storage locker for "compelling" reasons should be reconsidered by providing a secure general drug evidence storage locker.

• The supervisor, Lois Woodworth, was assisting in analyzing drug cases, handling the breath-testing program and testifying in court on breath alcohol cases. These duties alone are burdensome and this left very little time for her supervision of the Controlled Substances Unit. Furthermore, it is unclear who she was taking direction from – the Quality Assurance Manager or the Laboratory Manager. Ms. Woodworth was appointed supervisor less than one year ago and does not appear to have received comprehensive management training or guidance as to duties, authority and responsibilities.

**Recommend-ations**

The auditors make the following recommendations:

• Install a Laboratory Information Management System (LIMS) that includes such capabilities as evidence control and electronic recordation of chain-of-custody, electronic note-taking, electronic report generation and distribution, and tracking analyst's performance.

• Technical and administrative reviews should be clearly delineated on the laboratory report and all analytical notes should be separate from the report of the results of the analysis.

• A secure central storage area or cabinet should be used, rather than a box on floor, for incoming and outgoing drug evidence.

• It is good laboratory practice to heat-seal or tape-seal the ziplock bag or the container in intimate contact with the drug evidence and place initials across the seal.

– Reference ASCLD/LAB: 1.4.1.3 Discussion: *When it is necessary to place evidence in a container to protect it from loss, cross-transfer and/or contamination, the container must be properly sealed. Proper seals may be accomplished in various ways such as heat seal, tape seal and lock seal. All seals must be initialed or otherwise marked to document the person sealing the evidence. Heat sealed packages must have initials or other identification across the heat seal to be properly sealed.*

*Continued on next page*

001228

Recommend-
ations
(continued)

The auditors make the following recommendations:

- Increase the number of Controlled Substances Unit staff to handle the estimated 14,000+ drug cases submitted annually to the Criminalistics Laboratory.
  - In the recently issued report *An Examination of Forensic Science in California November 2009* of the California Crime Laboratory Review Task Force (http://ag.ca.gov/publications/crime_labs_report.pdf) the task force notes that the average number of drug cases completed per analyst per year (2007) was approximately 1,053 cases/analyst (Table 9, page 64). Furthermore, the report also includes information on "ideal" drug case turnaround times of 1-20 days versus actual drug case turnaround times of 1-63 days (Table 11, page 66). The SFPD Criminalistics Laboratory's Controlled Substances Unit staff average 5,000 to 7,000 drug cases per analyst per year and provide a 2-day turnaround time.
- Expand and remodel the Controlled Substances Laboratory in order to accommodate additional Unit staffing, work flow, alleviate potential overcrowding due to added staff, and provide a clean well-organized work area.
- Ensure that drug casework reassignments are better controlled and documented by either ensuring secure transfers of drug evidence using the barcode program to clearly document the transfer from analyst A to analyst B; or, by storing unworked drug cases in a central depository (the secure storage cabinet noted above) for easy reassignment rather than storing unworked cases in an analyst's short-term drug evidence storage locker.
- Stop the practice of reporting gross weights of drug evidence and report drug weight as the net weight.
- Improve communication between management and staff. Laboratory management needs to dictate the direction and priorities of the laboratory in order to ensure a quality product.
- Laboratory supervisors should supervise and not be responsible for analyzing casework.

*Continued on next page*

001229

## Audit of the Controlled Substances Unit, Continued

**Submission of the audit report**  The audit report is respectfully submitted March 29, 2010.


_(signature)_
Robert A. Jarzen
Director
Laboratory of Forensic Services
Sacramento County
Office of the District Attorney

_(signature)_
John Yoshida
Laboratory Director
Central Valley Laboratory
California Department of Justice
Bureau of Forensic Services

| DATE | EVENT(s) | COMMENTS |
|------|----------|----------|
| 3/23/10 | INFORMATION FROM NEWS ARTICLES | |
| | | |
| Oct-09 | Madden admits she started theft | |
| 12/8/09 | Requests Leave of Absense | |
| 12/16/09 | Sister's reports Madden | |
| 2/3/10 | Search warrant served/221 found | SID also on scene/findings needed |
| 2/10/10 | Recert to SFPD not given/6mos to fix | |
| 2/22/10 | Crim Invest begins | |
| 3/1/10 | Madden retires | |
| 3/11/10 | Attny Gen'l starts invest w/SFPD | |
| 4/5/10 | Madden 98 back to court | |
| | | |
| | Tech noticed poss theft | |
| | Supervisor notices tampering w/pkg | |

011334

USAO0003306
USAO0003306

# ASCLD/LAB®
# INSPECTION REPORT



## SAN FRANCISCO POLICE DEPARTMENT
## CRIMINALISTICS LABORATORY

**Inspected: November 17-20, 2009**

USAO0002830
USAO0002830



# INTRODUCTION

This is the report of the ASCLD/LAB accreditation inspection of the San Francisco Police Department Criminalistics Labbratory which was conducted during the period of November 17-20, 2009.

The ASCLD/LAB inspection team consisted of the following members:

**Robert Gonsowski**, Staff Inspector, ASCLD/LAB, Herrin, IL
**Chuck McClelland**, North Carolina State Bureau of Investigation, Raleigh, N.C
**Diane Tolliver**, Indiana State Police, Indianapolis, IN
**Jody Wolf**, Phoenix Police Department, Phoenix, AZ
**Peter Striupaitis**, Northeastern Illinois Regional Crime Laboratory, Vernon Hills, IL
**Mary Kate McGilvray**, Massachusetts State Police (Retired), Bolton, MA

This report and the findings, observations, conclusions and recommendations are for pre-decisional purposes only. The inspection was performed using the principles, standards and criteria established in the 2008 version of the ASCLD/LAB Accreditation Manual and the 2009 version of the "FBI Quality Assurance Standards Audit for Forensic DNA Testing Laboratories."

# LABORATORY OVERVIEW



The San Francisco Police Department Criminalistics Laboratory is a public laboratory which provides services primarily to the San Francisco Police Department. The laboratory is located at 850 Bryant Street, San Francisco, CA 94103 and is seeking renewal of its ASCLD/LAB accreditation. Laboratory Director James Mudge, reports to Captain Goldberg, Acting Director of the Forensic Services Division. The Laboratory provides services in the discipline of Controlled Substances, Biology, Trace Evidence (gunshot residue and impression evidence only), Firearms/Toolmarks and Questioned Documents. The Laboratory has a staff of nineteen (19) testifying analysts and three (3) support staff.

# INSPECTION TEAM FINDINGS

The inspection team's scoring of each of the ASCLD/LAB Accreditation Standards and Evaluation Criteria from the 2008 Accreditation Manual follows. Each criterion for which the inspection team determined the laboratory to be in compliance is scored "Yes." Each criterion for which the inspection team found the laboratory to not be in total compliance is scored "No." Each criterion which is not applicable to the inspection of this laboratory is scored "N/A." The Summary portion of the report documents the basis for all non-compliance and all non-applicable findings of the Inspection Team.



USAO0002831
USAO0002831

# STANDARDS AND CRITERIA

*The laboratory should establish objectives which are relevant to the community that it serves and communicate them to all employees orally and in written form.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 1.1.1.1 (I) | Does the laboratory have a written statement of its objectives? | ✓ | ___ | ___ |
| 1.1.1.2 (I) | Do the objectives appear to be relevant to the needs of the community serviced by the laboratory? | ✓ | ___ | ___ |
| 1.1.1.3 (D) | Does the laboratory staff understand and support the objectives? | ✓ | ___ | ___ |

*A laboratory or its parent agency should have a formal written budget which is consistent with the forensic services provided by it.*

| 1.1.2.1 (I) | Does the laboratory or its parent agency have a formal written budget? | ✓ | ___ | ___ |
|---|---|---|---|---|
| 1.1.2.2 (I) | Is the budget adequate to meet the written objectives? | ___ | ✓ | ___ |

*Clearly written and well understood procedures must exist for handling and preserving the integrity of evidence; laboratory security; preparation, storage, security and disposition of case records and reports; control of materials and supplies; maintenance and calibration of equipment and instruments; and for operation of individual characteristic databases. Clearly written and well understood documentation or procedures should also exist for job requirements and descriptions; personnel evaluations and objectives; and for employee complaints concerning the quality system.*

Does clearly written and well understood documentation or procedure exist for the following:

| 1.1.2.3 (E) | Handling and preserving the integrity of evidence? | ✓ | ___ | ___ |
|---|---|---|---|---|
| 1.1.2.4 (E) | Laboratory security? | ✓ | ___ | ___ |
| 1.1.2.5 (E) | Preparation, storage, security and disposition of case records and reports? | ✓ | ___ | ___ |
| 1.1.2.6 (E) | Control of materials and supplies? | ✓ | ___ | ___ |
| 1.1.2.7 (E) | Maintenance and calibration of equipment and instruments? | ✓ | ___ | ___ |
| 1.1.2.8 (E) | Operation of individual characteristic databases? | ✓ | ___ | ___ |
| 1.1.2.9 (D) | Job requirements and descriptions? | ✓ | ___ | ___ |
| 1.1.2.10 (D) | Personnel evaluations and objectives? | ___ | ✓ | ___ |
| 1.1.2.11 (D) | Employee complaints concerning the quality system? | ✓ | ___ | ___ |

USAO0002832
USAO0002832

*A laboratory should have a management information system which provides information which assists the laboratory in accomplishing its objectives.*

|  | | Yes | No | N/A |
|---|---|---|---|---|

1.1.2.12 (I)  Does the laboratory have and use a management information system?  ✓ ___ ___

*The laboratory manager should be able to relate the organizational structure to interacting variables such as those stated in the principle.*

1.2.1.1 (D)  Does the organizational structure group the work and personnel in a manner that allows for efficiency of operation, taking into account the interrelation of various forensic disciplines?  ✓ ___ ___

1.2.1.2 (D)  Has the laboratory director considered and taken appropriate action to correct any discrepancies with regard to numbers of personnel when grouping work and resources?  ✓ ___ ___

*The laboratory director should have authority commensurate with the assigned responsibilities.*

1.2.2.1 (I)  Is the laboratory director's authority well defined?  ✓ ___ ___

1.2.2.2 (I)  Does the laboratory director have authority commensurate with responsibilities?  ✓ ___ ___

*Delegation of authority within the laboratory should follow the organizational process outlined in the principle.*

1.2.2.3 (I)  Is there sufficient delegation of authority?  ✓ ___ ___

1.2.2.4 (I)  Is authority of supervisors commensurate with their responsibilities?  ✓ ___ ___

1.2.2.5 (I)  Is each subordinate accountable to one and only one immediate supervisor per function?  ✓ ___ ___

1.2.2.6 (I)  Are performance expectations established and are they understood by laboratory personnel?  ✓ ___ ___

*Constructive discussion should occur between supervisors and subordinates.*

1.3.1.1 (D)  Is there constructive discussion between supervisors and subordinates?  ✓ ___ ___

*Supervisors should carefully and objectively review laboratory activities and personnel.*

1.3.1.2 (I)  Do supervisors carefully and objectively review laboratory activities and personnel?  ✓ ___ ___

USAO0002833
USAO0002833

*Supervisory techniques should encourage creative thinking and objectivity and should recognize meritorious performance of subordinates.*

|  | Yes | No | N/A |
|---|---|---|---|
| 1.3.1.3 (D)  Do the supervisory techniques encourage creative, objective thinking and recognize meritorious performance? | ✓ | ___ | ___ |

*Communication within the laboratory should exist for coordination of case work and to ensure wide dissemination of technical and operational information.*

| 1.3.2.1 (D)  Does an effective means of communication exist within the laboratory? | ✓ | ___ | ___ |

*A training program to develop the technical skills of employees is essential in each applicable discipline and subdiscipline.*

| 1.3.3.1 (E)  Does the laboratory have and use a documented training program in each discipline and subdiscipline for employees who are new, untrained or in need of remedial training? | ___ | ✓ | ___ |

*A formalized personnel development program is important to prepare employees to assume more responsible jobs.*

| 1.3.3.2 (I)  Does the laboratory have an employee development program? | ✓ | ___ | ___ |

*The laboratory should maintain an adequate forensic library to include literature published in the applicable functional areas.*

| 1.3.3.3 (I)  Does the forensic library contain current books, journals, and other literature dealing with each functional area? | ✓ | ___ | ___ |

*A system or procedure should exist to encourage a review of appropriate new literature by personnel.*

| 1.3.3.4 (I)  Does a system exist to encourage each examiner to review appropriate new literature? | ✓ | ___ | ___ |

*A chain of custody record must be maintained which provides a comprehensive, documented history of each evidence transfer over which the laboratory has control.*

| 1.4.1.1 (E)  Does the laboratory have a written or secure electronic chain of custody record with all necessary data which provides for complete tracking of all evidence? | ___ | ✓ | ___ |

*Each individual item of evidence must be marked for identification, when practical. If the item does not lend itself to marking, its proximal container or identifying tag must be marked.*

| 1.4.1.2 (E)  Is all evidence marked for identification? | ✓ | ___ | ___ |

*Evidence seals must be designed and used to protect the integrity of the evidence.*

| 1.4.1.3 (E)  Is evidence stored under proper seal? | ✓ | ___ | ___ |

USAO0002834
USAO0002834

*Procedural precautions must exist which reduce the risk of evidence loss, cross transfer, contamination and /or other deleterious change.*

|  | | Yes | No | N/A |
|--|--|-----|----|-----|

1.4.1.4 (E)    Is evidence protected from loss, cross transfer, contamination and/or deleterious change?    ✓

*A secure area for overnight and/or long-term storage of evidence must be available.*

1.4.1.5 (E)    Is there a secure area for overnight and/or long-term storage of evidence?    ✓

*A forensic laboratory must establish whether individual characteristic database samples are treated as evidence, reference materials, or examination documentation.*

1.4.1.6 (E)    Has the laboratory established whether individual characteristic database samples are treated as evidence, reference materials, or examination documentation?    ✓

*Each individual characteristic database sample under the control of the laboratory must be uniquely identified.*

1.4.1.7 (E)    Is each individual characteristic database sample under the control of the laboratory uniquely identified?    ✓

*Procedural precautions must exist which reduce the risk of individual characteristic database sample loss, cross transfer, contamination and /or other deleterious change.*

1.4.1.8 (E)    Are individual characteristic database samples protected from loss, cross transfer, contamination and/or deleterious change?    ✓

*Access to individual characteristic database samples under the control of the laboratory must be restricted to those persons authorized by the laboratory director.*

1.4.1.9 (E)    Is access to individual characteristic database samples restricted to those persons authorized by the laboratory director?    ✓

*All elements of a laboratory's quality system must be clearly documented in a quality manual which is kept current under the responsibility of a quality manager.*

1.4.2.1 (E)    Does the laboratory have a comprehensive quality manual?    ✓

*A laboratory must have an individual designated as the Quality Manager.*

1.4.2.2 (E)    Is an individual designated as the quality manager?    ✓

*To verify that its operations continue to comply with the requirements of its quality system and the standards under which ASCLD/LAB accreditation was granted, each accredited laboratory must conduct an annual audit of its operations and submit an Annual Accreditation Audit Report (Appendix 6) to ASCLD/LAB by the anniversary of its accreditation.*

USAO0002835
USAO0002835

|  | Yes | No | N/A |
|---|---|---|---|

1.4.2.3 (E)  Did the accredited laboratory conduct and document an annual audit of its operations and submit an annual accreditation audit report to ASCLD/LAB by the required deadline?  ✓ ___ ___

*The quality system requires that laboratory management conduct a review at least once yearly to ensure the continued suitability and effectiveness of such a system.*

1.4.2.4 (E)  Does the laboratory conduct and document an annual review of its quality system?  ✓ ___ ___

*Procedures used must be generally accepted in the field or supported by data gathered and recorded in a scientific manner.*

1.4.2.5 (E)  Are the procedures used generally accepted in the field or supported by data gathered and recorded in a scientific manner?  ✓ ___ ___

*New technical procedures must be validated to prove their efficacy in examining evidence material before being implemented on casework.*

1.4.2.6 (E)  Are new technical procedures scientifically validated before being used in casework and is the validation documentation available for review?  ✓ ___ ___

*The laboratory must maintain written copies of appropriate technical procedures.*

1.4.2.7 (E)  Are the technical procedures used by the laboratory documented and are the documents available to laboratory personnel for review?  ✓ ___ ___

*Controls and standard samples must be used and documented in the case record to ensure the validity of the testing parameters and, thereby, the conclusion.*

1.4.2.8 (E)  Are appropriate controls and standards specified in the procedures and are they used and documented in the case record to ensure the validity of examination results?  ✓ ___ ___

*The quality of the standard samples and reagents must be adequate for the procedure used.*

1.4.2.9 (E)  Is the quality of the standard samples and reagents adequate for the procedure used?  ✓ ___ ___

*All reagents must be routinely tested for their reliability.*

1.4.2.10 (E)  Does the laboratory routinely check the reliability of its reagents?  ✓ ___ ___

*Instruments/equipment should be adequate for the procedures used.*

1.4.2.11 (I)  Are the instruments/equipment adequate for the procedures used?  ✓ ___ ___

USAO0002836
USAO0002836

*Instruments/equipment should be maintained in proper working order.*

|  | Yes | No | N/A |
|---|---|---|---|

1.4.2.12 (I)   Are the instruments/equipment in proper working order? — Yes ✓

*Instruments/equipment must be properly calibrated and calibration records maintained for all calibrated instruments.*

1.4.2.13 (E)   Are the instruments/equipment properly calibrated? — Yes ✓

*The laboratory must create and maintain a uniquely identified case record for all administrative and examination documentation generated and/or received by the laboratory for each case involving the analysis of evidence.*

1.4.2.14 (E)   Does the laboratory create and maintain a uniquely identified case record for all examination and administrative documentation generated and/or received by the laboratory for each case involving the analysis of evidence? — No ✓

*The laboratory's unique case identifier must be on each page of examination documentation, and the handwritten initials (or secure electronic equivalent) of the person generating the examination documentation must be on each page generated by that person.*

1.4.2.15 (E)   Does the laboratory's unique case identifier appear on each page of examination documentation, and does the handwritten initials (or secure electronic equivalent) of the person generating the examination documentation appear on each page generated by that person? — Yes ✓

*Examination documentation must be sufficiently detailed to support the conclusions and opinions reported by the examiner(s) and must be such that, in the absence of the examiner(s), another competent examiner or supervisor could evaluate what was done and interpret the data. Examination documentation must be of a permanent nature and must be free of obliterations and erasures.*

1.4.2.16 (E)   Are conclusions and opinions in reports supported by data available in the case record, and are the examination documents sufficiently detailed such that, in the absence of the examiner(s), another competent examiner or supervisor could evaluate what was done and interpret the data? — No ✓

1.4.2.17 (E)   Is examination documentation of a permanent nature and is it free of obliterations and erasures? — Yes ✓

*Laboratory personnel who issue findings based on examination documentation generated by another person(s) must complete and document the review of all relevant pages of examination documentation in the case record.*

1.4.2.18 (E)   Has each person(s) in the laboratory who issued findings based on examination documentation generated by another person, completed a review of all relevant pages of examination documentation and documented the review in the case record? — Yes ✓

USAO0002837
USAO0002837

*Written reports must be generated for all analytical work performed on evidence by the laboratory and must contain the conclusions and opinions that address the purpose for which the analytical work was undertaken. The significance of associations made must be communicated clearly and qualified properly. The name of the author(s) must appear in the report.*

|  | Yes | No | N/A |
|---|---|---|---|

1.4.2.19 (E)  Does the laboratory generate written reports for all analytical work performed on evidence, and do the reports contain the conclusions and opinions that address the purpose for which the analytical work was undertaken? — Yes ✓

1.4.2.20 (E)  Where associations are made, is the significance of the association communicated clearly and qualified properly in the report? — Yes ✓

1.4.2.21 (E)  Does the name of the author(s) appear in the report? — Yes ✓

*It is essential that a representative number of reports be subjected to a technical review.*

1.4.2.22 (E)  Does the laboratory have, use and document a system of technical review of the reports to ensure that the conclusions of its examiners are reasonable and within the constraints of scientific knowledge? — No ✓

*Administrative reviews must be conducted to ensure the completeness and correctness of the reports issued.*

1.4.2.23 (E)  Does the laboratory conduct and document administrative reviews of all reports issued? — Yes ✓

*The laboratory must have and follow a written procedure whereby the testimony of each examiner is monitored at least once every year.*

1.4.2.24 (E)  Does the laboratory monitor the testimony of each examiner at least annually and is the examiner given feedback from the evaluation? — Yes ✓

*The laboratory must have a written procedure which it uses to initiate a review and to take corrective action when the laboratory has an indication of a significant problem with a technical procedure or the work of an analyst.*

1.4.2.25 (E)  If the laboratory has an indication of a significant technical problem, is there a procedure in writing and in use whereby the laboratory initiates a review and takes any corrective action required? — No ✓

*Each laboratory must have a documented program of proficiency testing which measures the capability of its examiners and the reliability of its analytical results.*

1.4.3.1 (E)  Does the laboratory have a documented program of proficiency testing? — Yes ✓

USAO0002838
USAO0002838

*The laboratory must participate in proficiency testing programs in which samples are provided by an external test provider. ASCLD/LAB approved providers must be used where available.*

|  | Yes | No | N/A |
|---|---|---|---|

1.4.3.2 (E)   Does the laboratory participate in proficiency testing programs conducted by approved test providers or by other external provider(s) when no approved provider is available?   ✓ ___ ___

*Each Examiner should be proficiency tested annually in each subdiscipline in which casework is performed.*

1.4.3.3 (I)   Was each examiner proficiency tested annually in each subdiscipline in which casework was performed?   ✓ ___ ___

*The laboratory should conduct annual proficiency testing in each discipline using re-examination or blind techniques.*

1.4.3.4 (I)   Does the laboratory conduct proficiency testing using re-examination or blind techniques?   ___ ✓ ___

*Each examiner must be proficiency tested at least once, during each five-year accreditation cycle, in each subdiscipline in which the examiner performs casework examinations and issues report.*

1.4.3.5 (E)   Was each examiner proficiency tested at least once, during the previous five-year accreditation cycle, in every subdiscipline in which the examiner performed casework examinations and issued reports?   ✓ ___ ___

## MANAGEMENT

*The laboratory director should have a minimum of a baccalaureate degree in a natural science, criminalistics or a closely related field. If the director lacks a scientific background, then there should be support within management by personnel with appropriate scientific background.*

2.1.1 (I)   Does the laboratory director possess a degree in a natural science, criminalistics or in a closely related field, or is the laboratory director supported by scientific personnel of sufficient managerial rank and authority?   ✓ ___ ___

*A laboratory director should have at least five years of forensic science experience performing casework in one of the ASCLD/LAB accredited disciplines.*

2.1.2 (D)   Does the laboratory director have at least five years of forensic science experience?   ✓ ___ ___

*Additional education in management or business administration by college course work or short training courses (or both) is recommended.*

2.1.3 (D)   Does the laboratory director have some formal training in management?   ✓ ___ ___

USAO0002839
USAO0002839

*The laboratory director should have at least two years of experience in management.*

|  | Yes | No | N/A |
|---|---|---|---|
| 2.1.4 (D) Does the laboratory director have at least two years of managerial experience? | ✓ | — | — |

## CONTROLLED SUBSTANCES

*Examiners must have education and experience/training commensurate with the examinations and testimony provided. A baccalaureate or advanced degree in a natural science, criminalistics or in a closely related field is required.*

| 2.2.1 (E) Does each examiner possess a baccalaureate or advanced degree in a natural science, criminalistics or in a closely related field and does each have experience/training commensurate with the examinations and testimony provided? | ✓ | — | — |
|---|---|---|---|

*Examiners must have a good understanding of the principles, uses and limitations of the instruments, and the methods and procedures as applied to the tasks performed.*

| 2.2.2 (E) Does each examiner understand the instruments, and the methods and procedures used? | ✓ | — | — |
|---|---|---|---|

*Examiners must have successfully completed a competency test.*

| 2.2.3 (E) Did each examiner successfully complete a competency test prior to assuming casework responsibility? | ✓ | — | — |
|---|---|---|---|

*A proficiency test must be successfully completed by each examiner at least annually.*

| 2.2.4 (E) Did each examiner successfully complete an annual proficiency test? | ✓ | — | — |
|---|---|---|---|

## TOXICOLOGY

*Examiners must have education and experience/training commensurate with the examinations and testimony provided. A baccalaureate or advanced degree in a natural science, toxicology, criminalistics or in a closely related field is required.*

| 2.3.1 (E) Does each examiner have a baccalaureate or advanced degree in a natural science, toxicology, criminalistics or in a closely related field and does each have experience/training commensurate with the examinations and testimony provided? | — | — | ✓ |
|---|---|---|---|

*Examiners must have a good understanding of the principles, uses and limitations of the instruments, and the methods and procedures applied to the tasks performed.*

| 2.3.2 (E) Does each examiner understand the instruments, and the methods and procedures used? | — | — | ✓ |
|---|---|---|---|

USAO0002840
USAO0002840

*Examiners must have successfully completed a competency test.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 2.3.3 (E) | Did each examiner successfully complete a competency test prior to assuming casework responsibility? | —— | —— | ✓ |

*A proficiency test must be successfully completed by each examiner at least annually.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 2.3.4 (E) | Did each examiner successfully complete an annual proficiency test? | —— | —— | ✓ |

## TRACE EVIDENCE

*Examiners must have education and experience/training commensurate with the examinations and testimony provided. A baccalaureate or advanced degree in a natural science, criminalistics or in a closely related field is required.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 2.4.1 (E) | Does each examiner possess a baccalaureate or advanced degree in a natural science, criminalistics or in a closely related field and does each have experience/training commensurate with the examinations and testimony provided? | ✓ | —— | —— |

*Examiners must have a good understanding of the principles, uses and limitations of the instruments, and the methods and procedures applied to the tasks performed.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 2.4.2 (E) | Does each examiner understand the instruments, and the methods and procedures used? | ✓ | —— | —— |

*A competency test must be successfully completed prior to working cases of each evidence type.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 2.4.3 (E) | Did each examiner successfully complete a competency test in each of the subdisciplines processed prior to assuming casework responsibility? | ✓ | —— | —— |

*A proficiency test must be successfully completed by each examiner at least annually.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 2.4.4 (E) | Did each examiner successfully complete an annual proficiency test? | ✓ | —— | —— |

## BIOLOGY

*Examiners must have education and experience/training commensurate with the examinations and testimony provided. A baccalaureate or advanced degree in a natural science, criminalistics or in a closely related field is required.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 2.5.1 (E) | Does each examiner possess a baccalaureate or advanced degree in a natural science, criminalistics or in a closely related field and does each have experience/training commensurate with the examinations and testimony provided? | ✓ | —— | —— |

USAO0002841
USAO0002841

|  | Yes | No | N/A |
|---|---|---|---|

2.5.2 (E)  Does each examiner performing DNA analysis have education, training and experience consistent with those required by the quality assurance audit document? — ✓ — —

*Examiners must have a good understanding of the principles, uses and limitations of the instruments, and the methods and procedures applied to the tasks performed.*

2.5.3 (E)  Does each examiner understand the instruments, and the methods and procedures used? — ✓ — —

*Examiners must have successfully completed a competency test.*

2.5.4 (E)  Did each examiner successfully complete a competency test prior to assuming casework responsibility? — ✓ — —

*A proficiency test must be successfully completed by each examiner at least annually?*

2.5.5 (E)  Did each examiner successfully complete an annual proficiency test? — ✓ — —

*Two proficiency tests must be successfully completed by each DNA examiner annually.*

2.5.6 (E)  Did each examiner performing DNA analysis successfully complete two annual proficiency tests from an approved test provider? — ✓ — —

## FIREARMS/TOOLMARKS

*Firearms/toolmarks examiners should have a baccalaureate degree with science courses.*

2.6.1 (I)  Does each examiner possess a baccalaureate degree with science courses? — ✓ — —

*Examiners must have a good understanding of the principles, uses and limitations of the instruments, and the methods and procedures used as applied to the tasks performed.*

2.6.2 (E)  Does each examiner understand the instruments, and the methods and procedures used? — ✓ — —

*Examiners must have education and experience/training commensurate with the examinations and testimony provided. Independent case examinations must not be undertaken until extensive instruction from a qualified examiner has been completed.*

2.6.3 (E)  Did each examiner have extensive training from a qualified examiner and does each have experience commensurate with the examinations and testimony provided? — ✓ — —

USAO0002842
USAO0002842

*Examiners must successfully complete a competency test.*

|  | Yes | No | N/A |
|---|---|---|---|

2.6.4 (E)  Did each examiner successfully complete a competency test prior to assuming case work responsibility? — Yes ✓

*A proficiency test must be successfully completed by each examiner at least annually.*

2.6.5 (E)  Did each examiner successfully complete an annual proficiency test? — Yes ✓

## QUESTIONED DOCUMENTS

*Questioned document examiners should have a baccalaureate degree with science courses.*

2.7.1 (I)  Does each examiner possess a baccalaureate degree with science courses? — Yes ✓

*Examiners must have a good understanding of the principles, uses and limitations of the instruments, and the methods and procedures used as applied to the tasks performed.*

2.7.2 (E)  Does each examiner understand the instruments, and the methods and procedures used? — Yes ✓

*Examiners must have education and training/experience commensurate with the examinations and testimony provided. Independent case examinations must not be undertaken until extensive instruction from a qualified document examiner has been completed.*

2.7.3 (E)  Did each examiner have extensive training from a qualified examiner and does each have experience commensurate with the examinations and testimony provided? — Yes ✓

*Examiners must have successfully completed a competency test.*

2.7.4 (E)  Did each examiner successfully complete a competency test prior to assuming case work responsibility? — Yes ✓

*A proficiency test must be successfully completed by each examiner at least annually.*

2.7.5 (E)  Did each examiner successfully complete an annual proficiency test? — Yes ✓

## LATENT PRINTS

*Latent print examiners should have a baccalaureate degree with science courses.*

2.8.1 (I)  Does each examiner possess a baccalaureate degree with science courses? — N/A ✓

USAO0002843
USAO0002843

*Examiners must have a good understanding of the concept of individualization and the principles, uses and limitations of the instruments, and the methods and procedures used as applied to the tasks performed.*

|  | | Yes | No | N/A |
|---|---|---|---|---|

2.8.2 (E)    Does each examiner understand the instruments, and the methods and procedures used?     ___   ___   ✓

*Examiners must have education and training/experience commensurate with the examinations and testimony provided. Independent case examinations must not be undertaken until extensive instruction from a qualified latent print examiner has been completed.*

2.8.3 (E)    Did each examiner have extensive training from a qualified examiner and does each have experience commensurate with the examinations and testimony provided?     ___   ___   ✓

*Examiners must have successfully completed a competency test.*

2.8.4 (E)    Did each examiner successfully complete a competency test prior to assuming casework responsibility?     ___   ___   ✓

*A proficiency test must be successfully completed by each examiner at least annually.*

2.8.5 (E)    Did each examiner successfully complete an annual proficiency test?     ___   ___   ✓

## TECHNICAL SUPPORT

*The individual must meet the specification of the job description.*

2.9.1 (E)    Do technical support personnel meet the requirements of their job descriptions?     ✓   ___   ___

*The job description and the duties performed must be in agreement.*

2.9.2 (E)    Are the job descriptions and the duties performed in agreement?     ✓   ___   ___

*Technical support staff must have successfully completed an appropriate competency test.*

2.9.3 (E)    Did each member of the technical support staff successfully complete an appropriate competency test prior to assuming casework responsibility?     ✓   ___   ___

*Technical support personnel must successfully complete an appropriate proficiency test annually.*

2.9.4 (E)    Did all technical support personnel successfully complete an appropriate proficiency test, annually?     ✓   ___   ___

USAO0002844
USAO0002844

*Two proficiency tests must be successfully completed annually by all technical support personnel performing DNA analysis.*

|  | Yes | No | N/A |
|---|---|---|---|
| 2.9.5 (E) Did all technical support personnel performing DNA analysis successfully complete two annual proficiency tests from an approved test provider? | ___ | ___ | ✓ |

## CRIME SCENE

*The examiner must meet the requirements of the job description.*

2.10.1 (E)  Do examiners meet the requirements of their job descriptions?  ___ ___ ✓

*Examiners must have a good understanding of the concept and theory of scene security and integrity, and the uses and limitations of the equipment, methods and procedures used to document and process crime scenes, as applied to the tasks performed.*

2.10.2 (E)  Does each examiner understand the equipment, methods and procedures used?  ___ ___ ✓

*Examiners must have training and experience commensurate with the examinations, documentation and testimony provided, as applied to the tasks performed. Independent examinations and documentation at crime scenes must not be undertaken until extensive instruction from a qualified examiner has been completed.*

2.10.3 (E)  Did each examiner have extensive training from a qualified examiner and does each have experience commensurate with the examinations/documentation and testimony provided?  ___ ___ ✓

*Examiners must have successfully completed a competency test(s) as applied to the task(s) performed.*

2.10.4 (E)  Did each examiner successfully complete a competency test(s) prior to primary responsibility for the examination, documentation and processing of a crime scene?  ___ ___ ✓

*A proficiency test must be completed by each person conducting crime scene examinations at least annually. The proficiency test should reflect the types of procedures, methods and equipment as applied to the typical task(s) performed.*

2.10.5 (E)  Did each examiner successfully complete an annual proficiency test?  ___ ___ ✓

## DIGITAL & MULTIMEDIA EVIDENCE

*Digital and multimedia evidence examiners should have a baccalaureate degree with science courses.*

2.11.1 (I)  Does each examiner possess a baccalaureate degree with science courses?  ___ ___ ✓

USAO0002845
USAO0002845

*Examiners must have a good understanding of the principles, uses and limitations of the hardware, software, and the methods and procedures as applied to the tasks performed.*

|  | | Yes | No | N/A |
|---|---|---|---|---|
| 2.11.2 (E) | Does each examiner understand the equipment, programs, methods and procedures used? | — | — | ✓ |

*Examiners must have education and training/experience commensurate with the examinations and testimony provided. Independent case examinations must not be undertaken until extensive instruction from a qualified examiner has been completed.*

| 2.11.3 (E) | Does each examiner have experience commensurate with the examinations/documentation and testimony provided? | — | — | ✓ |
|---|---|---|---|---|

*Examiners must have successfully completed a competency test.*

| 2.11.4 (E) | Did each examiner successfully complete a competency test in each subdiscipline prior to assuming casework responsibility? | — | — | ✓ |
|---|---|---|---|---|

*A proficiency test must be successfully completed by each examiner at least annually.*

| 2.11.5 (E) | Did each examiner successfully complete an annual proficiency test? | — | — | ✓ |
|---|---|---|---|---|

*Each employee should have adequate work space to accomplish assigned tasks.*

| 3.1.1 (I) | Does each employee have adequate work space to accomplish assigned tasks? | ✓ | — | — |
|---|---|---|---|---|

*Sufficient space should be provided for storage of supplies, equipment and tools.*

| 3.1.2 (D) | Is there sufficient space provided for storage of supplies, equipment and tools? | — | ✓ | — |
|---|---|---|---|---|

*Examiners should have space available for writing reports and other official communications.*

| 3.1.3 (I) | Is there adequate space available for examiners for writing reports and other official communications? | ✓ | — | — |
|---|---|---|---|---|

*Adequate and appropriate space should exist for records and reference materials.*

| 3.1.4 (I) | Is there adequate and appropriate space available for records, reference works and other necessary documents? | ✓ | — | — |
|---|---|---|---|---|

*Sufficient space should be available for instrumentation/equipment to facilitate its operation.*

| 3.1.5 (I) | Is adequate space available for instrumentation/equipment to facilitate its operation? | ✓ | — | — |
|---|---|---|---|---|

USAO0002846
USAO0002846

*Accessories should be stored near instrumentation/equipment to facilitate its use and operation.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|

3.1.6 (D)  Are accessories stored near instrumentation/equipment to facilitate its use and operation?  ✓ ___ ___

*The physical design should permit the efficient flow of evidence from the time of its acceptance until its proper disposal.*

3.2.1 (I)  Does the physical design permit the efficient flow of evidence from the time of its acceptance until its proper disposal?  ✓ ___ ___

*The relative locations of functional areas should facilitate the use of equipment and instruments.*

3.2.2 (D)  Do the relative locations of functional areas facilitate the use of equipment and instruments?  ✓ ___ ___

*Adequate and proper lighting should be available for personnel to carry out assigned tasks.*

3.2.3 (I)  Is there adequate and proper lighting available for personnel to carry out assigned tasks?  ✓ ___ ___

*Adequate and proper plumbing and wiring should be available and accessible to carry out assigned tasks.*

3.2.4 (I)  Is there adequate and proper plumbing and wiring available and accessible to carry out assigned tasks?  ✓ ___ ___

*The laboratory should have proper general ventilation.*

3.2.5 (I)  Does the laboratory have proper general ventilation?  ✓ ___ ___

*There should be adequate heating, cooling and humidity control in the laboratory.*

3.2.6 (I)  Is the heating, cooling and humidity control in the laboratory adequate?  ✓ ___ ___

*Access to the operational area of the laboratory must be controllable and limited to those individuals who are assigned to routinely work in the area or to those individuals designated by the laboratory director to have access.*

3.3.1 (E)  Is access to the operational area of the laboratory controllable and limited?  ✓ ___ ___

*All exterior entrance/exit points require adequate security control.*

3.3.2 (E)  Do all exterior entrance/exit points have adequate security control?  ✓ ___ ___

USAO0002847
USAO0002847

*Internal areas requiring limited/controlled access must have a lock system.*

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 3.3.3 (E) | Do all internal areas requiring limited/controlled access have a lock system? | ✓ | ___ | ___ |

*Accountability of all keys, magnetic cards, etc., must be documented and their distribution limited to those individuals designated by the laboratory director to have access.*

3.3.4 (E)   Is distribution of all keys, magnetic cards, etc., documented and is distribution limited to those individuals designated by the laboratory director to have access? ✓ ___ ___

*The laboratory must be monitored during vacant hours by an intrusion alarm or by security personnel.*

3.3.5 (E)   Is the laboratory secured during vacant hours by means of an intrusion alarm or by security personnel? ✓ ___ ___

*The laboratory should have a fire detection system.*

3.3.6 (I)   Does the laboratory have a fire detection system? ✓ ___ ___

*All elements of a laboratory's health and safety program must be clearly documented in a manual. The program should be monitored and the manual kept current by a health and safety manager.*

3.4.1 (I)   Does the laboratory have an effective health and safety program documented in a manual? ✓ ___ ___

3.4.2 (I)   Is an individual designated as the health and safety manager? ✓ ___ ___

3.4.3 (I)   Is the health and safety program monitored regularly and reviewed annually to ensure that its requirements are being met? ✓ ___ ___

*The laboratory should have available and encourage the use of safety devices (particularly those required in its health and safety manual). Examples of such devices are goggles, face protectors, ear protectors, gloves and fire extinguishers.*

3.4.4 (I)   Does the laboratory have available and encourage the use of safety devices, particularly those required by its health and safety manual? ✓ ___ ___

*Proper equipment and material should be available for the handling of carcinogenic, toxic and/or other dangerous material spills.*

3.4.5 (I)   Does the laboratory have proper equipment and material available for the handling of carcinogenic, toxic and/or other dangerous material spills? ✓ ___ ___

USAO0002848
USAO0002848

*The laboratory should have safety shower and eye wash equipment in appropriate locations and in good working condition.*

|  | | Yes | No | N/A |
|---|---|---|---|---|
| 3.4.6 (I) | Does the laboratory have safety shower and eye wash equipment in appropriate locations and in good working condition? | ✓ | ___ | ___ |

*Exhaust hoods must be available to maintain a safe work environment.*

| 3.4.7 (I) | Are sufficient exhaust hoods available to maintain a safe work environment? | ✓ | ___ | ___ |
|---|---|---|---|---|

*Sufficient first-aid kits should be available and strategically located.*

| 3.4.8 (I) | Are sufficient first-aid kits available and strategically located? | ✓ | ___ | ___ |
|---|---|---|---|---|

*An adequate number of personnel should hold current certification in first-aid.*

| 3.4.9 (I) | Does the laboratory have an adequate number of personnel holding current certification in first-aid? | ✓ | ___ | ___ |
|---|---|---|---|---|

*Space should be provided for safe storage of volatile, flammable, explosive and other hazardous materials.*

| 3.4.10 (I) | Is appropriate space provided for safe storage of volatile, flammable, explosive and other hazardous materials? | ✓ | ___ | ___ |
|---|---|---|---|---|

*Emergency exits from the laboratory should be in compliance with safe working requirements.*

| 3.4.11 (I) | Are the emergency exits from the laboratory adequate for safe exit in an emergency? | ✓ | ___ | ___ |
|---|---|---|---|---|

*General cleanliness and good-housekeeping should be apparent.*

| 3.4.12 (D) | Is there general cleanliness and apparent good-housekeeping in the laboratory? | ___ | ✓ | ___ |
|---|---|---|---|---|

USAO0002849
USAO0002849

# SUMMARY



The following summarizes the criteria for which the Inspection Team determined the laboratory to not be in compliance at the time of the inspection and documents the basis for the findings. The summary also identifies criteria which were determined to be not applicable and the basis for that determination:

1.1.2.2 (I)    Is the budget adequate to meet the written objectives?

**The laboratory does not have sufficient personnel resources to meet its present objectives. The laboratory must analyze most controlled substance cases within a forty-eight hour time period to prevent the dismissal of criminal charges. Mandatory overtime is continually used to meet this requirement. Even with the required overtime the laboratory does not always meet this requirement.**

1.1.2.10 (D)    Does clearly written and well understood documentation or procedure exist for personnel evaluations and objectives?

**The laboratory does not complete agency required written personnel evaluations of civilian employees.**

1.3.3.1 (E)    Does the laboratory have and use a documented training program in each discipline and subdiscipline for employees who are new, untrained or in need of remedial training?

**The Questioned Documents and the Impression Evidence training programs consist of outlines of seven and two pages respectively. The training programs are not sufficiently comprehensive to cover all aspects of the work performed by laboratory analysts in the two respective disciplines. The outlines do not reference more detailed training modules in other laboratory documents.**

1.4.1.1 (E)    Does the laboratory have a written or secure electronic chain of custody record with all necessary data which provides for complete tracking of all evidence?

**In the Controlled Substances discipline, chain of custody records are maintained electronically. Evidence transfers which did not occur sometimes show up in the record and transfers which did occur are sometimes omitted from the record.**

**In the Controlled Substances discipline, the terminal in which analysts enter electronic chain of custody information is not secured from unauthorized access. The laboratory does not have a written procedure for securing the terminal after an analyst has made an entry and steps away from the terminal.**

1.4.2.14 (E)    Does the laboratory create and maintain a uniquely identified case record for all examination and administrative documentation generated and/or received by the laboratory for each case involving the analysis of evidence?

**In the Biology discipline, all examination documentation generated by the analyst is not retained in the case record. Handwritten examination documentation recorded at the time of analysis is discarded after being transcribed to the LIMS system.**



USAO0002850
USAO0002850

1.4.2.16 (E)   Are conclusions and opinions in reports supported by data available in the case record, and are the examination documents sufficiently detailed such that, in the absence of the examiner(s), another competent examiner or supervisor could evaluate what was done and interpret the data?

**In the Controlled Substances discipline, the Controlled Substances SOP 4.A.5 states the negative control will be free of controlled substances contaminants. Mass spectral data was not available for review in the case record for extraneous peaks found in the reagent blank/negative control. The laboratory does not have a policy to retain this data.**

**In the Controlled Substances discipline, the date the analyst begins the examination is not recorded in the examination documentation.**

1.4.2.22 (E)   Does the laboratory have, use and document a system of technical review of the reports to ensure that the conclusions of its examiners are reasonable and within the constraints of scientific knowledge?

**The Controlled Substances SOP requires documentation of the technical review on the case report. The technical review is documented on a technical review log instead of the laboratory report.**

1.4.2.25 (E)   If the laboratory has an indication of a significant technical problem, is there a procedure in writing and in use whereby the laboratory initiates a review and takes any corrective action required?

**Balance verifications in the controlled substances discipline are performed on a monthly basis. In two instances balances have been taken out of service for errors without initiating a review and following the laboratory corrective action procedure.**

1.4.3.4 (I)   Does the laboratory conduct proficiency testing using re-examination or blind techniques?

**The laboratory does not conduct proficiency testing using re-examination or blind techniques in at least fifty percent of the disciplines.**

3.1.2 (D)   Is there sufficient space provided for storage of supplies, equipment and tools?

**Cleaning supplies, water carboy bottles, and metal storage cabinets are located in the corridors of the laboratory.**

3.4.12 (D)   Is there general cleanliness and apparent good-housekeeping in the laboratory?

**Common areas in the building which are used by the laboratory are in a poor state of housekeeping and repair.**

All criteria for sections 2.3 Toxicology, 2.8 Latent prints, 2.10 Crime Scene and 2.11 Digital & Multimedia Evidence were scored N/A because the laboratory does not perform work in the disciplines.

Criterion 2.9.5 was scored N/A because the laboratory does not use technicians in the Biology discipline.

USAO0002851
USAO0002851

# SUMMATION OF CRITERIA RATINGS

|  | Total Possible | Total Yes | Total No | Total N/A | Total Number Yes/No |
|---|---|---|---|---|---|
| Essential | 91 | 67 | 6 | 18 | 73 |
| Important | 45 | 41 | 2 | 2 | 43 |
| Desirable | 16 | 13 | 3 | 0 | 16 |

Percent Essential: 92%

Percent Important: 95%

Percent Desirable: 81%

Areas sought for accreditation are as follows:

- Firearms/Toolmarks
- Trace Evidence (gunshot residue and impression evidence only)
- Controlled Substances
- Biology
- Questioned Documents

Prepared by: Robert Gonsowski, ASCLD/LAB Staff Inspector

*Ralph M. Keaton*

Ralph M. Keaton, Executive Director

USAO0002852
USAO0002852



 **San Francisco Police Department**
**Criminalistics Laboratory**

James Mudge, Crime Lab Manager
850 Bryant Street
San Francisco, CA 94103
(415) 671-3179

February 5, 2010

Robert Gonsowski, Team Captain
ASCLD/LAB Staff Inspector
409 Woodvale Lane
Herrin, Illinois 62948

Dear Mr. Gonsowski:

In response to the ASCLD/LAB Report received following our inspection in November 2009, please see comments below and attached remediation documentation as required to demonstrate compliance with the criteria listed below. The summary of your report is attached to this response. Documentation of compliance for each of the six essential findings is located in the tabbed attachments.

**1.1.2.2 (I)      Is the budget adequate to meet the written objectives?**

The comments are noted and undisputed.

**1.1.2.10 (D)   Does clearly written and well understood documentation or procedure exist for personnel evaluations and objectives?**

The comments are noted and undisputed. The Laboratory Management team will be working this year on the development of an evaluation mechanism that will best assist supervisors and employees in identifying and achieving goals with appropriate rating tools to create a dynamic interaction between employee and supervisor.

**1.3.3.1 (E)    Does the laboratory have and used a documented training program in each discipline and subdiscipline for employees who are new, untrained or in need of remedial training?**

New training programs have been adopted for Questioned Documents and Impression Evidence. These programs are comprehensive and utilize detailed training modules with references. All of the references for the QD program are either located in the laboratory, through QDAD (QD Article Database), or from other regional QD laboratories. All of the Impression Evidence program references are located in the laboratory. The training programs are attached.

**1.4.1.1 (E)    Does the laboratory have a written or secure electronic chain of custody record with all necessary data which provides for complete tracking of all evidence?**

SFPD 30089

000124

USAO0003807
USAO0003807

The chain of custody records in the Controlled Substances unit are maintained electronically using a commercially available product. However, there are two computers in two different locations and since there was no networking capabilities until recently, we have been using a memory stick. This has caused problems in the past year. The laboratory has been taking steps to correct this problem in conjunction with the software provider, *FileOnQ*. We have connected both computers to a networked server that is housed at the Crime Laboratory. We have contracted with the vendor to provide the updates necessary to link the two systems in the manner used by other Police Departments. This will provide a single audit trail and chain of custody document. The scope of work has been attached in letter form from the vendor. The work will be performed in the next month. As a temporary measure, all entries are currently being made at the computer in the Controlled Substances Laboratory, and no data transfers to the other computer are being performed.

The laboratory has policies in place to secure the bar-code terminal from unauthorized access, specifically, *Controlled Substances SOP Section 2. EVIDENCE INTEGRITY, C. Chain of Custody, 3.*, that states:

3. **Bar-coding of Evidence.**

a. Each PCD member handling controlled substances evidence and each member of the Controlled Substances Unit has a unique personal password that is required to gain access to the bar-code program. Personnel must log-off the program upon completion of entering one or more chain of custody transaction(s).

and *Controlled Substances SOP Section 2. EVIDENCE INTEGRITY D.*, that states:

D. **Evidence Security at the Crime Lab**
1. The Controlled Substances Laboratory must be locked when no analysts are present.
2. Only analysts assigned to this unit, PCD Narcotics couriers, the Crime Lab Manager, and the Quality Assurance Manager have access to this laboratory.
3. Any visitors, police officers not assigned to the laboratory, janitors or maintenance personnel, and non-unit analysts, must be escorted by a unit analyst, the Crime Lab Manager, or the QA Manager while in the Controlled Substances Laboratory.

Please find the documentation from the Controlled Substances SOP attached.

**1.4.2.14 (E)    Does the laboratory create and maintain a uniquely identified case record for all examination and administrative documentation generated and/or received by the laboratory for each case involving the analysis of evidence?**

All examination and administrative documentation generated and/or received by the Laboratory is created and maintained in a uniquely identified case record. Case files for each incident involving analysis of evidence are created by the Laboratory and include *SFPD Case Diagram Notes* and *LIMS DNA analytical worksheets*, final *Reports of Laboratory Examination*,

SFPD 30090

000125                                              USAO0003808
                                                    USAO0003808

*Communications Logs, Evidence Receipt and Disposition Logs*, etc. that capture analytical and administrative case information.

From the SFPD *DNA Unit Quality Control* and *Quality Assurance Manual*:

> *11.1   The laboratory has and follows written procedures for taking and maintaining case notes to support the conclusions drawn in laboratory reports.  See Quality Control Manual.*
>
> *The laboratory maintains, in a case record, all documentation generated by examiners related to case analyses.*
>
> *A case file with a unique laboratory number, containing the Laboratory Request form, is established for each case when evidence is retrieved by the DNA section. Accurate records (e.g., notes, diagrams, photographs, worksheets, DNA Section forms, etc.) of analytical work (e.g., examinations, tests, observations, etc.) performed are maintained for each case.*
>
> *11.2   Reports, according to written guidelines, include the following:*
>
> *Case identifier, description of evidence examined, description of the methodology, locus, results and/or conclusions, an interpretive statement (either quantitative or qualitative), date issued, disposition of evidence, and a signature and title, or equivalent identification, of the person(s) accepting responsibility for the content of the report. Final reports address each tested item or its probative fraction.*

Case records are completed when an analyst makes a handwritten entry into the case file or prints a LIMS-generated case note. Such entries are made prior to the case review and are stored in hard copy (in the case file) and electronic format (as a LIMS worksheet).

Examples of 'unofficial' case records, which may be recorded but not retained by the Laboratory, include the following: (1) post-it notes used to capture communications with investigators and District Attorneys, (2) DRAFT *Reports of Laboratory Examination*, (3) photographs unsuitable to accurately depict evidence (blurred or out-of-focus images, etc.). The administrative and/or examination documentation within these unofficial records are memorialized by the analysts in formal case records; the unofficial records are discarded. For example, a communication captured on a post-it note may be handwritten into the *Communication Log* or typed directly into a LIMS-generated *Communication Log* and printed in hard copy to serve as a case record. The post-it note is then discarded after such entry. Similarly, DRAFT *Reports of Laboratory Examination*, which contain administrative and analytical documentation are also not retained by the Laboratory. A final *Report of Laboratory Examination*, formalized following completion of administrative and technical review, is retained by the Laboratory and the DRAFT report is discarded. Blurred images are discarded in lieu of in-focus digital images.

One auditor noted that examination documentation for DNA casework was not retained by the Laboratory but rather transcription of data into a LIMS worksheet occurred. Following a review of >30 DNA case files, the auditor did not cite any missing case notes/worksheets related to administrative or examination documentation; indeed, all exam documentation was retained by

SFPD 30091

USAO0003809
USAO0003809

the Laboratory and stored in their respective files as case records. All handwritten case notes for biological screening, LIMS-generated worksheets for DNA extraction, quantitation, amplification, STR run and profile genotyping summaries were present in these case files. All administrative documentation (*e.g.*, *Reports of Laboratory Examination, Communications Logs, Evidence Receipt and Disposition Logs, Lab Work Summaries, Assignment Summaries, Case Review Checklists*, etc.) were also present in all instances. These data were also available in electronic format in the MS Access DNA-LIMS.

The auditor felt that *any* handwritten notation must be captured in the case file. However, the auditors on the ASCLD-LAB inspection team did not state in their summary of findings that other documentation such as DRAFT reports or post-it notes used to capture communications must be retained by the Laboratory (these topics were discussed during the audit with several members of the inspection team).

A proposed clarification in the DNA Unit *Quality Control* and *Quality Assurance Manual* follows (see underlined text) follows for remediation of this finding:

> ### 11.1 The laboratory has and follows written procedures for taking and maintaining case notes to support the conclusions drawn in laboratory reports. See Quality Control Manual.
>
> *The laboratory maintains, in a case record, all documentation generated by examiners related to case analyses.*
>
> *A case file with a unique laboratory number, containing the Laboratory Request form, is established for each case when evidence is retrieved by the DNA section. Official case records (e.g. diagrams, photographs, handwritten or LIMS worksheets, DNA forms, final Reports of Laboratory Examination, etc.) of analytical work (e.g., examinations, tests, observations, etc.) are stored in hard copy in a case file and may also be in electronic format within DNA-LIMS. Case records are completed prior to final case review. Unofficial case records may be retained by the Laboratory.*

**1.4.2.16 (E)** **Are conclusions and opinions in reports supported by data available in the case record, and are the examination documents sufficiently detailed such that, in the absence of the examiner(s), another competent examiner or supervisor could evaluate what was done and interpret the data?**

The Controlled Substances Unit supervisor has added language to the SOP Sections 4.A.5.a and 4.A.5.c that address negative control data. The negative control data is being retained in hardcopy format.

The report and notes form has been clarified to include the date the evidence was opened. Please find the relevant sections of the SOP and the latest version of the Report attached.

**1.4.2.22 (E)** **Does the laboratory have, use and document a system of technical review of the reports to ensure that the conclusions of its examiners are reasonable and within the constraints of scientific knowledge?**

SFPD 30092

USAO0003810
USAO0003810

The Controlled Substances Unit has moved to 100% technical reviews with the signature on the Report form indicating a complete Administrative and Technical Review. Please find attached section 4.E which conforms to the practices already in place, clarifying that our current practice constitutes a full review of casework.

**1.4.2.25 (E)** If the laboratory has an indication of a significant technical problem, is there a procedure in writing and in use whereby the laboratory initiates a review and takes any corrective action required?

In 2008, two balances in the Controlled Substances Unit were taken out of service because they would not operate (could not be used for weighing). These balances, both the same model, were purchased and installed in late 2007. Each exhibited an intermittent malfunction that was always the same: they would not operate. Until the failure of each balance, both performed accurately during monthly QC checks. Since the non-functioning of these balances failed to affect the accuracy of evidence weights, there was no "indication of a significant technical problem." The unit supervisor (since retired) failed to record the exact dates that the balances were removed from service and failed to notify the QA Manager of the removal to initiate repair or replacement. One of the balances was under warranty by Mettler and was replaced in December 2008 with a new balance of the same model. The other balance was simply set aside (not used) and is currently being checked by Mettler for stability as it still operates intermittently. The controlling laboratory standard for equipment used in the Controlled Substances Unit is the unit SOP (Section 4 Quality Assurance Program):

## I. Laboratory Equipment

*All equipment in the Controlled Substances laboratory must function properly and provide accurate and reliable results. All instruments are under service contracts and receive annual preventive maintenance (PM) servicing. All instruments in this unit are described in the Crime Lab equipment inventory. Each instrument has a logbook that is used to document the PM visits. Analysts will perform routine maintenance on all instruments and document this work in the logbook also.*

*Minor instrumental problems may be diagnosed and repaired by staff without further action. When an instrument fails to perform properly in spite of the routine maintenance or minor repair, it must be removed from service. The symptom will be described in the logbook and the service vendor notified. The instrument will not be put back into service until the problem is corrected and the instrument performs properly with blank and standard runs.*

This standard, while meant to apply to major instruments, implies that all instruments have a logbook where PM visits, minor repairs, etc. are logged. Since there are no logbooks for the balances, there was no mechanism to record when and why the balances were removed from service. This finding is best-suited as a violation of the laboratory *Quality Assurance Manual Section 3.8.14 Corrective Action Policy* which includes the following:

*<u>Audit Nonconformance</u>: Any findings of nonconformance as a result of internal or external laboratory audits (e.g., ASCLD/LAB or FBI Quality Assurance Standards, security audits, etc.) are reported to the Quality Assurance Manager or initiated by the*

*Quality Assurance Manager. These nonconformances may be corrected through revision of the affected Unit or Laboratory Manual(s) as well as operational modifications, as needed. Documentation of significant non-conformances and notification to unit personnel is the responsibility of the unit supervisor and QA Manager.*

The quarterly QC checks and internal audit for 2008 should have disclosed that no review of the problem was initiated and no corrective action taken. Determination of root cause for this problem was straightforward, as it was clearly the lack of a mechanism to record the instrument failure (especially where analytical results are not affected) and lack of communicating the problem to appropriate channels for corrective action. After reviewing the problem and root cause, the following corrective action plan was implemented:

1. The new Controlled Substances unit supervisor has created a *Workstation Inventory Log* for each of the workstations in this unit (attached). The purpose of the log is to keep a current inventory of the workstation components and to record any replacements or removals of equipment and/or reagents used at each station. The date and reason for the removal is recorded. When a new reagent or instrument is brought into a workstation, it will be recorded.
2. The Controlled Substances SOP and Lab-wide Internal Audit document have been updated to reflect the use and audit of the new log form.
3. The log will be implemented in February 2010 and Controlled Substances Unit staff will be trained on the purpose and use of the log.
4. During the quarterly laboratory Health & Safety inspection, the QA Manager will also review the quarterly QC checks to make sure there is adequate follow-up and documentation of repair and replacement. Documentation of this review will be added to the H&S Inspection form for convenience (see attached form).
5. The Controlled Substances SOP Section 4.I was changed to state that each <u>major</u> instrument has a logbook to record PM and other service. A major instrument is one that is generally used to confirm controlled substances, e.g. GC/MS and FTIR.

Please see attached supporting documentation.

**Regarding Criteria 1.4.3.4 (I), 3.1.2 (D) and 3.4.12 (D):**

The comments for these three non-essential criteria are noted and undisputed.

Please contact me if clarification is required for any of these responses.

Sincerely,

James Mudge, Crime Lab Manager

SFPD 30094

000129

USAO0003812
USAO0003812

1          (Document was tendered to the witness.)

2   BY MR. DEMEESTER

3   Q.   Ms. Woodworth, handing you a document.  I'm only

4   interested in the last -- the last paragraph on the first page.

5   I'll ask you to read that.

6          (Witness complied.)

7   A.   Yes.

8   Q.   And does reading that particular document refresh your

9   recollection as to the exact date of your referral -- I don't

10  mean referral, but providing information to Ms. Madden about

11  the Employee Assistance Program?

12  A.   Yes.

13  Q.   And what date was that?

14  A.   November 23rd, 2009.

15  Q.   Now, in terms of the workload that criminalists have in

16  the Narcotics Unit, on an annual basis from figures that Ms.

17  Smith has talked about in extrapolating, is it fair to say that

18  the caseload, the number of narcotics cases analyzed by your

19  unit on an annual basis is somewhere around the neighborhood of

20  13,000 to 15,000?

21  A.   Probably more on the order of 12,000.

22  Q.   12,000.  And referring to, you know, the period around

23  2009?

24  A.   Of course.

25  Q.   Okay.  Now, we heard also from your colleagues that -- and

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

000130

1  from yourself as well, I think, that initially when you started

2  and were colleagues with Ms. Madden, there were more analysts

3  working drug cases?

4  A.   Yes.   When I started, there was myself and four other drug

5  chemists.

6  Q.   By the time that we came to the fall of 2009, if I

7  calculate it correctly, you were devoting lots of your time to

8  other projects; forensic alcohol, administration, supervising,

9  paperwork.

10     Is it fair to say that in terms of the number of analysts

11  available, that it would be 2.5 or a little bit less?

12  A.   Absolutely, yes.

13  Q.   Maybe closer to two?

14  A.   Might be.   I probably did on the order of maybe a quarter

15  to a half of the cases that Tasha and Debbie completed.

16  Q.   You told us earlier today that you have testified in over

17  300 DUI cases, was it?

18  A.   DUI cases and controlled substances cases and other

19  evidence cases.

20  Q.   Concentrating on the DUI, that takes up a lot of your

21  time, does it not?

22  A.   Yes, it does.

23  Q.   Which physically takes you out of the Crime Lab building?

24  A.   Yes.

25  Q.   Because those cases are tried at the Hall of Justice?

Current Narcotics Testing Procedures v. 2017 Narcotics Procedures*

| | | |
|---|---|---|
| Number of cases completed 2007 | 13, 166 | Cases completed with 5 FTEs using fast, but outdated methods |
| Projected number of cases completed 2017** | 21,170 | Cases will be completed by 10 FTEs using industry standard methods*** |

*Current practices are by outdated and seldom used (industry-wide) wet chemistry techniques, which are not industry standard. Federal Daubert decision issued in 2006 strongly pushed the SFPD lab to updated methods and documentation Migration toward updated testing methods and not incurring backlogs is the impetus to increase the number of FTEs.

**Numbers are based on the large increase in Gang Task Force Officers and subsequent gun and drug arrests/submissions. Conservative estimates anticipate a roughly 5% increase per annum in drug case submissions.

***Instrumental analysis requires preparation time for samples, actual instrument time (varied) and data analysis.

011494
USAO0003465
USAO0003465

# San Francisco Police Department
## Criminalistics Laboratory 2008



Crime Laboratory Manager (1)

Administrative Assistant
Senior Clerk Typist (1)

Quality Assurance Manager (1)

**General Criminalistics:**
Firearms/Toolmarks
Criminalist III (1)

**Controlled Substances/ Chemical**
Criminalist III (1)

**Forensic Biology/DNA Technical Lead**
Criminalist III (2)

Firearms Examiner
Criminalist II (2)
Criminalist I (1)

Controlled Substances
Criminalist II (2.35)

DNA Casework
Criminalist II (6)
Criminalist I (2)

NIBIN
Police Officer (1)
Inspector (1)

Forensic Alcohol
Criminalist II (1.5)

DNA Grant Administration
CODIS Administration

Trace Evidence
GSR, Impressions
Criminalist II (1.15)

Forensic Document Examination
Criminalist II (1)

Number in parentheses = full time equivalent personnel

011407

# Memorandum

**San Francisco Police Department**

|  | Approved | Yes | No |
|---|---|---|---|
|  | _____ | ☐ | ☐ |
| TO: James Mudge, OIC Crime Lab | _____ | ☐ | ☐ |
| FROM: Lois Woodworth, Supervising Criminalist | _____ | ☐ | ☐ |

DATE: 15 December 2009

SUBJECT: Eligible List for 8260 General Criminalist

The current eligible list for the 8260 General Criminalist (list ID 055654) adopted on 8/13/2009 is exhausted. There were (3) vacancies at the time of testing, and only two have been filled as of this writing. Please find below, in table format, the justifications for exhausting the list. I recommend immediately beginning an announcement to replace this list.



Not interested in performing controlled substances analysis
Offered, but failed Background check
Not interested in performing controlled substances analysis
Not interested in performing controlled substances analysis
Rejected offer of employment
Not interested in performing controlled substances analysis
8259 promoted to 8260 from an existing vacancy
Unqualified to perform controlled substances analysis
Removed name from list
Accepted 8260 position, currently in background

Due to the critical nature of staffing in the controlled substances unit I respectfully request that a mechanism be put into place to seek immediate filling of the position.

Please find the referenced list attached to this memorandum.

Thank you for your attention to this matter.

011495

from your records.

Diese Nachricht enthält vertrauliche Informationen. Sollten Sie nicht der beabsichtigte Empfänger dieser E-mail sein, senden Sie bitte diese an den Absender zurück und löschen Sie die E-mail aus Ihrem System.

---

This communication contains confidential information. If you are not the intended recipient please return this email to the sender and delete it from your records.

Diese Nachricht enthält vertrauliche Informationen. Sollten Sie nicht der beabsichtigte Empfänger dieser E-mail sein, senden Sie bitte diese an den Absender zurück und löschen Sie die E-mail aus Ihrem System.

----- Forwarded by Sal Ahmed/SFPD/SFGOV on 04/08/2010 02:19 PM -----

| | |
|---|---|
| **Lois Woodworth/SFPD/SFGOV** | ToJames Mudge/SFPD/SFGOV |
| | cc |
| 08/05/2009 01:34 PM | SubjectMarijuana grow cases |

The marijuana drying container is once more filled beyond capacity.

There are no more dry cases that can be removed. It takes about 6 weeks for bags of wet marijuana to dry completely (depending on the ambient conditions, how tightly the marijuana is packed, and the dampness of the marijuana in a case).

These are the case numbers of what is currently in the container (all of these cases are from July).

| | | |
|---|---|---|
| 090758833 | 259288 | 24 bags |
| 090762953 | 259301 | 18 bags |
| 090770439 | 259346 | 4 bags |
| 090766137 | 259319 | 6 bags |
| 090688218 | 258849 | 4 bags |
| 090675760 | 258779 | 9 bags |
| 090654463 | 258648 | 4 bags |
| 090725155 | 259069 | 9 bags |
| 090682458 | 258836 | 8 bags |
| 090626092 | 258484 | 6 bags |
| 090777877 | 259392 | 6 bags |

These cases are from August and have been transferred to another area of the warehouse at 606.

| | | |
|---|---|---|
| 090789571 | 259452 | 6 bags |
| 090791736 | 259471 | 8 bags |

In addition to the space concerns for short term drying storage, this is a **manpower issue** . My estimate is that each bag of marijuana plant material requires 3 hours of time. Inspector Doss (PCD, currently assigned to assist crime lab staff with the marijuana drying container) will need

SFPD 30345

USAO0004064
USAO0004064

to spend on average 2 hours of time re-packaging the plants and tracking inventory. Additionally, at least an hour of Criminalist time is required for the weighing and testing of the exhibits. For the 99 bags currently in the middle of the drying process, this represents nearly 100 hours of Criminalist time on a unit that is already sorely understaffed. It also represents 200 hours of time for an officer to re-package and track inventory on these cases.

This also does not represent the marijuana case backlog we have for analysis of already dried cases. These cases are currently being temporarily stored within the narcotics unit, and constitutes nearly 30 boxes of dried marijuana which require a report be issued by the lab. Without additional staffing , we are not capable of processing this number of marijuana grow cases. These cases must be realistically prioritized along with the nearly 14,000 other cases that the unit will be responsible for analyzing and issuing timely reports. I will further point out that no other county in the Bay Area maintains this quantity of marijuana for long periods of time, and that a quicker approval for destruction of excess plant material would save both PCD and the Crime Lab time and space.

Lois Woodworth
Criminalist, SFPD Crime Laboratory

phone
pager 
fax

----- Forwarded by Sal Ahmed/SFPD/SFGOV on 04/08/2010 02:19 PM -----

**Lois Woodworth/SFPD/SFGOV**

08/05/2009 03:28 PM

Totasha.smith@sfgov.org
cc
SubjectCAC membership

Here is the web address for the CAC. The link for membership is on the top bar.

http://www.cacnews.org/

Good luck,

-l-

Lois Woodworth
Criminalist, SFPD Crime Laboratory

phone
pager 
fax

----- Forwarded by Sal Ahmed/SFPD/SFGOV on 04/08/2010 02:19 PM -----

**Lois Woodworth/SFPD/SFGOV**

ToNathan Quigley/DA/SFGOV
cc

SFPD 30346

http://lnm01a04.sfgov.org/mail/mradanov.nsf/($Inbox)/D736013E50A553AC882576FF007A...   4/9/10

USAO0004065
USAO0004065

Lois,

Thank you............... I was just passing on the info from Mr. Ross. I will forward your e-mail with comments and see what there concerns are. Apparently, a bunch of subpoenas were returned.

Let me know what I can do to assist you.

John

-----Lois Woodworth/SFPD/SFGOV wrote: -----

To: John Goldberg/SFPD/SFGOV@SFGOV
From: Lois Woodworth/SFPD/SFGOV
Date: 11/23/2009 02:48PM
Subject: Fw: Narco Testing

Captain Goldberg,

In case you weren't sure, I am the Controlled Substances Unit Supervisor as of 7/27/09.

I am not 100% sure to what Mr. Ross is referring. David Merin (ADA in charge of preliminary hearings) and I have worked out an agreement for preliminary hearing purposes. If there are complaints about the process, I have not heard from Mr. Merin.

As to Jury Trial cases, I work with the individual ADA assigned to the case. Most of the time, the DA's office has plenty of notice, and I have only had one problem with this arrangement. I do need a little bit of time to get the property back to the Crime Lab and to have it tested. I am hesitant to retest everything

SFPD 30327

USAO0004046
USAO0004046

that comes by subpoena because these matters rarely proceed on the date of the subpoena, and I **do not** want to have everyone in the lab testing every case that comes our way so that we can guarantee that a testing Criminalist will be available at the drop of a hat.

I don't feel that a couple of days notice is too onerous for the District Attorney's office to provide. If there are problems with this approach (and again, I have only had one problem in the last 4 months) I am more than willing to talk to the DA's office.

Our testing process is standard, and to insure that high quality, correct work is produced, we have a Technical Review process in place for the original analysis. This means that on a given day, in order for results to go out for rebooking purposes, we do have to have at least two qualified analysts in the building.
For retesting purposes, the Criminalist must only come to the same analytical conclusion as the original analyst. Therefore, retesting may be performed by only one Criminalist.

All that being said, we are indeed extremely short-staffed (down to 3 from 6) given the very rapid response time required for an analysis. I feel that my staff has performed their duties admirably given the harsh demands upon their time and the amounts of overtime they are being asked to work.

If you have any further questions, I am at your disposal.

Thank you,

Lois

SFPD 30328

USAO0004047
USAO0004047



| | | |
|---|---|---|
| Kevin<br>Cashman/SFPD/SFGOV<br>11/24/2009 03:12 PM | To | Russ Giuntini/DA/SFGOV@SFGOV |
| | cc | |
| | bcc | |
| | Subject | Re: 3 narc analysts at the lab |

Russ,

Thanks for the update. Have a Happy Thanksgiving. Will see you next week.

Kevin
3 narc analysts at the lab

### 3 narc analysts at the lab

Russ Giuntini  to: Kevin Cashman                                    11/24/09 10:01

Kev,

As I am sure you are aware, there are now only 3 narc analysts at the lab which could impede our ability to try cases as we can't 115 a trial. If there is anything we can do to help ameliorate the problem let me know.   We have Sharon prioritizing the requests so no needless lab time is expended. Have a great Thxgiving.  I'm leaving for the Trinity home tonight and will be returning Monday. Pfeifer and Paul Henderson are around tomorrow and Jeff will be back on Monday.



Russell J. Giuntini
Chief Assistant District Attorney
850 Bryant St., Room 322
San Francisco, CA 94103
Phone:
Facsimile:



John Goldberg/SFPD/SFGOV
12/14/2009 09:40 AM

To

Kenneth Bukowski/SFPD/SFGOV@SFGOV

cc

Alice Villagomez/SFPD/SFGOV@SFGOV,
James Mudge/SFPD/SFGOV@SFGOV

Subject

Narco Criminalists

Gentlepersons,

Things are going from bad to worse.  We are down to 3 criminalists in the Narco unit and one is having medical issues............. the two potential hires were lost in the background/hiring process.

As of this writing, there is a critical need to bring back Francis Woo to bridge the gap until we can get some new criminalists aboard.  With that in mind, Jim Mudge is preparing a memo that I will walk through to the A/C requesting that we bring back Francis as quickly as possible.

Ken, we spoke briefly and I know you are concerned about using forfeiture funds to bring back Francis, so it would have to come from civilian salary.  This will be a policy decision, but each analysis must be tested by two criminalist – one to do the initial testing and one to do the confirmation.  There are not a whole lot of options.

John

SFPD 30286

USAO0004006
USAO0004006

# DECLARATION OF JAMES L. NORRIS

I, JAMES L. NORRIS, say that:

1)     In 1995, I became the Director of the San Francisco Police Department Forensic Services Division. I served in that position until my retirement in 2004, after a career of 34 years in criminalistics and forensic sciences: criminalist at the San Mateo County Sheriff's Office Crime Lab 1970-1974; criminalist at the Santa Clara County District Attorney's Office Crime Lab 1974-1987; senior criminalist at the San Francisco Police Department Crime Lab 1987-1995 with the responsibility of managing the Crime Lab.

As Director of the San Francisco Police Department Forensic Services Division I was responsible for the overall management of the Forensic Services Division that included the Criminalistics Laboratory (Crime Lab), Crime Scene Investigation Unit, Photography Section, Polygraph Unit, Computer Analysis Unit, Forensic Art Unit, and the Identification Bureau.

2)     I am familiar with the 2009 Crime Lab incidents involving Deborah Jean Madden, the defendant in *United States v. Deborah Jean Madden*, United States District Court No. CR-11-0879-SI, on whose behalf I submit this declaration. I have consulted with the defense in a number of criminal cases regarding the 2009-2010 events at the Crime Lab (not limited to Ms. Madden's conduct) and testified before the San Francisco Board of Supervisors in 2010 when the Board conducted hearings about the San Francisco Crime Lab.

3)     In 1994, it came to my attention that one of the criminalists in the Narcotics Analysis Unit of the Crime Lab was not conducting the required confirmatory testing when analyzing narcotics evidence, yet reporting out confirmatory results ("dry labbing"). I conducted an investigation that confirmed the suspicions of wrongdoing. Thousands of cases were impacted, as the test results in those cases were potentially erroneous, however, there were no mass dismissals of criminal cases. The criminalist was terminated, her cases were isolated, and a number of those cases submitted for retesting. The Narcotics Analysis Unit of the Crime Lab was not closed.

4)     I believe that the 1994 dry-labbing incident was worse than the allegations against Ms. Madden because Ms. Madden has never been accused of falsifying any analytical results.

5)     Had the San Francisco Police Department maintained a resource policy of having five criminalists assigned to the Narcotics Analysis Unit, then the Madden issue could have been managed fairly easily. During my tenure at the Crime Lab, five criminalists were assigned to narcotics cases (not always the same criminalists as the lab maintained a rotation policy with other Crime Lab units – most criminalists in other units are qualified to conduct narcotics analyses). The number of narcotics cases worked by the San Francisco Crime Lab was approximately the same during my tenure as it was in 2009, as reported by Ms. Lois Woodworth at the trial in this case, when Ms. Woodworth put the annual case load at about 12,000 cases (I have reviewed the trial transcript excerpt on that issue).

2

Upon Ms. Madden's retirement, the Narcotics Analysis Unit was down to one analyst position, with additional help from Ms. Woodworth when needed. But Ms. Woodworth also served as the administrative supervisor and as the criminalist responsible for forensic alcohol cases. Having tended to both of these functions myself while at the Crime Lab, I say with great confidence that the forensic alcohol work is time consuming and requires the criminalist to attend to many court proceedings, all of which are at the Hall of Justice, which is at least fifteen minutes away from the Crime Lab at the former naval shipyard. In addition, the supervisory position takes the criminalist away from the work bench. It is fair to say that after Ms. Madden left, there was *de facto* only one analyst left in the Narcotics Analysis Unit, where five positions were the norm. One retired worker, Mr. Francis Woo, was then brought out of retirement to assist with the narcotics cases.

6)      It is my opinion that the Narcotics Analysis Unit was closed in 2010 for two reasons: (1) the critical *Inspection Report* issued by the American Association of Crime Laboratory Directors (ASCLD) of the San Francisco Criminalistics Laboratory of the San Francisco Police Department, based on ASCLD's inspection of the lab on November 17 through 20, 2009; and (2) the improper resource policy of the San Francisco Police Department that permitted the Narcotics Analysis Unit to drop down from five criminalists analyzing narcotics to just one (supplemented at the end by having a retiree help out).

The *Inspection Report* bluntly stated that the Crime Lab's budget was not adequate to meet the written objectives of the lab. (*Inspection Report*, § 1.1.2.2(I).) Clearly

written and well-understood documentation or procedure did not exist for personnel evaluations and objectives. (*Inspection Report*, § 1.1.2.10(D).) The Crime Lab did not "have and use a documented training program in each discipline and subdiscipline for employees who are new, untrained or in need of remedial training." (*Inspection Report*, § 1.3.3.1(E).) The Crime Lab did not "have a written or secure electronic chain of custody record with all necessary data which provides for complete tracking of all evidence." (*Inspection Report*, § 1.4.1.1(E).) The Crime Lab did not "create and maintain a uniquely identified case record for all examination and administrative documentation generated and/or received by the laboratory for each case involving the analysis of evidence." (*Inspection Report*, § 1.4.2.14(E).) The Crime Lab scored a negative on whether "conclusions and opinions in reports" are "supported by data available in the case record," and whether "the examination documents" are "sufficiently detailed such that, in the absence of the examiner(s), another competent examiner or supervisor could evaluate what was done and interpret the data." (*Inspection Report*, § 1.4.2.16(E).) The Crime Lab did not "have, use and document a system of technical review of the reports to ensure that the conclusions of its examiners are reasonable and within the constraints of scientific knowledge." (*Inspection Report*, § 1.4.2.22(E).) The Crime Lab did not have a written procedure for when the lab had an indication of a significant technical problem, in order to initiate a review and take any corrective action required. (*Inspection Report*, § 1.4.2.25(E).) The Crime Lab did not "conduct proficiency testing using re-examination or blind techniques." (*Inspection Report*, § 1.4.3.4(I).) The Crime Lab did not have "sufficient space provided for storage of

4

supplies, equipment and tools." (*Inspection Report*, § 3.1.2(D).) The Crime Lab did not demonstrate "general cleanliness and apparent good-housekeeping." (*Inspection Report*, § 3.4.12(D).)

In its Summary section, the *Inspection Report* noted the following concerns:

> The laboratory does not have sufficient personnel resources to meet its present objectives. The laboratory must analyze most controlled substance cases within a forty-eight hour time period to prevent the dismissal of criminal charges. Mandatory overtime is continually used to meet this requirement. Even with the required overtime the laboratory does not always meet this requirement. (*Inspection Report*, Summary, § 1.1.2.2(I).)

> In the Controlled Substances discipline, chain of custody records are maintained electronically. Evidence transfers which did not occur sometimes show up in the record and transfers which did occur are sometimes omitted from the record.
> In the Controlled Substances discipline, the terminal in which analysts enter electronic chain of custody information is not secured from unauthorized access. The laboratory does not have a written procedure for securing the terminal after an analyst had made an entry and steps away from the terminal. (*Inspection Report*, Summary, § 1.4.1.1(E).)

> In the Controlled Substances discipline, the Controlled Substances SOP 4.A.5 states that the negative control will be free of controlled substances contaminants. Mass spectral data was not available for review in the case record for extraneous peaks found in the reagent blank/negative control. The laboratory does not have a policy to retain this data.
> In the Controlled Substances discipline, the date the analyst begins the examination is not recorded in the examination documentation. (*Inspection Report*, Summary, § 1.4.2.16(E).)

> Balance verifications in the controlled substances discipline are performed on a monthly basis. In two instances balances have been taken out of service for errors without initiating a review and following the laboratory corrective action procedure. (*Inspection Report*, Summary, § 1.4.2.25(E).)

> Cleaning supplies, water carboy bottles, and metal storage cabinets are located in the corridors of the laboratory. (*Inspection Report*, Summary, §3.1.2(D).)

Common areas in the building which are used by the laboratory are in a poor state of housekeeping and repair.
(*Inspection Report*, Summary, § 3.4.12(D).)

7)     The San Francisco Crime Lab was given two extensions in order to bring the lab up to accreditation standards before it was able to meet those standards again later in 2010. Ms. Madden's conduct was not at issue in the *Inspection Report*, hence she cannot be faulted for management deficiencies pointed out in the Report. Likewise, Ms. Madden was not responsible for the budget and staffing of the Crime Lab. Ms. Madden is not accountable for the shortage of narcotics analysts that existed upon her retirement.

8)     I am of the opinion that the closing of the Narcotics Analysis Unit was a gross overreaction and unilateral decision that was easily avoidable through proper management and provision of resources. Mass dismissal of criminal cases was not undertaken when a worse problem surfaced in 1994 that affected far more cases.

9)     The time problem noted by the *Inspection Report*, in terms of the difficulty of completing narcotics analyses within 48 hours of arrest in order to stave off dismissal of the criminal charges had existed for a long time, including during my tenure. I recommended during my directorship that field presumptive testing be conducted by police officers shortly after the seizure of suspected narcotics. The recommendation was never implemented during my tenure or thereafter, until 2010 when staff shortages forced the Police Department to pursue field presumptive testing. The technique is efficient and saves resources, allowing more time for a complete analysis of seized narcotics to be finished prior to the conduct of preliminary hearings.

6

1  I declare under penalty of perjury that the foregoing is true and correct. Executed

2  at Redwood City, California on July 11, 2013.

3

4



5  JAMES L. NORRIS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# PROPOSED FIELD PRESUMPTIVE TESTING WORK FLOW
## SAN FRANCISCO POLICE DEPARTMENT CRIME LAB
### 3.6.2007

```
┌─────────────┐
│ ARREST MADE │
└──────┬──────┘
       │
       ▼
┌──────────────┐
│ PRESUMPTIVE  │
│ TEST BY      │
│ OFFICER      │
└──────┬───────┘
       │
       ▼
┌──────────────┐     ┌──────────────┐
│ REPORT       │────▶│ NO CHARGES   │
│ FINDINGS     │     │ FILED, CASE  │
│ TO REBOOKING │     │ DISPO'D?     │
└──────┬───────┘     └──────────────┘
       │
       ▼
┌──────────────┐
│ CHARGES      │
│ FILED,       │
│ EVIDENCE     │
│ TO LAB       │
└──────┬───────┘
       │
       ▼
┌──────────────┐
│ LAB          │
│ EXAMINATION  │
│ COMPLETED    │
│ AND REPORTED │
│ WITHIN 5     │
│ BUSINESS     │
│ DAYS         │
└──────┬───────┘
       │
       ▼
┌──────────────────┐
│ TECHNICALLY      │
│ REVIEWED, WELL   │
│ DOCUMENTED       │
│ REPORT AVAILABLE │
│ PRIOR TO         │
│ PRELIMINARY      │
│ HEARING          │
└──────────────────┘
```

011515

USAO0003486
USAO0003486